# No. 24-1510

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————

ADIDAS AMERICA, INC., ADIDAS AG,

*Plaintiffs-Appellants,*

*v.*

THOM BROWNE, INC.,

*Defendant-Appellee.*

———————————————

Appeal from the United States District Court
for the Southern District of New York

———————————————

APPELLANTS' PRINCIPAL BRIEF

———————————————

R. CHARLES HENN JR.
K. BRADFORD SEARS
KILPATRICK TOWNSEND
  & STOCKTON LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309
(404) 815-6500
chenn@ktslaw.com
bsears@ktslaw.com

ADAM H. CHARNES
KILPATRICK TOWNSEND
  & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

*Counsel for Appellants adidas America, Inc. and adidas AG*

# CORPORATE DISCLOSURE STATEMENT

In accordance with Fed. R. App. P. 26.1, Appellants adidas America, Inc. and adidas AG hereby disclose the following through their undersigned counsel:

adidas America, Inc. is wholly owned by adidas North America, Inc., which is a non-public Delaware corporation.

adidas North America, Inc. is wholly owned by adidas AG.

adidas AG has no parent corporation, and no publicly held corporation owns 10% or more of the stock of adidas AG.

DATED: September 13, 2024

*/s/ Adam H. Charnes*
ADAM H. CHARNES
KILPATRICK TOWNSEND
  & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES ........................................................... iv

JURISDICTIONAL STATEMENT .................................................... 1

INTRODUCTION .................................................................... 2

STATEMENT OF THE ISSUES...................................................... 7

STATEMENT OF THE CASE ........................................................ 8

I.    adidas sued Thom Browne to protect its famous Three-Stripe
      Mark and minimize consumer confusion. ..................................... 10

II.   Thom Browne prevailed at trial without having produced
      critical Emails discussing adidas and the likelihood of
      consumer confusion. ....................................................... 11

III.  The District Court denied adidas's Rule 60(b) motion for
      relief from judgment despite acknowledging the Emails
      helped adidas and "should have been disclosed." .......................... 16

SUMMARY OF THE ARGUMENT ..................................................... 18

ARGUMENT ........................................................................ 21

I.    Thom Browne's discovery misconduct requires a new trial
      under Federal Rule of Civil Procedure 60(b)(3). ........................... 21

      A.   Numerous 60(b)(3) cases correctly hold that parties
           commit "misconduct" by failing to produce discoverable
           material. ............................................................ 23

B. The District Court's contrary holding rests on multiple errors.................................................................29

C. Thom Browne committed "misconduct" even under the District Court's erroneous framework. ...................34

D. The District Court wrongly excused Thom Browne's misconduct..................................................................38

E. adidas satisfies Rule 60(b)(3)'s remaining criteria...............41

II. adidas's newly discovered evidence requires a new trial under Federal Rule of Civil Procedure 60(b)(2). ...........................43

A. The Emails are quintessential 60(b)(2) evidence. ...............45

B. The District Court trivialized Thom Browne's damning admissions. ........................................................51

CONCLUSION ................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM – SPECIAL APPENDIX

Dkt. 255 Order [Denying Motion for New Trial] 05/03/2024)..................................................... Add.1

Dkt. 260 Opinion & Order (07/29/2024) .............................. Add.2-39

Fed. R. Civ. P. 60.................................................... Add.40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Addington v. Comm'r*,
205 F.3d 54 (2d Cir. 2000)...............................................................35

*adidas Am., Inc. v. Skechers USA, Inc.*,
890 F.3d 747 (9th Cir. 2018) .........................................................10

*adidas Am., Inc. v. Thom Browne, Inc.*,
No. 21-cv-5615 (JSR), 2024 WL 3565643 (S.D.N.Y. July
29, 2024)...................................................................................9

*adidas Am., Inc. v. Thom Browne, Inc.*,
No. 23-166, 2024 WL 1953594 (2d Cir. May 3, 2024) ....................12

*Anderson v. Cryovac, Inc.*,
862 F.2d 910 (1st Cir. 1988).........................................24, 26, 27, 28

*Anschutz Corp. v. Merrill Lynch & Co.*,
690 F.3d 98 (2d Cir. 2012)...............................................................28

*Car-Freshner Corp. v. Am. Covers, LLC*,
980 F.3d 314 (2d Cir. 2020).......................................................2, 45

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
286 F. Supp. 2d 309 (S.D.N.Y. 2003) .......................................23, 43

*Chevron Corp. v. Donziger*,
833 F.3d 74 (2d Cir. 2016).........................................................37, 39

*E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*,
90 F. Supp. 2d 277 (S.D.N.Y. 2000), *aff'd*,
4 F. App'x 81 (2d Cir. 2001) .........................................................48

*Garcia v. Garland*,
64 F.4th 62 (2d Cir. 2023) .............................................................26

*Gross v. Bare Escentuals Beauty, Inc.*,
    641 F. Supp. 2d 175 (S.D.N.Y. 2008) ..............................................53

*Hayward v. IBI Armored Servs., Inc.*,
    954 F.3d 573 (2d Cir. 2020)...........................................................23

*In re Sobolevsky*,
    430 F. App'x 9 (2d Cir. 2011) ...................................................35, 40

*In re Trib. Co. Fraudulent Conv. Litig.*,
    946 F.3d 66 (2d Cir. 2019)............................................................37

*Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*,
    609 F.3d 122 (2d Cir. 2010)......................................................22, 44

*Lonsdorf v. Seefeldt*,
    47 F.3d 893 (7th Cir. 1995) ..........................................................24

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006)......................................................26, 30

*Mirlis v. Greer*,
    952 F.3d 36 (2d Cir. 2020).........................................................27, 44

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir. 1987)..........................................................48

*Morgan v. Tincher*,
    90 F.4th 172 (4th Cir. 2024)......................22, 23, 24, 26, 30, 33, 43

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961).........................................45, 48, 53, 54

*Ratliff v. Davis Polk & Wardwell*,
    354 F.3d 165 (2d Cir. 2003)..................................................28, 32, 43

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
    818 F.3d 1320 (Fed. Cir. 2016) .....................................23, 24, 26, 33

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) ..................... 23, 24, 26, 27, 32, 33, 42

*Schlagenhauf v. Holder*,
379 U.S. 104 (1964) ........................................................ 28

*Schultz v. Butcher*,
24 F.3d 626 (4th Cir. 1994) ........................ 23, 24, 26, 27, 33, 34, 35

*SEC v. Rashid*,
96 F.4th 233 (2d Cir. 2024) ............................................. 23

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*,
374 F.3d 158 (2d Cir. 2004) .................................... 21, 24, 27, 31, 41

*Stridiron v. Stridiron*,
698 F.2d 204 (3d Cir. 1983) ............................................. 24

*Summers v. Howard University*,
374 F.3d 1188 (D.C. Cir. 2004) ....................................... 24

*Thomas v. City of New York*,
293 F.R.D. 498 (S.D.N.Y. 2013), *aff'd sub nom.*
*Thomas v. McAullife*, 691 F. App'x 671 (2d Cir. 2017) ................ 24

*Trump v. Vance*,
941 F.3d 631 (2d Cir. 2019) ............................................. 26

*United States ex rel. Eisenstein v. City of New York*,
540 F.3d 94 (2d Cir. 2008) ............................................. 32

*United States v. Batista*,
684 F.3d 333 (2d Cir. 2012) ............................................. 45

*United States v. One (1) Douglas A-26B Aircraft*,
662 F.2d 1372 (11th Cir. 1981) ....................................... 28

*United States v. Rivas*,
377 F.3d 195 (2d Cir. 2004) ............................................. 25

*United States v. Stillwell,*
    986 F.3d 196 (2d Cir. 2021)............................................................25

*West v. Bell Helicopter Textron, Inc.,*
    803 F.3d 56 (1st Cir. 2015)....................................23, 24, 28, 29, 42

**Statutes**

28 U.S.C. §
    1291 ........................................................................................2
    1331 ........................................................................................2
    1367 ........................................................................................2
    2107(a) ....................................................................................2

**Rules**

Fed. R. App. P.
    4(a)(1)(A) ..............................................................................2
    4(a)(4)(B)(ii) ..........................................................................2

Fed. R. Civ. P.
    26(b) .......................................................................................5
    26(b)(1) .............................................................................26, 30
    26(e)(1) ...................................................................................30
    37(b)-(f) ..................................................................................32
    59(b) ......................................................................................44
    60(b) .............................................................................8, 21, 22, 57
    60(b)(2) .............................................................................*passim*
    60(b)(3) .............................................................................*passim*
    60(c)(1) ...............................................................................2, 31

Model Code of Jud. Conduct Canon 2 r. 2.15(a) ......................................25

Model Rules of Prof. Conduct r. 8.4(a) ...............................................25

N.Y. Rules of Prof. Conduct r.
    5.3 cmt. [2] .......................................................................35, 39
    5.3 cmt. [2]-[3].........................................................................37

**Other Authorities**

12 Moore's Federal Practice – Civil (2024)........................................21, 29

Ballentine's Law Dictionary (3d ed. 1969) .............................................25

Black's Law Dictionary (12th ed. 2024)...........................................25, 29

Oxford English Dictionary (2024) ............................................................25

Restatement (Third) of Agency (2006)..............................................37, 39

# JURISDICTIONAL STATEMENT

This action involves federal claims for trademark infringement and dilution under the Lanham Act and state claims under analogous New York law. Plaintiffs adidas America, Inc., and adidas AG (collectively, "adidas") sued Defendant Thom Browne, Inc. ("Thom Browne") in the United States District Court for the Southern District of New York. App.41.[1] The District Court entered final judgment on a jury verdict for Thom Browne on January 13, 2023. App.94-95.

Following the District Court's entry of judgment, adidas moved for relief from judgment under Federal Rule of Civil Procedure 60(b) on October 19, 2023. App.143-48. The District Court denied adidas's motion in an Order dated May 3, 2024, App.313, after which adidas filed a notice of appeal on May 31, 2024, App.314-15. The District Court then entered a separate Opinion and Order on July 29, 2024, which explained the Court's reasons for the prior May 3 Order. App.316-53. adidas filed an amended notice of appeal on August 6, 2024, to address the Opinion and Order. App.354-56.

---

[1] All record citations correspond to materials included in the Appellants' Appendix ("App."). The appealed orders and text of Rule 60 also appear in the Special Appendix.

The District Court had subject-matter jurisdiction over adidas's federal claims under the general federal question statute. 28 U.S.C. § 1331. The District Court had subject-matter jurisdiction over adidas's transactionally related state-law claims under the supplemental jurisdiction statute. *Id.* § 1367. This Court has appellate jurisdiction over adidas's appeal from the District Court's denial of a motion for relief from final judgment under 28 U.S.C. § 1291. adidas's motion for relief from judgment on October 19, 2023, was timely filed within one year of the District Court's entry of final judgment on January 13, 2023. Fed. R. Civ. P. 60(c)(1). adidas's May 31 notice of appeal was timely filed within 30 days of the District Court's May 3 Order, and adidas's August 6 amended notice of appeal was timely filed within 30 days of the District Court's July 29 Opinion and Order. 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A), (4)(B)(ii).

## INTRODUCTION

Trademark cases rise and fall on the plaintiff's ability to show "likelihood of confusion." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 326 (2d Cir. 2020). In this case, adidas sued Thom Browne alleging a likelihood of confusion between adidas's famous "Three-Stripe

Mark" and Thom Browne's similar "Four-Bar" design. The parties presented competing arguments regarding likelihood of confusion to a jury, and the jury ruled for Thom Browne. But all the while—and unbeknownst to adidas or the jury—Thom Browne possessed four smoking gun documents that Thom Browne's attorneys failed to disclose until months after the trial concluded.

Specifically, a colossal and undisputed Thom Browne discovery failure denied adidas access to four damning emails (the "Emails") involving high-ranking Thom Browne executives—including Mr. Thom Browne himself—who admitted the similarity between the Three-Stripe Mark and Thom Browne's Four-Bar design, and readily acknowledged that consumer confusion was not just likely, but inevitable:

1.     On December 14, 2016, Senior Men's Account Manager Emily Maturo told a supplier: "**We try to avoid rows of 4 bar armband on the racks so as to not look like Adidas**." App.156 ("Email 1") (emphasis added).

2.     On November 26, 2018, Head of Menswear Thi Wan told Mr. Thom Browne (founder of the company and a key trial witness): "**As Adidas has such a big presence in the sporting world, it is**

*inevitable* **that our 4bar in white be read as adidas stripes**."
App.160 ("Email 2") (emphasis added); App.265.

3.      On December 24, 2018, Vice President of Marketing Tomaso
Galli told Mr. Browne: "**[FC Barcelona] are not comfortable with
any four bars, which in their view is too much in the spirit of
Adidas**." App.162 ("Email 3") (emphasis added).

4.      On August 5, 2019, Mr. Browne admitted in an email to his
Head of Menswear that his Vice President of Marketing had already
concluded "**we shouldn't use the four bar because of adidas**."
App.165 ("Email 4") (emphasis added).

The jury saw none of this crucial evidence, and adidas was
precluded from using the Emails in cross-examination of Mr. Browne.
Instead, the jury heard Mr. Browne profess his innocence and counsel
for Thom Browne insist in closing argument that no one at the company
"[e]ver talked about adidas." App.134 (Day 8 Tr. 1357:3-11).

When Thom Browne's nondisclosure finally came to light months
later (because the Emails were disclosed in a proceeding between the
same parties in the U.K.), adidas timely sought relief from judgment for
"misconduct by an opposing party" under Federal Rule of Civil

Procedure 60(b)(3) and "newly discovered evidence" under Federal Rule of Civil Procedure 60(b)(2). Despite concluding that the Emails "should have been disclosed during the course of discovery but, through no fault of Adidas, were not," App.327-28 & n.5, the District Court denied adidas relief based on three reversible errors.

*First*, the District Court misinterpreted Rule 60(b)(3)'s "misconduct" requirement to exclude discovery failures that are not "the product of negligence." Courts in this Circuit and across the country long have held that a failure to produce discoverable material qualifies as Rule 60(b)(3) misconduct no matter how compelling a party's excuse. These holdings align with the plain meaning of "misconduct," which includes any violation of an affirmative duty. Consistent with Federal Rule 26(b), this Court has recognized that parties have an affirmative duty to produce "all" requested documents that are relevant, non-privileged, and proportional to the needs of the case. Thom Browne fell short of this duty according to the District Court itself, which acknowledged the Emails "should have been disclosed" but "were not."

*Second*, the District Court downplayed clear indications of negligence that enable adidas to demonstrate "misconduct" even under

the District Court's erroneous 60(b)(3) framework. It is undisputed that no Thom Browne attorney ever reviewed the Emails during discovery, despite Thom Browne paralegals having marked each of the Emails as "needs further review." Four smoking guns thus remained tucked away in Thom Browne's files until a different team of Thom Browne lawyers finally did their job and produced the Emails to adidas in a foreign proceeding months after the U.S. trial. Thom Browne's failure to review documents explicitly flagged "needs further review" cannot possibly constitute reasonable care. While the District Court chalked up the production failure to a miscommunication between Thom Browne's counsel and Thom Browne's external discovery vendor, that reasoning fails to account for the strict supervisory duties lawyers assume when working with nonlawyers—whether their own paralegals or outside vendors. Thom Browne and its counsel cannot avoid responsibility for blatant discovery mismanagement by pointing fingers at nonlawyers under their supervision.

*Third*, with regard to Rule 60(b)(2), the District Court provided a clearly erroneous assessment of the evidence in determining that adidas could not show the Emails "probably would have changed the outcome."

- 6 -

Few juries would fail to find a likelihood of confusion when the plaintiff and high-level employees of the defendant—including its founder and main trial witness—agree that confusion is "inevitable" and that the defendant should not use the infringing design "because of" the plaintiff. Additionally, the District Court opined that the principal reason the jury ruled against adidas was an argument by Thom Browne that adidas wanted to "own all stripes." The Emails flatly reject that narrative by making clear that adidas reasonably pursued claims against the Four-Bar design that Thom Browne itself recognized would "look like Adidas" and "be read as adidas stripes."

This Court should reverse the District Court's 60(b) denial and permit adidas to litigate its claims with the benefit of the pivotal Emails Thom Browne failed to produce before trial.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in limiting discovery "misconduct" under Rule 60(b)(3) to conduct evincing negligence, where Courts of Appeals across the country and district courts in this Circuit have approved 60(b)(3) relief for discovery violations without requiring

negligence, and where the plain meaning of "misconduct" includes any violation of applicable rules and affirmative duties.

2. Whether the District Court erred in holding Thom Browne's failure to produce the Emails was non-negligent, where the District Court recognized the Emails were in Thom Browne's possession and "should have been disclosed," and where Thom Browne's attorneys failed even to review the Emails despite Thom Browne's paralegals having marked them as "needs further review."

3. Whether the District Court erred in holding the Emails were unlikely to change the outcome at trial, where the Emails contain admissions from multiple high-level Thom Browne employees that the Four-Bar design is likely to be confused with adidas's Three-Stripe Mark, and where the Emails directly refute the key themes and arguments the District Court found to have swayed the jury.

## STATEMENT OF THE CASE

This is a trademark case about adidas's famous Three-Stripe Mark and adidas's entitlement to relief under Federal Rule of Civil Procedure 60(b). adidas has long defended its Mark and became concerned when Thom Browne began marketing and selling activewear

featuring parallel stripes that bore a confusingly similar resemblance to it. Unable to reach a resolution, adidas sued Thom Browne for trademark infringement and related claims under the Lanham Act and state law. The case proceeded to trial in the Southern District of New York under the direction of the Honorable Jed S. Rakoff, and the jury returned a verdict for Thom Browne.

The jury, however, did not have all of the facts, because Thom Browne had withheld from production four emails containing damning admissions of its most senior executives, including Mr. Thom Browne himself. Months after the verdict, when adidas finally learned that these four emails had been withheld, adidas moved for relief from judgment under Rule 60(b)(2) and 60(b)(3). Judge Rakoff denied that motion in a "bottom-line" Order dated May 3, 2024, followed by an Opinion and Order dated July 29, 2024, which explained the District Court's reasoning. The Opinion and Order is not published but is available on Westlaw. *See adidas Am., Inc. v. Thom Browne, Inc.*, No. 21-cv-5615 (JSR), 2024 WL 3565643 (S.D.N.Y. July 29, 2024).

## I.     adidas sued Thom Browne to protect its famous Three-Stripe Mark and minimize consumer confusion.

adidas's Three-Stripe Mark is "one of the most famous [trade]marks in the world." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 764 (9th Cir. 2018) (Clifton, J., concurring). It is also "one of adidas's most valuable" and enduring assets. App.69. adidas thus objected when fashion designer Thom Browne began using a Four-Bar design featuring four parallel white stripes on athletic-styled activewear and footwear within adidas's core product range. App.72-74. But adidas's objection did not deter Thom Browne. In fact, Thom Browne doubled down by introducing a new "compression running category" of clothing branded as "proper athletic wear" using the Four-Bar design. App.358-59 ¶¶ 139, 144-45. Compounding matters, Thom Browne routinely promoted its four-stripe compression apparel using models that simultaneously wore adidas shoes bearing the Three-Stripe Mark. App.362-63 ¶¶ 62-63.

Forced to resort to litigation, adidas sued Thom Browne "for trademark infringement, dilution, unfair competition, and unfair business practices" under the Lanham Act and analogous state laws. App.44 ¶ 6. adidas alleged that Thom Browne had used "confusingly

similar imitations of adidas's Three-Stripe Mark" in ways that were "likely to deceive, confuse, and mislead" consumers. App.57-59 ¶¶ 39, 44-45. adidas sought monetary damages, disgorgement of profits, and a permanent injunction barring Thom Browne from "distributing, marketing or selling apparel and footwear using or bearing confusingly similar imitations of the adidas Three-Stripe Mark." App.44-45 ¶ 6.

## II. Thom Browne prevailed at trial without having produced critical Emails discussing adidas and the likelihood of consumer confusion.

The parties proceeded to a jury trial focusing on the likelihood of confusion between adidas's Three-Stripe Mark and Thom Browne's Four-Bar design. The District Court told the jury the operative question was whether adidas could "prove[] that a likelihood of confusion exists," which depended on factors like the "strength of adidas' Three-Stripe Mark," the degree of "similarity between the parties' designs," and whether "Thom Browne acted in bad faith" by "purposely turn[ing] a blind eye to the high likelihood that consumers would be confused." App.138-40 (Day 8 Tr. 1411:4-21, 1412:21-1413:11).

Thom Browne's central defense, highlighted in opening statements and reiterated during closing arguments, was that confusion

was not likely. Thom Browne's counsel and witnesses emphasized that the parties' marks "are very different," "convey different things," and "visually" give "a completely different effect." App.100 (Day 1 Tr. 61:17-25); App.123 (Day 5 Tr. 519:15-24). Counsel further insisted that "nothing . . . Thom Browne has done in this case has anything to do with adidas." App.99 (Day 1 Tr. 48:20-22). In fact, counsel told the jury that Thom Browne employees "never talked about" or "considered adidas." App.134 (Day 8 Tr. 1357:7-10). The jury apparently accepted these arguments and ruled for Thom Browne. App.94-95.[2]

Several months later, in a U.K. proceeding between adidas and Thom Browne, Thom Browne's U.K. counsel produced four Emails that had never been produced by Thom Browne during the U.S. proceeding. App.149-50, 152 ¶¶ 2, 14. These Emails revealed conversations between Mr. Browne and other Thom Browne executives admitting the striking similarity of and the "inevitable" confusion between Thom Browne's Four-Bar design and the adidas Three-Stripe Mark.

---

[2] This Court affirmed the District Court's entry of judgment on the verdict in an appeal about a jury instruction and expert testimony that does not impact the issues adidas raises here. *adidas Am., Inc. v. Thom Browne, Inc.*, No. 23-166, 2024 WL 1953594 (2d Cir. May 3, 2024).

Email 1 came from Senior Men's Account Manager Emily Maturo. Contrary to Thom Browne's trial arguments that the parties' marks were "very different" and give "a completely different effect," Ms. Maturo told a supplier that "[w]e try to avoid rows of 4 bar armband on the racks so as to not look like Adidas." App.156, 158.

Email 2 came from Thom Browne's Head of Menswear Thi Wan to the company's founder, Mr. Thom Browne. Contrary to Thom Browne's trial arguments that confusion was unlikely, Mr. Wan admitted "it is inevitable that our 4bar in white be read as adidas stripes" because "Adidas has such a big presence in the sporting world." App.160, 265.

Email 3 came from Vice President of Marketing Tomaso Galli to Mr. Browne. Contrary to Thom Browne's trial arguments that the parties' marks "convey different things," Mr. Galli informed Mr. Browne that Thom Browne collaborator FC Barcelona was "not comfortable with any four bars, which in their view is too much in the spirit of Adidas." App.162, 321.

Email 4 involved a second exchange between Mr. Wan and Mr. Browne. Contrary to Thom Browne's trial arguments that the company "never talked about" or "considered adidas," Mr. Wan expressed concern

that Thom Browne's "4bar" might be "too loud and 'adidas' in the football context." App.165. Mr. Browne agreed, noting that the Vice President of Marketing had already concluded "we shouldn't use the four bar because of adidas." App.165, 321.

Thom Browne's failure to produce the Emails during the U.S. proceeding was inexcusable. On the very first day of discovery, adidas served requests for production covering, *inter alia*:

> Thom Browne's Communications, including Thom Browne's internal Communications, referring to adidas's Three-Stripe Mark or adidas's use of stripes on apparel or footwear;
>
> Documents concerning Thom Browne's decision to begin offering for sale Activewear bearing a Stripe Design;
>
> Thom Browne's internal Communications regarding third parties' use of Stripe Designs;
>
> Documents concerning consumers' awareness or understanding of the marks, including trade dress, in connection with which Thom Browne has offered for sale the Accused Products;
>
> Documents concerning any instance of which Thom Browne is aware in which any consumer, in connection with any Stripe Design[,] . . . expressed or displayed confusion or mistake—including through making an inquiry—as to the affiliation, connection, or association of Thom Browne and adidas;
>
> Documents sufficient to show the steps Thom Browne has taken to reduce or eliminate any actual or likely consumer

confusion or mistake as to the source or origin or sponsor or approval of Thom Browne's goods vis-à-vis adidas; [and]

Documents concerning Thom Browne's trademark clearance efforts in connection with any Stripe Design.

App.177, 181-82, 184-85 (RFPs 26, 63, 71, 84, 87, 94, 95).

Through negotiations regarding the proper scope of discovery, Thom Browne agreed to comply fully with each of these requests and promised it would produce responsive documents "from 2005-2021." App.207-08, 236-37, 242-43, 253, 255, 260-61. Thom Browne specifically agreed to search its electronic files for "the search terms adidas* and addidas*" and produce any relevant documents that "hit" on those terms. App.151-52 ¶ 13.

During discovery, Thom Browne's counsel did the promised search for "adidas*" and collected all four of the Emails, which it placed in its document-review platform. App.270-71, 275-78, 280-81, 283-86, 288-91 (Hr'g Tr. 15:18-16:22, 20:3-23:10, 25:24-26:14, 28:22-31:3, 33:25-35:19, 36:5-19). Thom Browne's paralegals tasked with reviewing the documents tagged each of the Emails with "needs further review" and withheld them from production. *Id.* Yet, none of Thom Browne's attorneys conducted the required "further review," so despite their obvious relevance and responsiveness to adidas's document requests,

- 15 -

the Emails remained permanently withheld from production. App.305 (Hr'g Tr. 86:3-12).

Because it never produced the Emails, Thom Browne prevented adidas from using them during depositions and at trial. The jury that found Thom Browne "not liable" never saw the Emails from Thom Browne's founder and primary trial witness admitting "we shouldn't use the four bar because of adidas." App.165.

## III. The District Court denied adidas's Rule 60(b) motion for relief from judgment despite acknowledging the Emails helped adidas and "should have been disclosed."

Shortly after learning of the four Emails, adidas filed a timely motion for relief from judgment for "misconduct by an opposing party" under Federal Rule of Civil Procedure 60(b)(3) and "newly discovered evidence" under Federal Rule 60(b)(2). App.143-48. The District Court permitted adidas to conduct discovery regarding the matter, during which Thom Browne's legal team confirmed that (1) Thom Browne's paralegals had marked all four Emails as "needs further review" but (2) Thom Browne's lawyers did not perform the requested review. App.305 (Hr'g Tr. 86:3-12); App.374-75 (Dep. Tr. 63:4-13, 64:2-65:12); App.326-27.

The District Court found that the Emails "should have been disclosed during the course of discovery but, through no fault of Adidas, were not." App.327. The District Court further found that "there were no other documents introduced at trial containing similar statements by Thom Browne employees" and that the Emails would have "provided useful impeachment of those Thom Browne employees who authorized the statements and testified at trial." App.329.

Nevertheless, the District Court denied adidas's motion. Under Rule 60(b)(3), the District Court held that "misconduct by an opposing party" required negligence and that Thom Browne had not been negligent because the production failure stemmed from a miscommunication between Thom Browne's counsel and Thom Browne's e-discovery vendor. App.348. Under Rule 60(b)(2), the District Court held that the Emails were not likely to change the outcome at trial because they "hardly seem material to the central issues in this case." App.329-30, 334. adidas timely appealed from the District Court's erroneous rulings. App.314-15, 354-56.

## SUMMARY OF THE ARGUMENT

adidas qualifies for relief from judgment based on Thom Browne's discovery misconduct under Rule 60(b)(3) and on newly discovered evidence under Rule 60(b)(2). The District Court's contrary holdings reflect three independent and reversible errors.

*First*, the District Court erroneously held that an opposing party's discovery failures cannot constitute "misconduct" under Rule 60(b)(3) unless those failures are negligent. The overwhelming weight of authority—including a recent Fourth Circuit case decided mere months after adidas filed its motion—holds otherwise. These cases align with the plain meaning of "misconduct," which naturally encompasses any departure from the applicable standard of conduct. Because the discovery rules require production of "all" discoverable materials covered by a document request, and because the District Court held the Emails "should have been disclosed during discovery," Thom Browne committed misconduct when it failed to produce them. The District Court's conflicting interpretation, in addition to ignoring the contrary decisions of other circuits and district courts, substitutes abstract and misplaced policy concerns for a careful analysis of the text.

*Second*, the District Court misapplied its own negligence framework by papering over clear evidence of Thom Browne's carelessness. It is undisputed that Thom Browne's law firm possessed the Emails, that its paralegals manually reviewed at least one and marked all of them as "needs further review," but that its lawyers never reviewed them. Attorneys clearly diverge from what a reasonable person would do under the circumstances when they fail to review documents expressly identified as needing review. The District Court's two conclusory justifications for this failure—that Thom Browne's outside discovery vendor failed to follow clear instructions and that a Thom Browne associate conducted an independent document search but did not see the Emails—do not help. Attorneys must *supervise* nonlawyer paralegals and vendors, not just instruct them to act and then ignore them. Additionally, the vendor's negligence in failing to follow clear instructions is negligence directly attributable to Thom Browne under basic agency principles. As for the associate's attempt at an independent search, the District Court acknowledged the associate somehow missed the Emails. Thom Browne should not get credit for

performing searches so deficient they did not uncover documents explicitly tagged "needs further review."

*Third*, the District Court trivialized Thom Browne's admissions in holding under Rule 60(b)(2) that adidas could not show the Emails probably would have changed the outcome at trial. All four Emails bear directly on the dispositive likelihood-of-confusion inquiry, with Thom Browne's Head of Menswear admitting in one of the Emails that confusion between "our 4bar" and "adidas stripes" was "*inevitable*." Another Email showed the Head of Menswear, the Vice President of Marketing, and Mr. Thom Browne himself all agreeing that "we shouldn't use the four bar because of adidas." If these smoking guns do not satisfy Rule 60(b)(2), it is difficult to imagine what would. The District Court substantially underestimated the Emails' persuasive value, reducing clear statements to "offhand suggestions" and overlooking the obvious impact the Emails would have had on Thom Browne's testimony and arguments at trial. Indeed, the District Court speculated that the jury most likely sided with Thom Browne based on Thom Browne's argument that adidas aggressively wanted to "own all stripes," an argument flatly contradicted by the Emails showing adidas

reasonably challenged an arrangement of stripes that Thom Browne personnel admitted "look[ed] like Adidas" and would cause "inevitable" confusion in the "sporting world."

Rule 60(b) is tailor-made for cases like this one. This Court should reverse.

## ARGUMENT

### I. Thom Browne's discovery misconduct requires a new trial under Federal Rule of Civil Procedure 60(b)(3).

The Federal Rules authorize relief from a final judgment when "fraud," "misrepresentation," or "misconduct by an opposing party" prevents "the moving party from fully and fairly presenting [its] case." Fed. R. Civ. P. 60(b)(3); *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 176 (2d Cir. 2004). Courts and scholars consistently recognize that "any form" of misconduct suffices, including "unintentional . . . failures to disclose" documents during discovery. 12 Moore's Federal Practice – Civil § 60.43 (2024) [hereinafter Moore's]. But the District Court took a different course. Despite acknowledging that the Emails "should have been disclosed during the course of discovery" but "were not," App.327, the District Court denied adidas the opportunity to present the Emails to a jury

because Thom Browne's discovery failures were not "the product of negligence," App.351.

This reasoning has two fatal flaws. First, the many cases the District Court swept aside got it right: "[A] party's failure to produce obviously pertinent requested discovery material in its possession qualifies as misconduct under Rule 60(b)(3)" no matter how good the excuse. *Morgan v. Tincher*, 90 F.4th 172, 177 (4th Cir. 2024). Second, Thom Browne's mismanagement of discovery was at least negligent and therefore triggers a new trial even under the District Court's erroneous 60(b)(3) framework.

adidas first examines the text and precedent informing a proper interpretation of Rule 60(b)(3); then addresses the District Court's flawed interpretation; next discusses Thom Browne's negligence; then rebuts the District Court's holding that Thom Browne was not negligent; and finally demonstrates how a lack of access to the Emails prevented adidas from fully and fairly presenting its case. While this Court reviews Rule 60(b) rulings for "abuse of discretion," district courts necessarily abuse their discretion by adopting an "erroneous view of the law." *Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*, 609 F.3d 122, 127

(2d Cir. 2010). Whether the District Court misinterpreted Rule 60(b)(3) is a question of law reviewed de novo. *Hayward v. IBI Armored Servs., Inc.*, 954 F.3d 573, 575 (2d Cir. 2020). Whether the District Court erroneously deemed Thom Browne's failure to produce the Emails non-negligent is a "predominantly legal" mixed question of fact and law also reviewed de novo. *SEC v. Rashid*, 96 F.4th 233, 240 (2d Cir. 2024).

### A. Numerous 60(b)(3) cases correctly hold that parties commit "misconduct" by failing to produce discoverable material.

For decades, appellate courts across the country and district courts within this Circuit have held that "inadvertent" and "accidental" discovery omissions constitute Rule 60(b)(3) "misconduct." *See Morgan*, 90 F.4th at 179-80; *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1328 (Fed. Cir. 2016); *West v. Bell Helicopter Textron, Inc.*, 803 F.3d 56, 67, 69 (1st Cir. 2015); *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339-42 (5th Cir. 1978); *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 286 F. Supp. 2d 309, 314-15 (S.D.N.Y. 2003).

The weight of authority is overwhelming.[3] And while this Court has not yet interpreted "misconduct" under Rule 60(b)(3), it has favorably cited 60(b)(3) cases holding that "[f]ailure to disclose or produce evidence requested in discovery" qualified as "misconduct." *See State St. Bank*, 374 F.3d at 176 (citing *Stridiron*, 698 F.2d at 207; *Rozier*, 573 F.2d at 1339). Significantly, the Fifth Circuit found misconduct in *Rozier* even though the defendant's trial attorneys were "personally unaware" of the requested document and even assuming the defendant had a "good faith belie[f]" that the document need not be produced. 573 F.2d at 1341-42 & n.10.

*Rozier*, *Morgan*, *Rembrandt*, *West*, *Schultz*, and the litany of other decisions similarly interpreting Rule 60(b)(3) find ample support in the text, context, and purpose of the Rule.

*First*, the plain meaning of "misconduct" encompasses a failure to comply with affirmative duties. Dictionaries define that term to include

---

[3] In addition to the decisions cited above, see *Summers v. Howard University*, 374 F.3d 1188, 1193 (D.C. Cir. 2004); *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995); *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988); *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983); and *Thomas v. City of New York*, 293 F.R.D. 498, 503-04 (S.D.N.Y. 2013), *aff'd sub nom. Thomas v. McAullife*, 691 F. App'x 671 (2d Cir. 2017).

(1) a "dereliction of duty," *Misconduct*, Black's Law Dictionary (12th ed. 2024) [hereinafter Black's], meaning a "deliberate *or accidental* failure to do what should be done," *Dereliction*, Black's (emphasis added); (2) a "transgression of some established and definite rule of action," *Misconduct*, Ballentine's Law Dictionary (3d ed. 1969); and (3) "[m]ismanagement" of "official or professional duties," *Misconduct*, Oxford English Dictionary (2024). In other words, "misconduct" is any departure from the applicable rules of conduct.

Established examples of misconduct confirm this straightforward interpretation. "Professional misconduct" occurs when a lawyer "violate[s] . . . the Rules of Professional Conduct." Model Rules of Prof. Conduct r. 8.4(a). "Judicial misconduct" occurs when a judge "has committed a violation of [the Judicial] Code." Model Code of Jud. Conduct Canon 2 r. 2.15(a). "Juror misconduct" occurs when a juror "violat[es] the court's charge." *Misconduct*, Black's. And "prosecutorial misconduct" occurs when a prosecutor "fail[s] to act" as required—even when that failure is "inadverten[t]." *Prosecutorial Misconduct*, Black's; *United States v. Stillwell*, 986 F.3d 196, 199-200 (2d Cir. 2021); *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004).

Here, Thom Browne had "a legal duty to produce" all "relevant, non-privileged evidence" that was requested by adidas and proportional to the needs of the case. *Trump v. Vance*, 941 F.3d 631, 641-42 (2d Cir. 2019); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 125 (2d Cir. 2006); *see* Fed. R. Civ. P. 26(b)(1). There is no doubt that Thom Browne failed to satisfy this duty. *Supra* at 12-17. Indeed, the District Court held the Emails "should have been disclosed during the course of discovery but, through no fault of Adidas, were not." App.327-28 & n.5. Thom Browne's "failure to produce the requested, clearly pertinent" Emails was therefore "misconduct under Rule 60(b)(3), irrespective whether that failure was inadvertent or intentional." *Morgan*, 90 F.4th at 178-80; *Rembrandt*, 818 F.3d at 1328; *Rozier*, 573 F.2d at 1341-42.

*Second*, a broad definition of misconduct follows from the relationship between Rules 60(b)(3) and 60(b)(2). *See Garcia v. Garland*, 64 F.4th 62, 72-73 (2d Cir. 2023) (construing "words in their context and with a view to their place in the overall statutory or regulatory scheme"). Rule 60(b)(2) "aim[s] at correcting an erroneous judgment stemming from the unobtainability of evidence." *Schultz*, 24 F.3d at 631; *Anderson*, 862 F.2d at 924 n.10. As such, 60(b)(2) movants must

show that newly discovered evidence "probably would have changed the outcome" of the case. *Mirlis v. Greer*, 952 F.3d 36, 50 (2d Cir. 2020). By contrast, Rule 60(b)(3) focuses not on "erroneous judgments" but on "judgments which were unfairly procured" by the "opposing party." *Schultz*, 24 F.3d at 631; *Anderson*, 862 F.2d at 924 n.10. This focus on fairness means 60(b)(3) movants need only show that "the conduct complained of prevented [them] from fully and fairly presenting [their] case," *State St. Bank*, 374 F.3d at 176—a "more lenient" standard than its 60(b)(2) counterpart, *Schultz*, 24 F.3d at 631.

Given the textual differences between 60(b)(2) and (b)(3), movants denied access to material evidence based on the discovery failures of an "opposing party" should have an easier standard than movants denied access to evidence without party fault. Construing "misconduct" to cover only a subset of discovery failures would disrupt this balance and force certain victims of nondisclosure to proceed under Rule 60(b)(2)'s heightened standard—even though all such victims face judgments obtained "unfairly" in violation of the discovery rules. *See Rozier*, 573 F.2d at 1346 (noting "selective disclosure of information" undermines "the 'fair contest' which the Federal Rules of Civil Procedure are

- 27 -

intended to assure"). This Court should not countenance that result, which contravenes the fundamental principle that the "[d]iscovery rules 'are to be accorded a broad and liberal treatment to effectuate their purpose that civil trials in the federal courts no longer need be carried on in the dark.'" *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003) (quoting *Schlagenhauf v. Holder*, 379 U.S. 104, 115 (1964)).

*Third*, the Advisory Committee's distinct inclusion of "misconduct" alongside "fraud" and "misrepresentation" further supports a broad interpretation. As the First Circuit explained, misconduct is an "expansive concept" that must extend beyond misrepresentation and fraud for the concept to have independent meaning. *West*, 803 F.3d at 67 (citing *Anderson*, 862 F.2d at 923). The Eleventh Circuit made a similar point when rejecting a narrow reading of misrepresentation that "would render it superfluous" to fraud. *United States v. One (1) Douglas A-26B Aircraft*, 662 F.2d 1372, 1374 & n.6 (11th Cir. 1981). Because fraud requires "the intention to deceive," *id.* at 1374 n.6, while misrepresentations can be "negligent," *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012), the separate term "misconduct" should be broader than those two levels of culpability. "Any form" of

- 28 -

misconduct will do, Moore's § 60.43, including discovery failures that are "careless or innocent," *West*, 803 F.3d at 69.

## B.   The District Court's contrary holding rests on multiple errors.

Unpersuaded by decades of precedent and a textual analysis, the District Court limited Rule 60(b)(3) "[i]n the context of the non-production of electronically stored information" to a subset of discovery failures evincing "negligence." App.341. None of its rationales withstands scrutiny.

*First*, the District Court quoted Black's Law Dictionary for the proposition that "misconduct" means "a dereliction of duty; unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust." App.341. As explained above, however, the same dictionary notes that "dereliction of duty" includes an "accidental failure to do what should be done." *Dereliction*, Black's. This understanding aligns with multiple cases and dictionary entries defining "misconduct" as a failure to perform affirmative duties. *Supra* at 23-29. "Improper" conduct, moreover, includes conduct that is "incorrect." *Improper*, Black's. Thom Browne cannot seriously assert that its failure to produce the Emails was somehow "proper" or "correct."

*Second*, the District Court inferred from Rule 26(b)'s proportionality requirement that parties need not exhibit "perfection in responding to discovery requests, particularly when it comes to the production of electronically stored information." App.341-43. No one disputes that discovery requests must be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). But when the requested materials *are* proportional, the party seeking discovery has a right to "obtain" them. *Id.* This right triggers a corresponding "legal obligation" to produce "all" relevant non-privileged documents covered by a request. *Lugosch*, 435 F.3d at 125. And when a party falls short of that obligation, it has a stringent duty to "supplement or correct." Fed. R. Civ. P. 26(e)(1); *Morgan*, 90 F.4th at 179-80.

The District Court's flawed focus on proportionality was especially inappropriate here because this case does not present any proportionality problems. Thom Browne agreed to search its electronic files for the key word "adidas," App.151-52 ¶¶ 12-13, and Thom Browne promised to "produce non-privileged documents from 2005-2021" regarding "Thom Browne's Communications, including Thom Browne's internal Communications, referring to adidas's Three-Stripe Mark or

adidas's use of stripes on apparel or footwear," App.260. Those reasonable and proportionate agreements plainly cover the Emails—hence the District Court's (correct) observation that the obviously relevant Emails "should have been disclosed." App.327-28. Rule 60(b)(3)'s "misconduct" standard requires nothing more.

*Third*, the District Court expressed concerns that "an overly expansive interpretation of Rule 60(b)(3) will have the perverse effect of incentivizing inordinate levels of care." App.343-44. But the legal duty to produce "all" discoverable material already exists. *Supra* at 26, 30. It is therefore the *District Court's* interpretation that incentivizes the wrong level of care. And the District Court's parade of horribles is otherwise overblown. Rule 60(b)(3) covers discovery failures only where (1) the moving party identifies the failure in time to seek relief within "a year" after the entry of judgment, Fed. R. Civ. P. 60(c)(1); and (2) the failure prevented "the moving party from fully and fairly presenting [its] case," *State St. Bank*, 374 F.3d at 176. Just because Thom Browne's damning Emails enable adidas to satisfy those requirements here does not mean that every other victim of nondisclosure will enjoy similar success. In any event, this Court interprets the Federal Rules by

examining their "plain meaning" rather than their policy implications.
*United States ex rel. Eisenstein v. City of New York*, 540 F.3d 94, 97 (2d
Cir. 2008).

*Fourth*, the District Court thought a negligence standard "ma[de]
sense" because "a party must show at least negligence to obtain
[discovery] sanctions." App.344-45. But adidas's motion does not seek
sanctions, nor does Rule 60(b)(3) provide them. *Cf.* Fed. R. Civ. P. 37(b)-
(f) (authorizing attorney's fees, issue preclusion, adverse inferences,
evidentiary limitations, stricken pleadings, dismissal, default judgment,
and contempt). adidas simply requests an opportunity to litigate its
case with the full set of materials that should have been available from
the start—instead of litigating the "hypothetical fact situation" where
senior Thom Browne executives never sent or received the Emails and
never made any admissions about "inevitable" consumer confusion.
*Rozier*, 573 F.2d at 1346; App.160. Conducting a trial after "full and
complete discovery" is not a sanction; it is what the Federal Rules
require. *Ratliff*, 354 F.3d at 170. And it "makes sense" that sanctions
would require a higher showing of misconduct than would the remedy
provided by Rule 60(b)(3).

*Fifth*, and finally, the District Court tried to downplay the deluge of cases "arguably contrary" to its interpretation by distinguishing their facts and dismissing their rule statements as "dicta." App.345-46. These attempted distinctions are illusory. Time and again, appellate courts have found "misconduct" under Rule 60(b)(3) based on nothing more than "a party's failure to produce obviously pertinent requested discovery material in its possession." *Morgan*, 90 F.4th at 177-81 (reversing denial of 60(b)(3) motion where defendant officer did not "supplement his discovery responses" to include a new lawsuit filed against him and plaintiff's "request for documents made clear that [plaintiff] was seeking" that information); *Rembrandt*, 818 F.3d at 1328-29 (reversing denial of 60(b)(3) motion where defendant "fail[ed] to obtain and produce" data requested during discovery, even assuming the omission was "accidental").[4] This Court should join its sister circuits and reject the District Court's outlier interpretation.

---

[4] *See also Schultz*, 24 F.3d at 628-30 (reversing denial of 60(b)(3) motion where defendant "served a request for production of documents pertaining to [a boat accident] but [plaintiff's] attorney failed to produce a pertinent report of the accident"); *Rozier*, 573 F.2d at 1341-42 & n.10 (reversing denial of 60(b)(3) motion where plaintiff's interrogatory as limited by court order "called for production" of document that defendant failed to produce).

### C. Thom Browne committed "misconduct" even under the District Court's erroneous framework.

While Rule 60(b)(3) does not require adidas to show negligence, the undisputed record shows Thom Browne was negligent (or worse) in at least four ways. adidas thus satisfies the misconduct requirement under both the plain meaning of Rule 60(b)(3) and the District Court's erroneous interpretation.

*First*, the District Court itself acknowledged that a party "act[s] with at least negligence" by "failing to produce" harmful material in its "possession." App.346 & n.15 (citing *Schultz*, 24 F.3d at 629). It is undisputed that Thom Browne and its counsel possessed the Emails long before trial and nevertheless failed to produce them. App.324-27. It is also undisputed that Thom Browne's counsel was generally aware of "presumptively responsive documents" mentioning "adidas." App.292 (Hr'g Tr. 51:7-9); App.324-25; App.371-73 (Dep. Tr. 39:16-40:1, 53:22-54:10, 57:15-58:7). And it is undisputed that Thom Browne's paralegals individually viewed and tagged Email 1 (recounting Thom Browne's efforts "to avoid rows of 4 bar armband on the racks so as to not look like Adidas") multiple times. App.156; App.270-76 (Hr'g Tr. 15:18-21:24); App.350. Although Thom Browne claims the Emails were "not

withheld intentionally," the Emails were "in [its] attorney's possession at the time of the request, and the failure to produce [these materials] which contained information helpful to an adversary's position is not easily excused." *Schultz*, 24 F.3d at 630.

*Second*, the record shows that none of Thom Browne's attorneys reviewed the Emails during discovery—even though each of the Emails had been flagged "needs further review" by the paralegals who did review them. *Supra* at 15-16; App.305 (Hr'g Tr. 86:3-12); App.374-75 (Dep. Tr. 63:4-13, 64:2-65:12); App.326-27. It is well established that a lawyer bears "responsib[ility] for the actions of non-lawyers" assisting on a case. *In re Sobolevsky*, 430 F. App'x 9, 18 (2d Cir. 2011). This includes responsibility for "paraprofessionals," which "act for the lawyer in rendition of the lawyer's professional services" and must be supervised to ensure competent performance. N.Y. Rules of Prof. Conduct r. 5.3 cmt. [2].

Given these supervisory obligations, Thom Browne's lawyers plainly "fail[ed] to do what a reasonable and prudent person would do under the circumstances" when they did not review documents marked "needs further review." *Addington v. Comm'r*, 205 F.3d 54, 58 (2d Cir.

2000) (defining negligence). Indeed, multiple members of Thom Browne's legal team testified to the obvious and "common practice" that "when you've marked something for further review, [it] ultimately [should] be reviewed." App.293-94, 306 (Hr'g Tr. 65:25-66:4, 91:7-23); App.370 (Dep. Tr. 33:16-22); App.378 (Dep. Tr. 20:9-17). Thom Browne's failure—not only to produce, but even to have an attorney review the Emails that its own paralegals flagged as *needing* further review—is the very opposite of reasonable care.

*Third*, Thom Browne's e-discovery vendor, Consilio, was negligent. According to the District Court, Consilio omitted the Emails and other documents marked "needs further review" from its compilation of potentially responsive discovery materials despite "unambiguous instruction[s]" from a Thom Browne paralegal to create "a saved search for ALL potentially privileged[5] documents that have not already been

---

[5] Thom Browne's paralegals marked the Emails as "needs further review" in the "privilege" category because Thom Browne's law firm had made a rather questionable blanket determination that all documents discussing "adidas" were potentially privileged. App.270-71, 275-78, 280-81, 283-86, 288-91, 296 (Hr'g Tr. 15:18-16:22, 20:3-23:10, 25:24-26:14, 28:22-31:3, 33:25-35:19, 36:5-19, 70:1-8). Thom Browne ultimately produced hundreds of harmless "adidas" documents but continued to withhold the four Emails from production. App.298-99, 302-04 (Hr'g Tr. 77:22-78:4, 81:12-83:15); App.311-12.

produced." App.348, 351-52, 385-86. A reasonable vendor would have performed differently. And Consilio's negligence in acting as Thom Browne's agent is directly attributable to Thom Browne as the principal. *See In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 79 (2d Cir. 2019); *Chevron Corp. v. Donziger*, 833 F.3d 74, 150 (2d Cir. 2016); Restatement (Third) of Agency §§ 3.15, 7.04 (2006).

*Fourth*, Thom Browne's counsel negligently overlooked Consilio's mistake. Just as lawyers must supervise paralegals, they also must supervise "document management compan[ies]." N.Y. Rules of Prof. Conduct r. 5.3 cmt. [2]-[3]. Yet Thom Browne's counsel simply "assumed" that Consilio properly conducted the requested search. App.308 (Hr'g Tr. 93:5-22). Counsel's failure to double-check Consilio's document compilation is particularly inexcusable because a Consilio representative summarized Consilio's deficient process in an email sent to Thom Browne's paralegals and attorneys. Instead of reporting that Consilio had collected "all potentially privileged" documents, the email stated that Consilio's "document universe" consisted of documents "not coded for responsiveness and not coded for privilege." App.385. "Not coded" is "typically understood to mean that there's no value in that

field." App.383 (Dep. Tr. 53:10-54:13). Consilio thus put Thom Browne on notice, using "typical" e-discovery terminology, that the documents it had compiled did not include documents (such as the Emails) "coded" as "needs further review." Thom Browne's attorneys ignored that red flag without justification, thereby ensuring that the critical Emails were never produced to adidas.

## D. The District Court wrongly excused Thom Browne's misconduct.

Faced with abundant evidence of negligence, the District Court nevertheless held that Thom Browne's team did everything a reasonable discovery team would have done under the circumstances. The District Court offered just two conclusory rationales to support that holding, both of which lack merit.

*First*, the District Court dismissed Thom Browne's failure as an "understandable mix-up." App.352. Despite acknowledging that the "disconnect" between Thom Browne's law firm and Thom Browne's e-discovery vendor "is readily apparent" in "hindsight," the District Court found it was reasonable "in the moment, while an extensive discovery review was ongoing," for Thom Browne's firm "to have assumed [its] unambiguous instruction was understood." *Id*. Not so.

To start, the District Court overlooked Consilio's negligence in failing to follow an "unambiguous instruction." This failure came in the course of work that Consilio performed as an agent of Thom Browne's law firm, App.382 (Dep. Tr. 13:18-14:8), which in turn was an agent of Thom Browne. Under basic agency principles, "[t]he relationships between a subagent and the appointing agent and between the subagent and the appointing agent's principal are relationships of agency." Restatement (Third) of Agency § 3.15(1). Consilio (the subagent), thus served as an agent to Thom Browne (the principal), with Consilio's negligence imputed to Thom Browne. *Id.* cmt. d; *Donziger*, 833 F.3d at 150.

The District Court also erred in presuming that lawyers discharge their duties regarding nonlawyers simply by giving clear instructions. "A law firm must ensure that . . . nonlawyer assistants are given appropriate instruction *and supervision*," with lawyers taking responsibility not only for work assigned but also for "work done." N.Y. Rules of Prof. Conduct r. 5.3 cmt. [2] (emphasis added). Thom Browne's counsel fell well short of these obligations—first by failing to review the "work done" by its paralegals, and then by failing to review the "work

done" by Consilio. The mistaken assumption that Consilio "[w]ould follow [instructions] . . . is not an excuse or justification," *Sobolevsky*, 430 F. App'x at 17-18, especially given the risks at stake if Consilio performed its job poorly.

Worse still, Thom Browne's legal team ignored a clear indication based on "typical" discovery terminology that Consilio had misinterpreted its instructions. App.383 (Dep. Tr. 53:10-54:13); *supra* at 37-38. The District Court forgave this oversight because it happened "in the moment" during an "extensive discovery review." App.352. But that is true of *all* discovery failures in complex litigation. A reasonable lawyer paying sufficient attention would have detected (or at least asked about) Consilio's misunderstanding. And again, Thom Browne's counsel had a legal duty to check Consilio's work no matter how Consilio described it. Lawyers cannot delegate critical discovery tasks to nonlawyer paralegals or vendors and then dodge responsibility when the nonlawyer performs deficiently. As one of Thom Browne's lawyers conceded during her deposition, "we were all collectively responsible" for "making sure that responsive documents collected from Thom Browne were actually produced." App.379 (Dep. Tr. 34:8-12).

*Second*, the District Court seized on testimony from an associate referencing "independent searches to ensure no other documents fell through the cracks." App.352-53. Whatever the parameters of these searches, they indisputably "did not identify the four emails" marked for "further review" by two nonlawyer members of the Thom Browne legal team. App.353. Deficient supervision of the reviewing paralegals, followed by deficient supervision of Consilio, plus an additionally deficient search for "other documents," does not add up to reasonable care. Failure upon failure is not an excuse. And Thom Browne's failure to review critical documents flagged for review was clearly negligent.

### E. adidas satisfies Rule 60(b)(3)'s remaining criteria.

Because the record clearly shows "misconduct by an opposing party," Fed. R. Civ. P. 60(b)(3), adidas qualifies for a new trial if Thom Browne's misconduct prevented adidas "from fully and fairly presenting [its] case." *State St. Bank*, 374 F.3d at 176. Cases applying this requirement, including the persuasive authority cited in *State Street Bank*, find unfair interference in the discovery context where a production failure (1) "precluded inquiry into a plausible theory of liability," (2) "denied [the movant] access to evidence that could well

have been probative on an important issue," or (3) "closed off a potentially fruitful avenue of direct or cross examination." *West*, 803 F.3d at 67; *Rozier*, 573 F.3d at 1342.

adidas addresses the full impact of Thom Browne's discovery misconduct in its discussion of Rule 60(b)(2) below. *See infra* at 43-57. But there is no doubt that a lack of access to the Emails substantially hindered adidas's ability to fully and fairly litigate the case. While the District Court found it unnecessary to reach the issue under Rule 60(b)(3), it held elsewhere that the Emails would have "provided useful impeachment of those Thom Browne employees who authorized the statements and testified at trial (notably Mr. Thom Browne himself) or who might have been called by plaintiffs as adverse witnesses." App.329. The District Court thus recognized that Thom Browne "closed off a potentially fruitful avenue of direct or cross examination." *West*, 803 F.3d at 67.

Additionally, it takes little imagination to see how statements from high-ranking Thom Browne officials admitting to "inevitable" consumer confusion would have "been probative on an important issue" and "helped strengthen [adidas's] arguments before the jury." *Id.*;

- 42 -

*Morgan*, 90 F.4th at 180; App.156, 160. The *entire trial* focused on likelihood of confusion, App.127-31 (Day 8 Tr. 1308:1-1312:5), and Thom Browne got to litigate that trial without ever confronting its own admissions. Litigation is neither full nor fair when a defendant's discovery conduct denies the plaintiff access to the most important documents in the case.

For the same reasons, adidas easily satisfies any requirement that the "need for substantial justice" outweigh "the value of preserving the finality of judgments." App.337 (quoting *Catskill*, 286 F. Supp. 2d at 316). The Advisory Committee already struck that balance when authorizing relief from judgment for "misconduct by an opposing party," and this Court's 60(b)(3) cases do not appear to discuss a freestanding balancing requirement outside the Rule's text. In any event, it defies both substantial justice and the purpose of the discovery rules to subject adidas to the result of a trial where Thom Browne's errors meant Thom Browne's admissions stayed "in the dark." *Ratliff*, 354 F.3d at 170.

## II.  adidas's newly discovered evidence requires a new trial under Federal Rule of Civil Procedure 60(b)(2).

Independent of Rule 60(b)(3), Federal Rule 60(b)(2) authorizes relief from judgment for "newly discovered evidence that, with

reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." *Ins. Co. of N. Am.*, 609 F.3d at 130-31. adidas qualifies for such relief if (1) "the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding," (2) adidas was "justifiably ignorant" of these facts "despite due diligence," (3) the evidence is "admissible and of such importance that it probably would have changed the outcome," and (4) the evidence is not "merely cumulative or impeaching." *Mirlis*, 952 F.3d at 50.

The District Court held that (1) the Emails existed at the time of trial, (2) adidas exercised due diligence, (3) the Emails were admissible, and (4) the Emails were not merely cumulative or impeaching. App.327-29 & n.7. The District Court nevertheless denied adidas relief after determining that the Emails were not likely to have swayed the jury at trial. This holding constitutes an abuse of discretion because it adopts a "clearly erroneous assessment of the evidence." *Ins. Co. of N. Am.*, 609 F.3d at 127. If any case satisfies Rule 60(b)(2), it is this one. The Emails provide smoking gun evidence against Thom Browne that directly supports a likelihood of confusion and directly undermines Thom Browne's defenses.

### A. The Emails are quintessential 60(b)(2) evidence.

The "ultimate issue" in every trademark infringement case is the "likelihood of confusion" created by a defendant's mark. *Car-Freshner Corp.*, 980 F.3d at 326. The District Court told the jury as much, App.137-38 (Day 8 Tr. 1410:16-1411:1), and further instructed the jury to evaluate the likelihood of confusion between adidas and Thom Browne by considering this Court's *Polaroid* factors. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). As explained to the jury, those factors included the "strength of adidas' Three-Stripe Mark," the degree of "similarity between the parties' designs," and whether "Thom Browne acted in bad faith" by "purposely turn[ing] a blind eye to the high likelihood that consumers would be confused." App.138-40 (Day 8 Tr. 1411:4-21, 1412:21-1413:3).[6]

This Court presumes the jury followed those instructions. *United States v. Batista*, 684 F.3d 333, 342 (2d Cir. 2012). But the jury did so

---

[6] The District Court similarly instructed the jury to consider the strength of the Three-Stripe Mark and its resemblance to Thom Browne's designs for purposes of adidas's separate trademark dilution claim, which required adidas to show that Thom Browne's designs were "likely to dilute the distinctiveness of adidas' Three-Stripe Mark." App.140-42 (Day 8 Tr. 1413:12-18, 1414:15-1415:1).

- 45 -

without ever seeing the four smoking guns Thom Browne failed to produce—each of which individually gives adidas critical ammunition it previously lacked, and all of which together would probably have altered the course of trial.

*First*, the Emails contain stunning admissions from senior Thom Browne executives regarding the "ultimate issue" in the case. Most notably, Head of Menswear Thi Wan confessed to Mr. Browne in Email 2 that "it is *inevitable* that our 4bar in white be read as adidas stripes" in the "sporting world." App.160 (emphasis added). Mr. Wan added that multiple soccer teams would "start bombarding [Mr. Browne] with [the same] concern." *Id.* And he made those comments even in the context of formalwear and "accessories." App.160, 265. Mr. Wan's concessions thus show more than adidas needed to show at trial: He admitted confusion was "inevitable," not just "likely," and he admitted such confusion would occur even with non-athletic products. These admissions would have permeated every aspect of the trial, permitting adidas to tell the jury that adidas and Thom Browne leadership both agreed that "a likelihood of confusion exists" and that adidas had "carried its burden of proof." App.140 (Day 8 Tr. 1413:9-11).

The other Emails buttress this theme. Consistent with Mr. Wan's observations about inevitable confusion, Senior Men's Account Manager Emily Maturo told a customer in Email 1 that "[w]e try to avoid rows of 4 bar armband on the racks so as to not look like Adidas." App.156. And true to Mr. Wan's prediction about soccer teams "bombarding" Thom Browne with concerns about its proposed designs in the sporting context, Vice President of Marketing Tomaso Galli reported to Mr. Browne in Email 3 that FC Barcelona was "not comfortable with any four bars, which in their view is too much in the spirit of Adidas." App.162. adidas would have had a field day with this evidence, along with the exchange between Mr. Wan and Mr. Browne in Email 4 where Mr. Wan again worried that Thom Browne's "4bar" might be "too loud and 'adidas' in the football context," and Mr. Browne himself acknowledged that "we shouldn't use the four bar because of adidas." App.165.

*Second*, the Emails bear directly on multiple *Polaroid* factors. Mr. Wan's acknowledgment that "adidas stripes" have "a big presence in the sporting world," App.160, bolsters "the strength of adidas' Three-Stripe Mark," App.138 (Day 8 Tr. 1411:6). Ms. Maturo's statement that "rows

- 47 -

of 4 bar armband" would "look like Adidas," App.156, concedes
"similarity between the parties' designs," App.138 (Day 8 Tr. 1411:16-
21). So does Mr. Wan's declaration that "4bar" will "inevitabl[y] . . . be
read as adidas stripes," App.160, and FC Barcelona's view that "four
bars" are "too much in the spirit of Adidas," App.162, 165. As for Thom
Browne's bad faith, the Emails reveal that Thom Browne "purposely
turn[ed] a blind eye to the high likelihood" of confusion, App.140 (Day 8
Tr. 1413:1-3), by pursuing its Four-Bar design despite internal
consensus that "it is inevitable that our 4bar in white be read as adidas
stripes" and that "we shouldn't use the four bar because of adidas,"
App.160, 165. These *Polaroid* factors are "perhaps the most significant
in determining the likelihood of confusion." *Mobil Oil Corp. v. Pegasus
Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987); *E.G.L. Gem Lab Ltd.
v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 295 (S.D.N.Y. 2000), *aff'd*,
4 F. App'x 81 (2d Cir. 2001). And the Emails give adidas compelling
material from inside Thom Browne for each one of them.

*Third*, the Emails undermine central arguments raised by Thom
Browne at trial. As the District Court noted, "the essence of Thom
Browne's defense in this case" was that adidas wanted to "own all

stripes" and "monopolize[] the sportswear market." App.335; App.132, 136 (Day 8 Tr. 1355:10-19, 1391:4-9). The District Court even opined that "it was this argument that most likely influenced the jury in Thom Browne's favor." App.335. Had adidas possessed the Emails, however, Thom Browne's narrative would have crumbled: adidas did not want to "own all stripes," but simply address an arrangement of stripes that *Thom Browne officials knew* "look[ed] like adidas" and made consumer confusion "inevitable." App.156, 160.

Apart from dismantling the "essence" of Thom Browne's strategy, the Emails also rebut other arguments Thom Browne made at trial. For example, Thom Browne's counsel told the jury during opening statements that "nothing . . . Thom Browne has done in this case has anything to do with adidas." App.99 (Day 1 Tr. 48:20-22). This theme resurfaced during closing, when counsel gestured to Mr. Browne, reminded the jurors that Browne had told his story "under oath," and insisted that no one at the company "[e]ver talked about adidas." App.133-34 (Day 8 Tr. 1356:4-14, 1357:3-11). The Emails, three of which came to or from Mr. Browne directly, squash that falsehood—Mr.

Browne and his colleagues not only *talked* about adidas, they knew not to "use the four bar *because of adidas*." App.160, 165 (emphasis added).

Thom Browne's counsel proceeded to argue that confusion was unlikely because the parties' marks "are very different and convey different things," App.100 (Day 1 Tr. 61:17-25), echoing testimony from Thom Browne CEO Rodrigo Bazan that "Thom Browne's 4-Bar design" and "adidas's three stripes" are "completely different" and "visually" give "a completely different effect," App.122-23 (Day 5 Tr. 501:3-18, 519:15-24). The Emails establish that not even Mr. Browne privately believed Bazan's assertions.

Finally, Thom Browne's counsel wheeled a rack of clothing into the courtroom that stayed there for the final four days of trial. App.120 (Day 5 Tr. 420:16-22). Mr. Browne testified on direct examination that the rack was a "representation of my collection in regards to . . . the usage of the 4-Bars." App.120-21 (Day 5 Tr. 420:18-421:7). Thom Browne's counsel then reiterated during closing arguments that the rack was "what we wanted you to see" in determining the likelihood of confusion. App.134-35 (Day 8 Tr. 1357:20-1358:4). But the jury did *not* see Ms. Maturo's email stating "[w]e try to avoid rows of 4 bar armband

on the racks *so as to not look like Adidas*." App.156 (emphasis added).
Everywhere Thom Browne turned, the Emails would have substantially
altered the proceedings.

### B.    The District Court trivialized Thom Browne's damning admissions.

Not satisfied with multiple smoking guns, the District Court found
the Emails were unlikely to sway the jury in adidas's favor. This
assessment reflects two clear and categorical errors.

*First*, the District Court mischaracterized each of the Emails.
Starting with Email 1, the District Court took an unambiguous
statement from Ms. Maturo that "[w]e try to avoid rows of 4 bar
armband on the racks so as to not look like Adidas," App.156, and
reduced that statement to an "off-hand suggestion" that "hardly conveys
an opinion" about the possibility of confusion, App.331. There was
nothing "off-hand" about Ms. Maturo's comment, which she provided as
an explanation to a customer for why "[w]e've . . . removed some styles
from your original orders." App.156. Nor is it fair to say that Ms.
Maturo failed to convey an opinion about confusion. The obvious
implication of *avoiding* four bars to *not* look like adidas is that
*displaying* four bars *would* look like adidas. This internal admission

directly bears on the similarity of the parties' marks, and reasonable jurors would understand that.

The District Court further trivialized Email 1 by limiting its relevance to "products for Asia." App.331. The operative statement generally describes what "we" at Thom Browne try to do, it lacks any express geographic limitation, and it comes from a Senior Account Manager based in New York. App.156, 158. While the District Court refused to believe the statement was a "general policy" because no "other evidence produced in discovery" suggested such a policy, App.331-32, all four Emails reflect the same general view, independent of location, that "we shouldn't use the four bar because of adidas," App.160, 162, 165.

The District Court also shortchanged adidas on Email 2, where Mr. Wan told Mr. Browne that consumer confusion between "our 4bar" and "adidas stripes" is "inevitable." App.160. Few admissions could be more fatal in a case about the likelihood of confusion. Yet the District Court glossed over Mr. Wan's statement because it only expressed "Mr. Wan's belief" and did not demonstrate an "objective likelihood of confusion." App.333. This reasoning fundamentally misunderstands the

value of Mr. Wan's concession. While the likelihood of confusion analysis may be objective, few juries performing that analysis will find confusion unlikely when the defendant's own executives—indeed, the head of Thom Browne's menswear division—admit confusion is "inevitable." *Cf. Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 188, 191-92 (S.D.N.Y. 2008) (finding actual confusion and similarity of the marks where counter-defendants admitted in an email that "[t]he similarity in the brand name often causes confusion"). Additionally, the bad faith *Polaroid* factor focuses on Thom Browne's subjective state of mind in "purposely turn[ing] a blind eye to the high likelihood that consumers would be confused." App.139-40 (Day 8 Tr. 1412:21-1413:3). Mr. Wan's admission provides direct (and irrefutable) evidence on that point.

In a separate attempt to water down Email 2, the District Court noted that Mr. Wan's statements referenced "formalwear and accessories" rather than the activewear products adidas had accused. App.333. This observation only confirms Email 2's utility: If confusion between adidas and Thom Browne is inevitable when Thom Browne uses its four bars on formalwear and accessories outside of adidas's core

product category, it follows *a fortiori* that confusion is even more inescapable when Thom Browne uses its design on activewear such as the compression running outfits accused of infringement at trial. *See supra* at 46.

Similar issues infect the District Court's analysis of Email 3, where Mr. Galli reported to Mr. Browne that FC Barcelona was "not comfortable with any four bars" because that design "is too much in the spirit of Adidas." App.162. The District Court again noted that "[t]he designs being discussed are for formalwear and accessories," which again supports adidas. App.332. The District Court also attributed the "spirit of Adidas" remark to "an unnamed individual at FCB," even though Mr. Galli plainly attributed that view to the entire FCB organization. *Id.* Finally, the District Court opined without explanation that "there is an obvious distinction between a likelihood of confusion and being 'too much in the spirit of Adidas.'" *Id.* Reasonable jurors would have little difficulty understanding that a design that is "too adidas" constitutes a similar mark under the *Polaroid* factors, which in turn supports a likelihood of confusion. And reasonable jurors would have paid particular attention to the perspective of FCB given the

- 54 -

extensive evidence adidas presented at trial regarding the importance of soccer ("football") to its brand, including adidas's relationship with then-FCB athlete Lionel Messi. App.98, 101, 103-12 (Day 1 Tr. 36:16-24, 96:15-21, 107:3-12, 108:20-109:2, 125:25-126:10, 138:9-19, 139:19-142:2); App.115-17 (Day 2 Tr. 165:12-16, 310:6-311:24).

As for Email 4, the District Court erroneously discarded a conversation between Mr. Browne and Mr. Wan about adidas as "doubtful[ly] relevan[t]." App.332. The District Court's analysis disregards a concern from Mr. Wan that "4bar" might be "too loud and 'adidas' in the football context." App.165. It undervalues the persuasive impact of Mr. Browne himself acknowledging "that we shouldn't use the four bar because of adidas." *Id.* And it ignores Mr. Wan's subsequent agreement that "[y]ou're right on the 4bar." *Id.* These statements all support adidas's core argument that Thom Browne leadership recognized a likelihood of confusion with adidas and, in subsequent years, nevertheless plowed ahead.

*Second*, the District Court substantially underestimated how the Emails would have altered "the central issues in this case as they actually played out at trial." App.334. The District Court identified

those issues as (1) "competing testimony of the parties' competing experts," (2) differences in "the quality and price-point" of the parties' products, (3) "Thom Browne's alleged bad faith," (4) a survey "that Adidas contended showed evidence of actual consumer confusion," and (5) Thom Browne's defense that adidas wanted to "own all stripes." App.333-36. But the District Court failed to meaningfully consider how these issues would have unfolded if the four Emails had been in play.

Instead of sorting through hundreds of pages of complex expert testimony and confusion surveys, for example, the jury simply could have credited adidas's experts and surveys as consistent with Thom Browne's admissions that confusion was "inevitable" and that Thom Browne's four bars "look like Adidas." App.156, 160. Those same admissions transcend any differences in quality and price point of the parties' products, since the Emails involve the same kinds of Four-Bar products that Thom Browne displayed on the rack at trial. App.120-21 (Day 5 Tr. 420:16-421:7); App.265. The Emails also highlight the subjective awareness of Thom Browne employees regarding the likelihood of confusion in a way that no other bad-faith evidence could. *Supra* at 48. And they negate Thom Browne's argument that adidas

- 56 -

filed suit because it wanted to own all stripes. *Supra* at 48-49. The Emails thus implicate every possible issue at trial, yet the District Court held that no jury should ever see them.

## CONCLUSION

The District Court misinterpreted Rule 60(b)(3), ignored Thom Browne's negligence under Rule 60(b)(3), and discarded four smoking guns under Rule 60(b)(2). This Court should reverse the District Court's 60(b) denial, vacate the judgment below, and remand for a new trial.

Respectfully submitted this 13th day of September, 2024.

R. CHARLES HENN JR.
K. BRADFORD SEARS
KILPATRICK TOWNSEND
  & STOCKTON LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309
(404) 815-6637
chenn@ktslaw.com
bsears@ktslaw.com

/s/ *Adam H. Charnes*
ADAM H. CHARNES
KILPATRICK TOWNSEND
  & STOCKTON LLP
2001 Ross Avenue
Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

*Counsel for Appellants adidas America, Inc. and adidas AG*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A)(i) and Second Circuit Rule 28.1.1(a) because it contains 10,795 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

3.     This brief has been scanned for viruses and is virus free.

DATED: September 13, 2024.

/s/ Adam H. Charnes
ADAM H. CHARNES
KILPATRICK TOWNSEND
   & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2024, I electronically filed **APPELLANTS' PRINCIPAL BRIEF** with the Clerk of Court using the CM/ECF System. Counsel for all parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF System.

*/s/ Adam H. Charnes*

ADAM H. CHARNES
KILPATRICK TOWNSEND
  & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

## ADDENDUM – SPECIAL APPENDIX

| No. | Description | Pages |
|---|---|---|
| 255 | Order [Denying Motion for New Trial] (05/03/2024) | Add.1 |
| 260 | Opinion & Order (07/29/2024) | Add.2-39 |
| | Fed. R. Civ. P. 60 | Add.40 |

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

```
ADIDAS   AMERICA,   INC.,   and
ADIDAS AG,

          Plaintiffs,

     -v-

THOM BROWNE, INC.,

          Defendant.
```

21-cv-5615 (JSR)

<u>ORDER</u>

JED S. RAKOFF, U.S.D.J.

On October 19, 2023, defendants adidas AG and adidas America, Inc. (collectively, "Adidas") filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 60(b). Upon full consideration of the parties' various submissions in connection with this motion and the record of the evidentiary hearing held on December 21, 2023, the Court hereby denies Adidas's motion. An opinion setting forth the reasons for this ruling will be issued in due course, at which time judgment will enter.

SO ORDERED.

Dated:    New York, NY

          May 3, 2024

          _____
          JED S. RAKOFF, U.S.D.J.

**Add.1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADIDAS AMERICA, INC., and ADIDAS AG, | 21-cv-5615 (JSR) |
| Plaintiffs, | <u>OPINION & ORDER</u> |
| -v- | |
| THOM BROWNE, INC., | |
| Defendant. | |

JED S. RAKOFF, U.S.D.J.

This is a trademark action brought by Adidas America, Inc.
and Adidas AG (collectively "Adidas") against Thom Browne, Inc.
("Thom Browne"). Adidas alleged that Thom Browne's use of its four
bar and grosgrain designs on certain of Thom Browne's activewear
infringed Adidas's trademarked three-stripe design. The case went
to trial in January 2023, and the jury returned a verdict of not
liable in favor of Thom Browne. Adidas appealed and the Second
Circuit affirmed in May 2024.

While its appeal was pending, Adidas filed the instant motion
for relief from judgment pursuant to Federal Rule of Civil
Procedure 60(b)(2) and 60(b)(3), based upon the intervening
discovery of four emails that Thom Browne failed to produce in
this case. According to Adidas, these emails show that Thom Browne
employees, including Mr. Thom Browne himself, knew that there was

**Add.2**

a likelihood Thom Browne's four-bar design could be confused with Adidas's three stripes.

On May 3, 2024, the Court issued a "bottom-line" Order denying Adidas's motion. This Opinion sets forth the reasons for that ruling. As explained in more detail below, the Court finds that Adidas has failed to show either that the four emails probably would have changed the outcome of trial as required to obtain relief pursuant to Rule 60(b)(2) or that Thom Browne engaged in "misconduct" in failing to produce the emails as required to obtain relief pursuant to rule 60(b)(3).

I.   Background

  A. Underlying Litigation & Trial

    The Court assumes familiarity with the background of this long-running litigation and sets forth only those facts necessary to understand the instant motion.[1] In brief, Adidas is a major player in the market for activewear, known for its signature "Three-Stripe Mark," which generally consists of three parallel lines of roughly the same width placed in close proximity. In 2021, Adidas brought this action against defendant Thom Browne,

---

[1]   For additional detail regarding the plaintiff's claims, see the Court's summary judgment Opinion, Dkt. 159, and Magistrate Judge Lehrburger's Report and Recommendation concerning defendant's motion to dismiss, Dkt. 41, which was adopted by the Court, Dkt. 47.

**Add.3**

asserting claims for trademark infringement, trademark dilution, and unfair competition. Adidas claimed that Thom Browne's use of its "Four-Bar Signature" design -- generally, four parallel bars -- and Thom Browne's "Grosgrain" design -- a pattern of red, white and blue stripes -- on certain pieces of Thom Browne's activewear infringed upon and diluted Adidas's Three-Stripe Mark.

The products Adidas accused of infringement (the "accused products") consisted of certain specified pieces of Thom Browne activewear, notably certain sweatpants, hoodies, and running shoes. Adidas expressly disclaimed any allegation that Thom Browne's other products for which it was more well known, such as Thom Browne's formalwear, were infringing. *See* Dkt. 225-17 (depicting accused products). While the precise definition of Adidas's Three-Stripe Mark was a disputed issue throughout the case, it was ultimately defined by the Court in its jury instructions as follows:

> adidas' Three Stripe Mark means its use of three parallel stripes on clothing or shoes in the manner described and exemplified in a number of federal trademark registrations that you can review at Plaintiffs' Exhibits 181 and 183. It also includes any other use by adidas of three parallel stripes on clothing or shoes that you find gives consumers the same commercial impression as any one or more of the registered uses. By this, I mean that you may find that a particular use of three parallel stripes by adidas falls under its Three Stripe Mark – even if it differs in some way from the use of three stripes in any of the federal registrations -- if you find that the use would be perceived in the same way by a reasonable consumer.

**Add.4**

Jury Instructions (Dkt. 190) at 14.

A jury trial on Adidas's claims was held on January 3,2023. During the eight-day trial, the jury heard the testimony of sixteen witnesses and saw the introduction into evidence of over 400 exhibits. After the conclusion of the evidence, the jury deliberated for approximately two hours before returning a verdict on January 12,2023 of not liable on all counts in favor of Thom Browne. *See* Dkt. 188. Adidas then timely filed a notice of appeal. *See* Dkt. 212. On May 31, 2024, the Second Circuit ruled in favor of Thom Browne and affirmed the jury's verdict. *See* Dkt. 256.

B. Adidas's Motion for New Trial

While Adidas's appeal was pending, Adidas's U.S. counsel was contacted by Adidas's U.K. counsel about certain emails that had been produced by Thom Browne in a somewhat parallel U.K. action, but, as it later became apparent, had not been produced during discovery in the instant case. *See* Henn Decl. (Dkt. 222) ¶ 1. After some back-and-forth with Thom Browne's U.S. counsel, Thom Browne produced to Adidas's U.S. counsel in October 2023 copies of various emails, four of which are the basis for the instant motion and are described below. *See id.* ¶ 5.

**Email 1 (Dkt. 222-1)** is a December 2016 email exchange between Emily Maturo, a Senior Men's Account Manager at Thom Browne and Incorp S.a.L., a distributor in Switzerland that purchased product from Thom Browne for retail stores in Asia. Bazan Decl. (Dkt. 227)

4

**Add.5**

¶¶ 3-5. Discussing the display of Thom Browne's clothes, Maturo states: "We try to avoid rows of 4 bar armband on the racks so as to not look like Adidas. We've therefore removed some styles from your original orders." (Dkt. 222-1)

**Email 2 (Dkts. 222-2, 230-4)** is a November 2018 email exchange between Thi Wan, then Thom Browne's Head of Menswear, and Mr. Thom Browne himself. In the exchange, the two discuss design choices for formalwear and accessories that Thom Browne was creating for FC Barcelona ("FCB"), the Spanish soccer (football) club. In the initial email, Wan states: "I wanted to hear your thoughts on the usage of 4bar for FCB dressing for players. I wanted to raise a flag now from me before other teams start bombarding you with this concern. As Adidas has such a big presence in the sporting world, it is inevitable that our 4bar in white be read as adidas stripes, especially on accessories. Or would you also consider RWB? [*i.e.,* a mark built around Mr. Browne's initials]." Dkt. 230-4 (alteration added). Below this, Wan included in his email pictures of various Thom Browne handbags and formalwear under consideration. *See id.* In response, Mr. Browne thanks Wan for the message and says, "Let's discuss." Dkt. 222-2. None of the products depicted in this email includes any of the accused products in the U.S. lawsuit and none was ever ultimately provided to FCB. Bazan Decl. (Dkt. 227) ¶¶ 7-8.

**Add.6**

**Email 3 (Dkt. 222-3)** is a December 2019 email exchange among Kelly Connor, Director of Brand Relations at Thom Browne, Tomaso Galli, Vice President of Marketing and Communication at Thom Browne, and Mr. Thom Browne. The discussion concerns the same formalwear and accessories for FCB that were being discussed in Email 2. In the final email in the chain, Galli states, "They [FCB] are not comfortable with any four bars, which in their view is too much in the spirit of Adidas." Dkt. 222-3.[2]

**Email 4 (Dkt. 222-4)** is an August 2019 email exchange between Wan and Browne. The discussion concerns design choices for accessories that Thom Browne was designing for FCB. In his initial email, Wan states: "There is a 4bar range and RWB range in case you feel that 4bar is too loud and 'adidas' in the football context." Dkt. 222-4. In response, Browne states: "[I] thought [T]omaso [Galli] has already said that we shouldn't use the four bar because of adidas… please confirm with matt and then we can proceed… maybe it would be safer to just make the rwb stripes bigger and proceed..." *Id.* Finally, Wan replies back, "You're right on the 4bar. We should and will focus on the RWB." *Id.*

\*      \*      \*      \*      \*

---

[2]    The first few emails in this chain were produced in discovery in the U.S. action, but the version with the final emails -- refering to Adidas -- was not. *See* Maldanado Decl. (Dkt. 230) ¶¶ 27-28 & Ex. 5; Henn Decl. (Dkt. 222) ¶ 15 & Ex. 9.

**Add.7**

Based upon the non-production of these four email exchanges, Adidas timely moved on October 19, 2023 for a new trial pursuant to Federal Rule of Civil Procedure 60(b)(2) and 60(b)(3).[3] In its moving papers, Adidas argued -- among other things -- that the non-production of the four emails must have been the product of intentional, bad faith conduct on the part of Thom Browne, and that even if the non-production was purely accidental, it still constituted "misconduct" justifying relief pursuant to Rule 60(b)(3). *See* Adidas Mot. (Dkt. 221) at 3-10, 21-22. In opposing this portion of Adidas's motion, Thom Browne argued that some intentional misconduct was necessary for Rule 60(b)(3) to apply, and that Adidas had failed to show that that the non-production of these emails was intentional. TB Opp. (Dtk. 224) at 9-10, 22-23.

After giving notice to the parties, the Court held an evidentiary hearing on December 21, 2023 to determine the reason why the four emails were not produced. During the hearing, the Court heard testimony from an e-discovery specialist employed by counsel of Adidas, and from two paralegals who worked for Thom Browne's counsel, the firm of Wolf Greenfield, during the relevant period. *See* Nov. 21, 2023 Minute Entry; Dec. 21, 2023 Hearing Tr.

---

[3]    Because Adidas's appeal with the Second Circuit was still pending at the time of its initial motion, the relief Adidas sought was technically an "indicative ruling" pursuant to Federal Rule of Civil Procedure Rule 62.1.

**Add.8**

(Dkt. 240). At the conclusion of this hearing, the Court granted Adidas permission to take the deposition of two associates who worked at Wolf Greenfield on the Adidas matter, and the deposition of a representative of Thom Browne's e-discovery vendor, Consilio. *See* Dec. 21, 2023 Hearing Tr. (Dkt. 240), at 97-99.[4]

Following the conclusion of this additional discovery, the Court ordered supplemental briefing on two questions:

1. Can even an innocent failure to produce documents during discovery constitute "misconduct" within the meaning Federal Rule of Civil Procedure 60(b)(3), or must the moving party demonstrate some greater degree of culpability, such as negligence, gross negligence, or recklessness?

2. In light of the additional discovery that the parties have received, why were the four emails that form the basis of Adidas's motion not produced during discovery, to what degree was Thom Browne (or its counsel) culpable for the failure to produce the emails and does that degree of culpability satisfy the aforementioned "misconduct" standard under Rule 60(b)(3)?

---

[4]   Following the hearing, with the Court's permission Thom Browne also activated its e-discovery database and conducted additional searches to confirm that no other documents went un-produced. The parties have not brought any such documents to the Court's attention beyond the four emails.

Dkt. 245.

C. Non-Production of the Four Emails

Based on the evidentiary hearing and the parties' written submissions, the Court makes the following findings of fact regarding the non-production of the four emails:

During the course of discovery in the U.S., the parties entered into a stipulated order governing the discovery of electronically stored information ("ESI"). *See* Dkt. 34. The ESI Order set forth procedures, whereby the parties would negotiate and agree upon a set of document custodians and search terms that the responding party would use to identify responsive documents. *See id.* ¶¶ 4-5. Prior to production, the ESI Order permitted the responding party to review and withhold documents that it believed to be privileged. *See id.* ¶¶ 4-6.

Consistent with this procedure, the parties agreed that Thom Browne would search the ESI of nine of its custodians. Maldenado Decl. (Dkt. 230) ¶¶ 4-7. With the help of its e-discovery vendor (Consilio), Thom Browne's counsel (Wolf Greenfield), collected over 1.4 million documents from these custodians spanning the years 2005 to 2021. *Id.* ¶ 9. The parties agreed upon a set of search terms and Consilio ran those search terms across the documents that were collected. Wolf Greenfield then oversaw a review of the resulting set of presumptively responsive documents for privilege. *Id.* ¶ 11.

**Add.10**

Wolf Greenfield's privilege review began with the creation of a list of search terms intended to identify potentially privileged documents, which would then be run across the potentially responsive documents. The plan was that all documents that hit on these terms would then be subjected to a manual review by Wolf Greenfield's attorneys before being either produced or listed on Thom Browne's privilege log and withheld. Among the terms that Wolf Greenfield used in identifying potentially privileged documents was the term "adidas," because of Thom Browne's long-running legal disputes with the company. *See* Hearing Tr. (Dkt. 240) at 70.

To carry out the privilege review, Wolf Greenfield began by creating a so-called "saved search" of all documents that "hit" on these privilege search terms. As part of that process, a Wolf Greenfield paralegal named Virginia Weeks sent an email to Consilio, instructing them to create "a saved search for ALL potentially privileged documents that have not already been produced by Thom Browne so that we will have one search to work with when we go to do our privilege review." Dkt. 244-4, at TB00530219. Joseph Juneau, the lead project manager from Consilio, responded that he had created a saved search titled "All Potentially Privileged" by running the privilege search terms -- provided by Ms. Weeks -- across all documents "that are not produced, not coded for responsiveness and not coded for

**Add.11**

privilege." *Id.* at TB00530218; Kerr Dep. (Dkt. 244-3) at 51-54.
Wolf Greenfield and Consilio then used this "All Potentially
Privileged" saved search to conduct their privilege review, with
reviewers going through each document and either tagging it for
production or listing it on the privilege log to be withheld.

The non-production of the four emails apparently resulted
from a misunderstanding between Wolf Greenfield and Consilio in
the creation of this "All Potentially Privileged" saved search.
Unbeknownst to Consilio, approximately a week earlier Ms. Weeks
had carried out a mass edit on some subset of documents that hit
on the search term "adidas" -- including the four emails here at
issue -- changing the responsiveness, privilege and
confidentiality fields to "needs further review." Hearing Tr.
(Dkt. 240) at 70, 75-76. Some or all of the documents Ms. Weeks
tagged in this manner were not included in the "All Potentially
Privileged" saved search because, in creating that search,
Consilio included only documents "not produced, not coded for
responsiveness and not coded for privilege," and yet Ms. Weeks *had*
in effect coded (*i.e.* tagged) these documents for privilege and
responsiveness although also indicating they needed to be reviewed
further. Dkt. 244-4, at TB00530218; *see* Kerr Dep. (Dkt. 244-3) at
51-55; Hearing Tr. (Dkt. 240) at 87-88. Because the four emails
were not included in the saved search used for the privilege
review, they were never reviewed for privilege or otherwise, but

**Add.12**

nonetheless were withheld from production because they hit on a privilege term. Then, in November 2022, Consilio was instructed to move all non-produced documents to storage. Hearing Tr. (Dkt. 240) at 80-81.

## II.  Discussion

### A. Federal Rule of Civil Procedure 60(b)(2)

Federal Rule of Civil Procedure 60(b)(2) permits a court to relieve a party of a final judgment upon a finding of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). To obtain relief under this rule, "[t]he movant must demonstrate that (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching." *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001) (quotation omitted).

Here, the first and second requirements of Rule 60(b)(2) are satisfied. The four emails are evidence that was in existence at the time of the trial that should have been disclosed during the course of discovery but, through no fault of Adidas, were not.

**Add.13**

While Thom Browne argues Adidas was "not diligent in pursuing discovery" in connection with the emails, Thom Browne Opp. (Dkt. 224) at 15, this argument is without merit. The fact that Adidas could have questioned Thom Browne's witnesses further about the subject matter of these emails, and perhaps discovered their existence that way, is beside the point, because Adidas was under no obligation to do so. Thom Browne does not meaningfully dispute that the four emails fell within the scope of Adidas's discovery requests.[5] When the emails were not produced by Thom Browne, Adidas could reasonably rely on Thom Browne's discovery response and assume that the emails did not exist. The extent to which Thom Browne is to blame for failing to produce the emails is a matter of dispute, but Adidas is certainly not to blame.[6]

---

[5]   In a footnote, Thom Browne suggests that these emails were not responsive to Adidas's discovery requests because those requests were limited to the United States. TB Opp. (Dkt. 224) at 23 n.19. But Thom Browne's witnesses testified that it was their practice to produce all documents that hit on the responsiveness search terms that were not potentially privileged, without regard to such a limitation, and as Adidas persuasively argues, the FCB deal plainly had a sufficient nexus with the U.S. to make the emails discoverable.

[6]   In this regard, the Court also finds unpersuasive Thom Browne's assertion of the defense of unclean hands. *See* Thom Browne Sur-Reply (Dkt. 235). To be applicable, the doctrine of unclean hands requires some direct connection between the inequitable conduct and the relief being sought. *See In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 484 (S.D.N.Y. 2013) (courts of equity "requir[e] clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation")(quoting *Keystone Driller Co. v. General Excavator*

**Add.14**

Though a closer call, the fourth requirement, that the emails "not be merely cumulative or impeaching," is also satisfied. *Int'l Bhd. of Teamsters*, 247 F.3d at 392.

Importantly, since there were no other documents introduced at trial containing similar statements by Thom Browne employees, this would, at a minimum, have provided useful impeachment of those Thom Browne employees who authorized the statements and testified at trial (notably Mr. Thom Browne himself) or who might have been called by plaintiffs as adverse witnesses if plaintiffs had known of these emails.

Resolution of the instant motion therefor turns on the third requirement: that the evidence "be admissible and of such importance that it probably would have changed the outcome." *Id.* The four email exchanges, plainly contain, at least in part, admissible evidence.[7] However, as explained below, the Court finds

---

*Co.*, 290 U.S. 240, 245 (1933)). Here, the only even arguably inequitable conduct by Adidas was the purported violation of the U.K. protective order that occurred when Adidas learned about the four emails. Whether that order was breached is a matter for the U.K. courts to decide, but it has little if any connection to the underlying non-disclosure of the emails that Adidas seeks to remedy through the instant motion.

[7]     Thom Browne argues the four emails are inadmissible hearsay and are "not . . . party admission[s] because adidas has not shown that th[e] statement[s] relates to the Accused Products." TB Opp. (Dkt. 224) at 19. But all four statements were made by Thom Browne employees "on a matter within the scope of [the employment] relationship and while it existed," and so are not hearsay. Fed. R. Evid. 801(d)(2)(D). The fact that these statements are not "admissions" is irrelevant. See Wright & Miller, Federal Practice

14

**Add.15**

that Adidas has not shown the emails are of such importance that
they probably would have changed the outcome of trial.

A key question at trial was whether the accused products
created a reasonable likelihood of confusion with Adidas's Three-
Stripe Mark. This is ultimately an objective standard, which can
be informed by the jurors' actual experience and observation. *See
Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.
1961). However, the Court instructed the jurors that they should
consider the so-called *Polaroid* factors. Jury Instructions (Dkt.
190) at 15. To this end, the instructions listed these *Polaroid*
factors relevant in this case as follows:

> *First*, the strength of adidas' Three Stripe Mark. . . .
> *Second*, the degree of similarity between adidas' Three
> Stripe Mark and Thom Browne's use of the Four Bar and/or
> Grosgrain designs on the Accused Products. . . . *Third*,
> whether the Accused Products and adidas products compete
> for the same consumers. *Fourth*, whether or not there is
> evidence that consumers are actually confused about
> which company offers the Accused Products. . . . *Fifth*,
> the quality of the Accused Products relative to adidas'
> products bearing the Three Stripe Mark. . . . *Sixth*, the
> degree of care and attention that an ordinary consumer
> would use when encountering adidas' and Thom Browne's
> respective products. . . . *Seventh*, whether adidas has
> shown that Thom Browne acted in bad faith.

---

& Procedure § 6772 ("There is no requirement that statements
admitted through Rule 801(d)(2) constitute 'admissions.'"). To the
extent certain emails contain a second layer of hearsay -- namely,
the views of FCB representatives -- they are admissible as going
to the declarant's state of mind. And while not directly addressed
to the accused products, they still relate to Thom Browne's
understanding of the possibility for confusion of the relevant
marks.

**Add.16**

Jury Instructions (Dkt. 190) at 15-16.

None of the four emails bears directly on any of these factors. Nonetheless, Adidas argues that the four emails constitute admissions of liability as to the "ultimate question of whether consumers are likely to be confused." Adidas Mot. (Dkt. 221) at 16-17. Adidas also argues that the four emails are "highly probative" of several of the *Polaroid* factors, including the strength of Adidas's mark, the degree of similarity between Adidas's mark and Thom Browne's design, the proximity of the parties' products, and "most significantly . . . Thom Browne's bad faith." *Id.* at 17-19. But these arguments are highly exaggerated.

Email 1 contains the off-hand suggestion by a senior account manager at Thom Brown, Emily Maturo, that, "[w]e try to avoid rows of 4 bar armband on the racks so as to not look like Adidas." Dkt. 222-1. To try to "not look like Adidas" hardly conveys an opinion that the repeating bars are confusing, let alone a confession of same. Moreover, there is no evidence that this email was referring to the accused products, and in fact the purchaser with whom Ms. Maturo was corresponding was located in Switzerland and purchasing products for Asia, so her remarks concerned an entirely distinct market. To the extent the reference to what "[w]e try" to do can be understood as a suggestion that Maturo was describing a general policy of the company, that inference is rebutted by the absence of any other evidence produced in discovery that such a policy

**Add.17**

exists. Further, even Adidas admitted that there is no risk of
confusion when it comes to Thom Browne's formalwear, having only
alleged infringement with respect to a subset of Thom Browne's
activewear, so the suggestion that "we try to avoid rows of 4 bar
armband[s]," without any limitation to Thom Browne's activewear,
hardly constitutes an admission of necessary confusion.

Email 3 reflects the views not of Thom Browne employees, but
of an FCB employee, Tomasso Galli. The email describes the view of
an unnamed individual at FCB that "any four bars . . . is too much
in the spirit of Adidas." Dkt. 222-3. The designs being discussed
are for formalwear and accessories, which Adidas does not contend
constitute infringement. The fact someone at FCB believed that the
design is "too much in the spirit of Adidas" may be well be
relevant, but it far from an admission that Thom Browne agreed.
Further, there is an obvious distinction between a likelihood of
confusion and being "too much in the spirit of Adidas." In Email
4, Thom Browne suggests that he "thought [T]omaso [Galli] has
already said that we shouldn't use the four bars because of
adidas." Dkt. 222-4. This simply summarizes Browne's view of the
import of Galli's views expressed in Email 3 and is of doubtful
relevance, let alone an alleged admission.

Of the emails, perhaps the only one of more than marginal
import is Email 2, in which Thi Wan, then Thom Browne's Head of
Menswear, states, "As Adidas has such a big presence in the

sporting world, it is inevitable that our 4bar in white be read as adidas stripes, especially on accessories." Dkt. 222-1. Even this is not an admission, because, as already noted, the issue is not Mr. Wan's belief, but what is the objective likelihood of confusion. In any case, Mr. Wan was not discussing any of the accused products, but was instead referring to formalwear and accessories (*i.e.* handbags). Again, Adidas admits that these products did not infringe on its trademark.

As noted, what the jury had to decide was whether, as an objective matter, there was a reasonable likelihood or confusion between Adidas's distinctive arrangement of three stripes and Thom Browne's distinctive arrangement of four bars. Aside from the jurors' visual assessment of the similarity and dissimilarity of the two designs, the central focus at trial was, as one would expect such a case, on the competing testimony of the parties' competing experts. These experts testified about the history of the brands, the historical use of stripes and bars in a wide variety of settings (*e.g.*, on the sleeves of army sergeants), consumers perceptions of various stripe designs, *etc.* There was also a considerable focus on the vastly differing price points of Adidas's and Thom Browne's products and the very different channels through which they are sold. The four email exchanges here at issue would have had little relevance to these central foci. It is true that Adidas also produced evidence of Thom Browne's alleged bad

18

**Add.19**

faith, but contrary to Adidas's own assertion, it is doubtful that the four emails would have played a material role in the jury's assessment of that issue.

Indeed, it was essentially undisputed at trial that Thom Browne was aware from early on that Adidas had concerns about anyone else's use of any combination of stripes (even if labeled "bars"), that Adidas had a history of taking highly aggressive actions against any other company that used stripes in their products, and that Thom Browne sought to minimize the risk of a confrontation with Adidas but ultimately concluded that their four-bar design could be defended. *See, e.g.*, Trial Tr., at 471:21-23; 472:1-16; 473:21-474:4. The four emails here at issue are consistent with that largely undisputed evidence at trial.

In sum, the four emails, while not irrelevant, hardly seem material to the central issues in this case as they actually played out at trial. It is also worth noting that the jury, by their verdict, plainly indicated that they were not persuaded by the much more directly relevant evidence that Adidas presented. For example, Adidas presented the results of a consumer's survey that Adidas contended showed evidence of actual consumer confusion between Adidas's stripes and Thom Browne's bars. *See* Trial Tr. (Dkt. 198) at 379-405. The survey polled 2,400 consumers in the U.S. and purportedly showed that somewhere between 14% and 38.6% were confused, depending on the product type. *Id.* at 403-404. The

**Add.20**

four emails now at issue, even when viewed most favorably to Adidas, express the view of a few individuals at Thom Browne and FCB that there was a risk of confusion. By contrast, this survey purported to show that hundreds of consumers were in fact confused. If the jury was willing to believe that there was a risk of confusion between the two marks, the views of these actual consumers would presumably have been far more powerful than the views expressed in the four emails.

Furthermore, the essence of Thom Browne's defense in this case was simply that Adidas's claims amounted to a contention that they owned all stripe designs and that this was a masked attempted to monopolized the sportswear market. In his closing statement, Thom Browne's counsel summarized this argument by declaring "this case isn't about confusion. It isn't about competition. It's about whether adidas can own all stripes." Trial Tr. (Dkt. 208) at 1391. Indeed, the Court's perception of the jury "body language" suggests that it was this argument that most likely influenced the jury in Thom Browne's favor. The four emails now at issue say nothing about this argument.

The same is true with respect to the other arguments emphasized by Thom Browne's counsel, such as that Thom Browne's products did not compete with those of Adidas because they had such widely differing price points. *Id.* at 1374-77, 1385-86. Thom Browne also stressed the substantial difference in quality between

the two companies' products, and the fact that Thom Browne's activewear is not really meant for sports. Mr. Browne testified that he "would advise not running in [his] running shoes." Trial Tr. (Dkt. 202) at 499. To be sure, Adidas disagreed, claiming that the quality and price-point of the clothes would not have been apparent in the pre-sale and post-sale contexts, which were the only circumstances where Adidas alleged that confusion occurred. But the point for present purposes is that the four emails, if they had been introduced at the trial, would have had little or no bearing on the central dispute in this case as they actually played out at trial. More generally, even though the trial lasted eight days and included the testimony of sixteen witnesses and the introduction of over 400 exhibits, the jury returned a verdict for Thom Browne in approximately two hours. This swift verdict shows that the jury was totally unpersuaded by virtually any of the proof or argument Adidas presented at trial, and it is frankly impossible to conclude under these circumstances that these four emails here at issue would have probably tipped the scales in favor.

B. Federal Rule of Civil Procedure 60(b)(3)

Federal Rule of Civil Procedure 60(b)(3) permits a Court to relieve a party of a final judgment in the case of "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). To be entitled to relief under this provision, Adidas must show that (1)

**Add.22**

Thom Browne engaged in "misconduct," (2) the misconduct "substantially interfer[ed] with [Adidas's] ability to fully and fairly present its case," and (3) the "need for substantial justice" outweighs "the value of preserving the finality of judgments" such that a new trial is warranted. *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 286 F. Supp. 2d 309, 312, 316 (S.D.N.Y. 2003).

Unlike the Rule 60(b)(2) standard discussed above, which requires a showing that the evidence probably would have changed the outcome of trial, the second element of the test under Rule 60(b)(3) is satisfied where "the concealment precluded inquiry into a plausible theory of liability, denied [the movant] access to evidence that could well have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination." *TAL Properties of Pomona, LLC v. Vill. of Pomona*, 2019 WL 3287983, at *9 (S.D.N.Y. July 22, 2019) (quotation omitted). Arguably, the four emails satisfy this second element; but the court does not reach that question because the Court finds that Adidas has failed to satisfy the first element, concerning whether Thom Browne has engaged in misconduct.[8]

---

[8]    Because, as explained below, the Court finds Adidas has not shown that Thom Browne engaged in misconduct, it follows that Adidas has also failed to satisfy the third element, *i.e.*, that the "need for substantial justice" warrants a new trial. *Catskill*, 286 F. Supp. 2d at 312.

**Add.23**

1. <u>Legal Standard</u>

While the Second Circuit has never addressed the precise meaning of "misconduct" as used in Rule 60(b)(3), it has held that the moving party, to be entitled to relief, must prove the opposing party's misconduct by "clear and convincing evidence." *Fleming v. New York Univ.*, 865 F.2d 478, 484 (2d Cir. 1989).

Adidas argues that "even an innocent failure to produce documents during discovery may constitute 'misconduct' under Rule 60(b)(3)." Adidas Supp. Br. (Dkt. 248) at 1. Though on its face, this seems inconsistent with the common meaning of "misconduct," Adidas's position is arguably suggested by at least *dicta* in some

cases from other Circuits,[9] and several courts in this District have adopted a similar view. [10]

In response, Thom Browne claims that the First Circuit's decision in *West v. Bell Helicopter Textron*, 803 F.3d 56 (1st Cir. 2015), "affirms that 'misconduct' requires intentional or conscious behavior." Thom Browne Supp. Br. (Dkt. 250) at 5-6. Thom Browne's reading of *West* is incorrect. *West* repeatedly cited and

---

[9]     *See Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988) (stating "misconduct" "can cover even accidental omissions"); *West v. Bell Helicopter Textron, Inc.*, 803 F.3d 56, 67 (1st Cir. 2015) (quoting this portion of *Anderson* with approval); *Schultz v. Butcher*, 24 F.3d 626, 630-31 (4th Cir. 1994) ("We hold that an adverse party's failure, either inadvertent or intentional, to produce such obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)."); *Morgan v. Tincher*, 90 F.4th 172, 180 (4th Cir. 2024) (finding "failure to disclose evidence" constituted "misconduct" "irrespective whether that failure was inadvertent or intentional"); *Bros. Inc. v. W.E. Grace Mfg. Co.*, 351 F.2d 208, 211 (5th Cir. 1965) (suggesting Rule 60(b)(3) analysis is "the same whether there was evil, innocent, or careless, purpose."); *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 879 (9th Cir. 1990) (stating "misconduct" may be "either knowing or accidental"); *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1328 (Fed. Cir. 2016) (applying Eleventh Circuit law and stating that "'misconduct' does not demand proof of nefarious intent or purpose as a prerequisite to redress.").

[10]     *See Thomas*, 293 F.R.D. at 503-04 (suggesting "misconduct" may be "accidental or inadvertent"); *Catskill*, 286 F. Supp. 2d at 314 ("[A]ccidental failure to disclose or produce materials requested in discovery can constitute "misconduct" within the purview of Rule 60(b)(3)."); *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, 1996 WL 524339, at *2 (S.D.N.Y. Sept. 13, 1996) ("[Plaintiff] correctly asserts that an adverse party's inadvertent failure to produce requested discovery material in its possession may constitute misconduct under Rule 60(b)(3).").

**Add.25**

quoted *Anderson* with approval, including those portions indicating
proof of intentional misconduct is not required. *See West*, 803
F.3d at 67 ("[Misconduct] is an expansive concept, as misconduct
'does not demand proof of nefarious intent or purpose as a
prerequisite to redress,' and the term 'can cover even accidental
omissions.'" (quoting *Anderson*, 862 F.2d at 922-23).[11]

However, in *Jordan v. Paccar, Inc.*, the Sixth Circuit
disagreed with this view and held that Rule 60(b)(3) "require[s]
the moving party to demonstrate that the non-moving party engaged
in deliberate or reckless misbehavior." 1996 WL 528950, at *8 (6th
Cir. 1996).[12] The *Jordan* court believed that "[f]raud cannot be
unintentional, and the use of the prefix 'mis' in both
'misrepresentation' and 'misconduct' also suggests that the moving
party under the rule must show that the adverse party committed a
deliberate act that adversely impacted the fairness of the relevant
legal proceeding in question." *Id.* at *6. *Jordan* found the

---

[11]    While the *West* court did fault the district court for failing
to determining the degree of defendants' culpability, it did so
only because that culpability was relevant as to whether
"substantial interference" could be presumed or must instead be
proven by plaintiff. *See id.* at 71-73. It did not require
intentional misconduct for Rule 60(b)(3) to apply.
[12]    Adidas mischaracterizes this case as requiring only a showing
that the non-disclosure resulted from "accidents that should have
been avoided." Adidas Supp. Br. (Dkt. 248) at 3 (quoting *Jordan*,
1996 WL 528950, at *6). While that language does appear in *Jordan*,
elsewhere in the *Jordan* opinion the court clearly specified that
the standard it espoused requires proof the non-disclosure was the
product of deliberate or reckless conduct. *See Jordan*, 1996 WL
528950, at *7-8.

**Add.26**

applicable canon of statutory interpretation to be *noscitur a sociis* -- the rule that "a word is known by the company it keeps" -- which suggests that "misconduct," when read with "fraud" and "misrepresentation" requires "some odious behavior on the part of the non-moving party." *Id.* at *7.

Having considered the relevant authorities, none of which is binding on this Court, the Court finds that a middle approach is appropriate here. In the context of the non-production of electronically stored information, the moving party must show the non-production was at least the product of negligence on the part of the non-producing party for it to constitute "misconduct" within the meaning of Rule 60(b)(3).

In this Court's view, this conclusion follows from the term "misconduct" itself. The term plainly connotes some form of malfeasance or inappropriate behavior. *See Misconduct*, Black's Law Dictionary (11th ed. 2019) (defining "misconduct" as "[a] dereliction of duty; unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust"); *see Anderson*, 862 F.2d at 924 n.10 ("In contrast [to Rule 60(b)(2)], Rule 60(b)(3) focuses not on erroneous judgments as such, but on judgments which were unfairly procured.").

Federal Rule of Civil Procedure 34 permits a party to "serve on any other party a request within the scope of Rule 26(b)" to produce "any designated documents or electronically stored

**Add.27**

information." Fed. R. Civ. P. 34. Rule 26(b), in turn, permits a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). Among the key considerations in evaluating whether the requested discovery is proportional is "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

It follows from this fundamental limitation -- that all discovery must be proportional -- that courts do not demand perfection in responding to discovery requests, particularly when it comes to the production of electronically stored information. *See Williams v. NYC Bd. of Elections*, 2024 WL 2125435, at *6 (S.D.N.Y. May 13, 2024) ("Perfection is not the rule, especially with multiple sources of ESI, the tendency for there to be multiple copies of the same email or near-dupes the production of which has no incremental value to the case but exponentially increases the costs of discovery."); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 461 (S.D.N.Y. 2010) ("In an era where vast amounts of electronic information is available for review . . . [c]ourts cannot and do not expect that any party can meet a standard of perfection."), *abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012); F*ed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 2014 WL 584300, at *2 (S.D.N.Y. Feb. 14, 2014) ("[N]o one

**Add.28**

could or should expect perfection from [the electronic discovery]
process."). Courts only require, for example, that a party conduct
a "reasonable search" for documents in response to a request, not
that they boil the ocean to ensure every potentially responsive
item is produced. *Raine Grp. LLC v. Reign Cap., LLC*, 2022 WL
538336, at *1 (S.D.N.Y. Feb. 22, 2022).

The strict liability rule demanded by Adidas is inconsistent
with this principle of proportionality. Unlike Rule 60(b)(2),
which requires a showing that the non-produced material probably
would have changed the outcome at trial, Rule 60(b)(3) may be
satisfied where "the concealment precluded inquiry into a
plausible theory of liability, denied [the opposing party] access
to evidence that could well have been probative on an important
issue, or closed off a potentially fruitful avenue of direct or
cross examination." *TAL Properties*, 2019 WL 3287983, at *9. The
scope of documents potentially encompassed by this rule is
comparatively vast, and it is entirely plausible that even a
thorough and diligent search will fail to identify items that
satisfy the test. If the innocent non-production of such documents
were in every case sufficient to void the results of a trial, the
balance of economy and thoroughness struck by the discovery rules
would be shattered, as parties would be incentivized to go to
inordinate lengths to ensure all conceivably significant material
is produced. And while most cases do not go to trial, every party

**Add.29**

must assume that a trial might take place and conduct their discovery accordingly. Thus, an overly expansive interpretation of Rule 60(b)(3) will have the perverse effect of incentivizing inordinate levels of care in a large proportion of cases, for fear that any trial win may be no win at all. This result cannot be correct.

In a similar vein, where a party "fail[s] to timely produce [certain] evidence," but this failure is discovered before trial, courts may not impose sanctions unless the failure was the product of "a culpable state of mind." *Valentini v. Citigroup, Inc.*, 2013 WL 4407065, at *2 (S.D.N.Y. Aug. 16, 2013). "The 'culpable state of mind' element is satisfied by a showing that 'a party has breached a discovery obligation . . . through bad faith or gross negligence [or] ordinary negligence.'" *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 113 (2d Cir. 2002)).

Just as a party must show at least negligence to obtain sanctions, it makes sense to require a similar showing of at least negligence to demonstrate "misconduct" within the meaning of Rule 60(b)(3). Not only does this align the standards of conduct throughout the various portions of the Rules of Civil Procedure, but also without such a showing, the moving party arguably has not demonstrated that the non-moving party even breached its discovery

obligations at all, and, hence, that any misconduct has occurred.[13]
By contrast, the strict liability rule advocated by Adidas would
create the anomalous result that a party may obtain a new trial
based on a showing that would not even entitle them to sanctions
during the normal course of litigation, a result fundamentally at
odds with the principle that "final judgments should not be lightly
reopened." *Catskill*, 286 F. Supp. 2d at 320 (quoting *Nemaizer v.
Baker*, 793 F.2d 58, 61 (2d Cir. 1986)(internal quotation marks
omitted)).

The Court acknowledges the non-binding authority cited above
that runs arguably contrary to this holding, but notes that the
suggestion that even innocent non-disclosures may constitute
misconduct was dicta in many of those cases, where some degree of
purposeful culpability was clearly apparent.[14] In the other cases

---

[13]    One might argue that the standard to obtain sanctions does
not actually define a party's underlying discovery obligations, or
in other words that there is a divergence between the conduct rule
and the decision rule. *See Meir Dan-Cohen, Decision Rules and
Conduct Rules: On Acoustic Separation in Criminal Law,* 97 Harv. L.
Rev. 625, 627-28 (1984) (explaining distinction between "conduct
rules" intended to guide the public's conduct and "decision rules"
addressed to officials applying the law). But even if Rule 37's
culpability requirement defines only when sanctions may be
obtained (*i.e.* defines a decision rule), the Court sees no reason
why a similar decision rule should not apply in the Rule 60(b)(3)
context.

[14]    *See, e.g., Anderson*, 862 F.2d at 927-28 ("Appellee's
knowledge of the Report, before trial and in ample time to make
disclosure, cannot be gainsaid."); *Jones*, 921 F.2d at 878-79
(remanding for district court to make findings about existence of
misconduct in first instance); *Morgan*, 90 F.4th at 180 (finding

**Add.31**

where a Rule 60(b)(3) motion was granted without an explicit
finding of culpability, there were nevertheless suggestions in the
record that the party engaging in misconduct was aware of the non-
produced information or that they likely had acted with at least
negligence in failing to produce it, and so the facts of these
cases are consistent with this Court's holding, even if their
reasoning diverges from it somewhat.[15] And, perhaps most
significantly, none of the other cases involved a failure to
produce electronically stored information as part of a substantial
discovery review process and thus none of the cases implicate the
proportionality concerns present in that context.

On the other hand, the Court is equally convinced that a
showing of no more than negligence is appropriate. Limiting
"misconduct" to "intentional[] or conscious" bad acts, as Thom

_____

defendant engaged in misconduct by failing to update discovery
response seeking information about other cases where the defendant
had been sued); *Thomas*, 293 F.R.D. at 505-06 (concluding misconduct
was intentional).

[15]    *See, e.g.*, *Rembrandt Vision Techs., L.P.*, 818 F.3d at 1328
(suggesting argument that party was unaware of test results
"strains credulity, given that it provided" its product to the
expert who conducted the testing); *Schultz*, 24 F.3d at 629
(suggesting non-producing party was "in possession of" extremely
harmful report it failed to disclose); *Bros Inc.*, 351 F.2d at 211
(concluding there was insufficient evidence to find party had
engaged in "purposeful misconduct" by submitting and relying on
false affidavit but granting Rule 60(b) relief regardless);
*Catskill*, 286 F. Supp. 2d at 314 (non-producing party admitted to
being aware of evidence, but failed to disclose it based on
erroneous interpretation of agreement regarding scope of
discovery).

**Add.32**

Browne requests, TB Supp. Br. (Dkt. 250) at 2, ignores the critical role that attorneys play in our discovery system. "Discovery is run largely by attorneys, and the court and the judicial process depend upon honesty and fair dealing among attorneys." *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007). "If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." 1983 Advisory Comm. Note to Rule 26(g). Demanding a party affirmatively use reasonable care in complying with its discovery obligations is therefore appropriate for the proper functioning of our civil justice system. *Cf. Residential Funds Corp.* 306 F.3d at 108 ("The inference is adverse to the destroyer [of documents] not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991)).

If only intentional misconduct were penalized, a party's incentive would be to do the bare minimum in complying with its obligations, in the hope that its lackluster performance would go unnoticed until a wrongful trial result was obtained and it is too late to correct. *See Anderson* 862 F.2d at 923 ("[I]t takes scant imagination to conjure up discovery responses which, though made in good faith, are so ineptly researched or lackadaisical that

32

**Add.33**

they deny the opposing party a fair trial."). And the problem is compounded by difficulties of proving an adversary's bad intent after the fact.[16]

Furthermore, permitting Rule 60(b)(3) relief based on a showing of negligence preserves the independent force of the term "misconduct."

2. Application

It follows that for Adidas to establish Thom Browne's non-production of the emails constituted "misconduct" within the meaning of Rule 60(b)(3), Adidas must show by clear and convincing evidence that Thom Browne was obligated to produce the emails and negligently failed to do so. The court finds that Adidas has not satisfied this burden.

As explained *supra* Section I.C., the non-production of the four emails was the product of a miscommunication between Thom Browne's counsel and its e-discovery vendor. Wolf Greenfield paralegal Viriginia Weeks sent an email to Thom Browne's e-discovery vendor, Consilio, instructing them to create "a saved search for ALL potentially privileged documents that have not already been produced by Thom Browne so that we will have one

---

[16]    True, a party still might be able to obtain relief under Rule 60(b)(2) if the non-disclosed evidence is sufficiently probative, but rarely will a court be able to say with confidence that a given piece of evidence "probably would have change the outcome" of a trial.

**Add.34**

search to work with when we go to do our privilege review." Dkt. 244-4, at TB00530219. Consilio then created a saved search titled "All Potentially Privileged" by running privilege search terms across all documents "that are not produced, not coded for responsiveness and not coded for privilege." *Id.* at TB00530218; Kerr Dep. (Dkt. 244-3) at 51-54. The four emails were not included in this "All Potentially Privileged" saved search because unbeknownst to Consilio, Ms. Weeks had previously tagged all (or some) documents hitting on the search term "adidas" as "needs further review." Hearing Tr. at 70, 75-76, 87-88; *see* Kerr Dep. (Dkt. 244-3) at 51-55. Because the four emails were not included in this saved search, they were never reviewed for privilege and so were never produced.

As an initial matter, there is no evidence in the record that suggests the non-production of the four emails was intentional or knowing. Each of Thom Browne's witnesses credibly denied any recollection of seeing the four emails or having ever been instructed to withhold responsive, non-privileged documents. This is confirmed by the Relativity document histories for the four emails. These histories reflect all instances when the four emails were viewed or modified. The histories for Emails 2 through 4, show that the only time a representative from Wolf Greenfield had any interaction with them was when Ms. Weeks carried out a "Mass Edit" on these documents (and presumably others) changing the

**Add.35**

responsiveness, confidentiality, and privilege coding to "Needs Further Review." *See* Dkts. 242-5, 242-6, 242-8, 242-9, 242-11, 242-12, 242-16, 242-17.[17]

The document history for Email 1 is somewhat more complicated. *See* Dkts. 242-2, 242-3. Email 1 was ultimately subject to the same mass edit by Ms. Weeks as the other three emails. However, prior to that edit another Wolf Greenfield paralegal, Cindy Babbit, viewed the document several times, made several mass edits to its responsiveness, privilege, and confidentiality coding, and made one non-mass edit, changing its privilege coding to "Needs Further Review." Ms. Weeks apparently also viewed this document before making her aforementioned mass edit. It is not clear why Ms. Babbit made these edits, why Ms. Babbit or Ms. Weeks viewed this document, or how long they viewed it for. At an evidentiary hearing, Ms. Babbit had no recollection of making these changes or viewing the document. Ms. Weeks testified she was instructed by a Wolf Greenfield associate to make the aforementioned mass tag of documents that hit on the Adidas search terms, but she also did not recall viewing the document.

Adidas nonetheless argues that these document histories demonstrate that Ms. Weeks and Ms. Babbit had knowledge of the

_____

[17]  According to the e-discovery principal employed by Adidas's own counsel, "[a] mass edit is when you apply tags or categories to a document without actually looking at [the documents]." Hearing Tr. (Dkt. 240) at 17:19-24.

**Add.36**

contents of at least Email 1. *See* Adidas Supp. Br. (Dkt. 248) at 5-7. But even assuming these individuals in fact had knowledge of Email 1 -- something both of them denied having any recollection of -- that would not establish any culpable conduct. As paralegals, they cannot reasonably be apprised of all documents produced and in play in the case. And even assuming, *arguendo*, that it might be reasonable to expect them to understand the significance of Email 1, the most they can be expected to do is flag the document for further review by an attorney, which is precisely what happened. Having done so, neither paralegal had any reason to believe the emails would not have been reviewed and produced.

Adidas argues that, even if not knowing, the non-production of the four emails was the product of negligence. In particular, Adidas points out that, in response to Ms. Weeks's request to create the saved search for the privilege review, Consilio told her it had included only documents "not coded for responsiveness and not coded for privilege," and so Weeks and other Wolf Greenfield attorneys cc'd on the email were on notice that the four emails -- which Weeks had previously coded -- were not included in the search. *See* Adidas Supp. Reply. (Dkt. 254) at 4-5.

The Court is not convinced this demonstrates negligence. Weeks' instruction that the saved search should include "ALL potentially privileged documents" was quite clear and it was

**Add.37**

reasonable for her to assume that this would encompass documents that had been tagged as "needs further review." By contrast, the suggestion that only documents "not coded for responsiveness and not coded for privilege" were included is rather vague, and documents "not coded for privilege" could easily be understood as encompassing only documents that had already been determined were in fact privileged. With the benefit of hindsight, this disconnect in understandings is readily apparent, but in the moment, while an extensive discovery review was ongoing, it is not clearly negligent for Weeks to have assumed her unambiguous instruction was understood. An inadvertent but understandable mix-up is not the same as negligence, at least not here.

Furthermore, Adidas has failed to prove by clear and convincing evidence that this further check was conducted in a negligent manner. Claire Schuster, a Wolf Greenfield associate, testified that she was tasked not only with reviewing the "All Potentially Privilege" saved searches created by Consilio, but also with conducting additional independent searches to ensure no other documents fell through the cracks. *See* Schuster Dep. (Dkt. 244-2) at 21-31. This included searching for any documents that were tagged as "needs further review." *See id.* at 40 (testifying that she "endeavored to be careful and review every document that was tagged 'further review.'"); *see also id.* at 57-58 (testifying that "it was [Schuster's] intent, when [she] was completing the

**Add.38**

privilege log exercise, to review every document that was tagged 'needs further review'" and that she "believe[s] [her] actions matched [her] intent").

While Schuster's quality check ultimately did not identify the four emails, *see id.* at 50-52, the very fact that such a check was conducted negates the high burden placed on Adidas to prove negligence with clear and convincing evidence.

III. Conclusion

For the forgoing reasons, the Court reconfirms its "bottom-line" order of May 3, 2024, denying Adidas's motion for a new trial.

        SO ORDERED.

Dated:    New York, NY

          July 29, 2024          _____

                                  JED S. RAKOFF, U.S.D.J.

**Add.39**

**Rule 60. Relief from a Judgment or Order**

**(a) Corrections Based on Clerical Mistakes; Oversights and Omissions**. The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

**(b) Grounds for Relief from a Final Judgment, Order, or Proceeding**. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

    **(1)** mistake, inadvertence, surprise, or excusable neglect;

    **(2)** newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

    **(3)** fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

    **(4)** the judgment is void;

    **(5)** the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

    **(6)** any other reason that justifies relief.

**(c) Timing and Effect of the Motion.**

    **(1) *Timing***. A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

    **(2) *Effect on Finality***. The motion does not affect the judgment's finality or suspend its operation.

**(d) Other Powers to Grant Relief**. This rule does not limit a court's power to:

    **(1)** entertain an independent action to relieve a party from a judgment, order, or proceeding;

    **(2)** grant relief under 28 U.S.C. §1655 to a defendant who was not personally notified of the action; or

    **(3)** set aside a judgment for fraud on the court.

**(e) Bills and Writs Abolished**. The following are abolished: bills of review, bills in the nature of bills of review, and writs of coram nobis, coram vobis, and audita querela.