# 24-1510

*To Be Argued By:*
Alexandra A.E. Shapiro

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

adidas America, Inc., adidas AG,

*Plaintiffs-Appellants,*

—against—

Thom Browne, Inc.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

Robert T. Maldonado
Wolf, Greenfield & Sacks, PC
605 Third Avenue
New York, New York 10158
(212) 697-7890

Harley I. Lewin
LewinConsult LLC
72 Commercial Street #5
Portland, Maine 04102
(914) 310-0744

Alexandra A.E. Shapiro
Julian S. Brod
Christopher Johnson
Shapiro Arato Bach LLP
1140 Avenue of the Americas,
    17th Floor
New York, New York 10036
(212) 257-4880

John L. Strand
John L. Welch
Wolf, Greenfield & Sacks, PC
600 Atlantic Avenue
Boston, Massachusetts 02210
(617) 646-8000

*Attorneys for Defendant-Appellee*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellee Thom Browne, Inc., by and through its undersigned counsel, makes the following disclosure: Ermenegildo ZEGNA NV is a publicly held corporation owning 10% or more of Thom Browne, Inc's stock.

Dated:    December 13, 2024

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ........................................................................ 1

STATEMENT OF THE ISSUES ............................................................. 3

STATEMENT OF THE CASE .............................................................. 4

    A.    Background ................................................................. 4

    B.    Trial And First Appeal .................................................... 7

    C.    Rule 60 Motion ...........................................................12

    D.    District Court Decision ...................................................15

SUMMARY OF ARGUMENT ................................................................20

STANDARD OF REVIEW .................................................................22

ARGUMENT ...........................................................................22

I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING ADIDAS'S MOTION UNDER RULE 60(b)(2) .............23

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING ADIDAS'S MOTION UNDER RULE 60(b)(3) .............34

    A.    Rule 60(b)(3) Requires Intentional Or Reckless Wrongdoing ........34

        1.    The Plain Meaning Of "Misconduct" ...................................34

        2.    The Interpretative Canons ...................................................39

        3.    The Structure Of Rule 60(b) And The Federal Rules ..........43

        4.    The Caselaw .................................................................47

        5.    Policy Considerations .......................................................55

      B.    At Minimum, Rule 60(b)(3) Requires Negligence,
           And Thom Browne Was Not Negligent ........................................56

      C.    Even Assuming "Misconduct," Adidas Was Not Prevented
           From Fully And Fairly Presenting Its Case ...................................59

CONCLUSION ................................................................................................59

CERTIFICATE OF COMPLIANCE...................................................................61

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Adidas Am., Inc. v. Thom Browne, Inc.*,
    23-166, 2024 WL 1953594 (2d Cir. May 3, 2024)....................12, 24

*Aguilar v. Standard Oil Co. of N.J.*,
    318 U.S. 724 (1943) ................................................................38

*Anderson v. Cryovac, Inc.*,
    862 F.2d 910 (1st Cir. 1988)................................................53, 54

*BFP v. Resol. Tr. Corp.*,
    511 U.S. 531 (1994) ................................................................42

*Bissonnette v. LePage Bakeries Park St., LLC*,
    601 U.S. 246 (2024) ................................................................41

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020) ................................................................34

*Boule v. Hutton*,
    328 F.3d 84 (2d Cir. 2003) .....................................................24

*Brown v. Felsen*,
    442 U.S. 127 (1979) ................................................................55

*Buxbaum v. Deutsche Bank AG*,
    216 F.R.D. 72 (S.D.N.Y. 2003) ..............................................42

*Carroll v. Trump*,
    49 F.4th 759 (2d Cir. 2022) ....................................................35

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990) ................................................................57

*Dukes v. City of Minneapolis*,
    339 F. App'x 665 (8th Cir. 2009) ...........................................49

*Fischer v. United States*,
    603 U.S. 480 (2024) ....................................................40, 41, 43

iv

*Fleming v. New York Univ.*,
 865 F.2d 478 (2d Cir. 1989) ................................................................22, 57

*Gater Assets Ltd. v. AO Moldovagaz*,
 2 F.4th 42 (2d Cir. 2021) ...............................................................................22

*Genger v. Genger*,
 663 F. App'x 44 (2d Cir. 2016) ....................................................................59

*Geo-Grp. Commc'ns, Inc. v. Chopra*,
 15 Civ. 1756 (KPF), 2023 WL 6235160 (S.D.N.Y. Sept. 26, 2023) ..42, 50, 59

*Gomez v. Banco Bilbao Vizcaya, S.A.*,
 92 Civ. 7863 (RPP), 1994 WL 414483 (S.D.N.Y. Aug. 8, 1994)...................51

*Grayton v. Ercole*,
 691 F.3d 165 (2d Cir. 2012) .........................................................................38

*Greiner v. City of Champlin*,
 152 F.3d 787 (8th Cir. 1998) ........................................................................59

*Gustafson v. Alloyd Co.*,
 513 U.S. 561 (1995) ......................................................................................40

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
 826 F.3d 27 (2d Cir. 2016) ...........................................................................29

*Harrington v. Purdue Pharma L.P.*,
 144 S. Ct. 2071 (2024) ..................................................................................41

*In re Lawrence*,
 293 F.3d 615 (2d Cir. 2002) .........................................................................50

*In re M/V MSC Flaminia*,
 72 F.4th 430 (2d Cir. 2023) ..........................................................................57

*In re Oliver*,
 333 U.S. 257 (1948) ......................................................................................38

*Info-Hold, Inc. v. Sound Merch., Inc.*,
 538 F.3d 448 (6th Cir. 2008) ........................................................................48

*Jeanty v. Cerminaro*,
    16-cv-966 (BKS/TWD), 2023 WL 2559412 (N.D.N.Y. Feb. 13, 2023).........50

*Jeanty v. City of Utica*,
    23-369, 2024 WL 4429417 (2d Cir. Oct. 7, 2024) .........................................50

*Jenkins v. Anton*,
    922 F.3d 1257 (11th Cir. 2019) ....................................................................43

*Lonsdorf v. Seefeldt*,
    47 F.3d 893 (7th Cir. 1995) ..........................................................................52

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006) .........................................................................................38

*Michelson v. United States*,
    335 U.S. 469 (1948) .......................................................................................38

*Mirlis v. Greer*,
    952 F.3d 36 (2d Cir. 2020) ...........................................................................24

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir. 1987) .........................................................20, 25, 29

*Morgan v. Tincher*,
    90 F.4th 172 (4th Cir. 2024). ........................................................................53

*N.L.R.B. v. Federbush Co.*,
    121 F.2d 954 (2d Cir. 1941) .........................................................................40

*Nederlandsche Handel-Maatschappij, N.V. v. Jay Emm, Inc.*,
    301 F.2d 114 (2d Cir. 1962) .........................................................................22

*Nemaizer v. Baker*,
    793 F.2d 58 (2d Cir. 1986) .....................................................................22, 55

*Niz-Chavez v. Garland*,
    593 U.S. 155 (2021) .......................................................................................37

*Paddington Partners v. Bouchard*,
    34 F.3d 1132 (2d Cir. 1994) .........................................................................23

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961) ...............................................................25

*Raine Grp. LLC v. Reign Cap., LLC*,
    21-cv-1898 (JPC) (KHP), 2022 WL 538336 (S.D.N.Y. Feb. 22, 2022) .........45

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
    818 F.3d 1320 (Fed. Cir. 2016) .......................................................53

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002) ..............................................................46

*Rozier v. Ford Motor Co.*,
    573 F.2d 1332 (5th Cir. 1978) .........................................................53

*Sack v. Cent. Intel. Agency*,
    53 F. Supp. 3d 154 (D.D.C. 2014) ...................................................49

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) .........................................................................56

*Satyam Comput. Servs., Ltd. v. Venture Global Eng'g, LLC*,
    323 Fed. App'x 421 (6th Cir. 2009) .................................................48

*Schultz v. Butcher*,
    24 F.3d 626 (4th Cir. 1994) ............................................................53

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020) ............................................................41

*Skilling v. United States*,
    561 U.S. 358 (2010) .......................................................................38

*Smith v. Clarke*,
    458 F.3d 720 (8th Cir. 2006) ..........................................................49

*Solomon v. Fordham Univ.*,
    18-cv-4615 (ER), 2024 WL 3273112 (S.D.N.Y. Jul. 2, 2024) .....................45

*Star Indus., Inc. v. Bacardi & Co. Ltd.*,
    412 F.3d 373 (2d Cir 2005) .......................................................24, 29

*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*,
　　374 F.3d 158 (2d Cir. 2004) ................................................................50, 59

*State v. Arnold*,
　　629 S.E.2d 807 (Ga. 2006) ...............................................................39

*Stevens v. Miller*,
　　676 F.3d 62 (2d Cir. 2012) ...............................................................22

*Stridiron v. Stridiron*,
　　698 F.2d 204 (3d Cir. 1983) ........................................................51, 52

*Summers v. Howard Univ.*,
　　374 F.3d 1188 (D.C. Cir. 2004).............................................43, 49, 52

*Thom Browne Inc. v. Adidas AG*,
　　[2024] EWHC 2990 ....................................................................31, 33

*Thomas v. City of New York*,
　　293 F.R.D. 498 (S.D.N.Y. 2013) .....................................................51

*Thomas v. McAullife*,
　　691 F. App'x 671 (2d Cir. 2017) .....................................................51

*Tiffany & Co. v. Costco Wholesale Corp.*,
　　971 F.3d 74 (2d Cir. 2020) .........................................................24, 29

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
　　508 U.S. 439 (1993) ........................................................................37

*United States v. Butler*,
　　955 F.3d 1052 (D.C. Cir. 2020).......................................................39

*United States v. Int'l Bhd. of Teamsters*,
　　247 F.3d 370 (2d Cir. 2001) ..............................................20, 22, 24

*United States v. One (1) Douglas A-26B Aircraft*,
　　662 F.2d 1372 (11th 1981) ..............................................................54

*United States v. Parse*,
　　789 F.3d 83 (2d Cir. 2015) ..............................................................39

*United States v. Reyes*,
    577 F.3d 1069 (9th Cir. 2009) ........................................................39

*Venture Indus. Corp. v. Autoliv ASP, Inc.*,
    457 F.3d 1322 (Fed. Cir. 2006) ......................................................48

*West v. Bell Helicopter Textron, Inc.*,
    803 F.3d 56 (1st Cir. 2015)..............................................................52

*West v. Love*,
    776 F.2d 170 (7th Cir. 1985) ..........................................................43

*Yates v. United States*,
    574 U.S. 528 (2015) ........................................................................40

*Zurich N. Am. v. Matrix Serv., Inc.*,
    426 F.3d 1281 (10th Cir. 2005) .................................................44, 49

## Rules

Fed. R. Civ. P. 26...........................................................................45, 49

Fed. R. Civ. P. 60(b) ........................................................................passim

N.Y. Rules of Pro. Conduct R. 5.3 ........................................................59

## Other Authorities

Advisory Committee Notes for 1946 Amendment to
    Fed. R. Civ. P. 60 ......................................................................34, 42

Advisory Committee Notes for 2006 Amendment to
    Fed. R. Civ. P. 26 ............................................................................56

Advisory Committee Notes for 2006 Amendment to
    Fed. R. Civ. P. 34 ............................................................................56

Antonin Scalia & Brian A. Garner,
    Reading Law: The Interpretation of Legal Texts (2012)................40

Ballentine's Law Dictionary (3d ed. 1969) ..........................................35

Black's Law Dictionary (4th ed. 1951) ....................................35, 36, 41

Black's Law Dictionary (4th rev. ed. 1968) .......................................... 35

Collins Online Dictionary .................................................................. 36

McCarthy on Trademarks and Unfair Competition (5th ed. 2024) ....................... 24

Merriam-Webster.com Dictionary ......................................................... 36

Model Code of Jud. Conduct ............................................................... 39

Model Rules of Pro. Conduct ............................................................... 39

Oxford English Dictionary (2024)......................................................... 37

Webster's New Collegiate Dictionary (2d ed. 1953) ............................................. 36

Wright & Miller, Federal Practice and Procedure (3d ed. 2024)............................ 59

## **INTRODUCTION**

Adidas and Thom Browne have been at war all around the world over Adidas's claim that Thom Browne's use of four horizontal bars infringes Adidas's classic three vertical stripes mark. These are extraordinarily weak trademark claims. The marks are not visually similar, the two companies are not competitors, and there is zero possibility of purchaser confusion. After an eight-day trial in the Southern District of New York, the jury returned a verdict in Thom Browne's favor on all counts after deliberating for only two hours. This Court affirmed.

Adidas now wants a do-over. The grounds? A minor, good faith discovery error. Thom Browne searched through and produced vast numbers of documents. A few emails slipped through the cracks. If these emails had any probative value, it was weak, and they would have added little to the fulsome picture the jury saw.

The district court gave Adidas every opportunity to show its entitlement to relief. It permitted discovery. It held an evidentiary hearing. It permitted follow-up depositions. It permitted supplemental briefing. Ultimately, it determined that the non-production resulted from a miscommunication between Thom Browne's outside counsel and its discovery vendor during their review of nearly a million-and-a-half documents. It found no bad faith or even negligence on the part of Thom Browne or its counsel. It also held that the four non-produced emails were not likely to have changed the result at trial.

These conclusions—informed by the district court's own observations from having presided over the trial, including about the jury's "body language"—were manifestly correct and certainly not an abuse of discretion. Rule 60(b)(2) requires movants to show that newly discovered evidence is of such importance that it would probably have changed the result. Adidas cannot make this showing. Adidas lost because its three-stripe mark and Thom Browne's four-bar mark are not visually similar and because the jury rejected Adidas's expert testimony. Adidas lost because the two brands occupy entirely different markets: Adidas is an everyday sports and leisure brand, Thom Browne is a luxury fashion label, known for its suiting, and charges over $1,000 for a hoodie. And Adidas lost because Thom Browne convinced the jury that Adidas was overreaching in a campaign to "own all stripes."

Adidas was also not entitled to relief under Rule 60(b)(3), which requires clear and convincing evidence of "fraud," "misrepresentation," or "misconduct." Adidas does not challenge the district court's finding that the error occurred in good faith. Indeed, it could hardly do so. The four emails came to light because they *were* produced by Thom Browne in parallel litigation in London. Instead, Adidas argues that Rule 60(b)(3) requires relief even where a purely innocent mistake deprives a litigant of documents that could have been used at trial. This strict liability standard is contrary to the ordinary meaning of "misconduct," which

plainly requires culpability. It is also contrary to applicable canons of statutory interpretation, the structure of Rule 60(b) and the Federal Rules governing discovery, and the strong policy favoring the finality of judgments. And it is contrary to persuasive caselaw from other Circuits. Far from a strict liability standard, Rule 60(b)(3) demands proof of intentional wrongdoing, or at least recklessness. However, this Court need not reach that question because, at a minimum, Rule 60(b)(3) requires proof of negligence, and the district court correctly held that Thom Browne was not negligent.

This Court should affirm.

## STATEMENT OF THE ISSUES

1.     Whether the district court abused its discretion by denying relief under Rule 60(b)(2) on the grounds that the four newly-discovered emails would not have changed the outcome at trial.

2.     Whether the district court abused its discretion by denying relief under Rule 60(b)(3) when Adidas failed to present clear and convincing evidence of misconduct and failed to show that any such misconduct prevented it from fully and fairly presenting its case at trial.

## STATEMENT OF THE CASE

### A.    Background

Adidas is a giant of the sports apparel business, known for athletic gear worn by both professional athletes and everyday consumers.  Its products are priced for the general market and sold at sporting goods stores such as Foot Locker, Dick's Sporting Goods, and JD Sports.  (SA-44).  Adidas t-shirts, for example, can retail at $30 and footwear at $50.  (SA-47-48).

Since the 1950s, Adidas has used its classic Three-Stripe Mark as a brand identifier in the U.S.  These "iconic and classic three stripes" have been so successful that Adidas is "synonymous" with its Three-Stripe Mark and is widely known as the "Brand with the Three Stripes."  (SA-4, 43, 45, 231).  Adidas even uses the slogan "Brand with the Three Stripes" as a verbal mark on its products. (*E.g.*, SA-46, 408).

The classic use of the Three-Stripe Mark is in evenly sized and spaced narrow parallel stripes running vertically down sleeves and pant legs on both sides of the garment.  (*E.g.*, SA-409-24, 439, 443, 448, 456).  A famous example is the tracksuit popularized by German soccer legend Franz Beckenbauer.  (SA-41, 312). While Adidas occasionally has used the Three-Stripe Mark horizontally—*e.g.*, hooped around athletic socks, cuffs, or waistbands—these uses are exceptional. (SA-52-54).  Indeed, Adidas generally instructs its designers not to use the Three-

4

Stripe Mark horizontally. (SA-393-94 (instructing designers, "DO NOT USE HORIZONTALLY"), 402 (same)).

Thom Browne founded his eponymous company in 2001 in his New York apartment. (SA-31, 121). Browne "wanted to create a collection that … melded the idea of … handmade clothing of the best quality with a more sportswear … Fifties aesthetic." (SA-122). The core of that collection is Browne's famous "shrunken" grey suit, which shook up suiting fashions in the early 2000s by introducing a shorter pant leg and jacket. (SA-155, 502). Over more than two decades, Thom Browne has grown into a high-end luxury fashion brand sold out of boutique showrooms and high-end department stores such as Bergdorf Goodman and Saks Fifth Avenue. (SA-179). Its runway shows are known for their theatricality. (SA-89, 94-95, 520-26). Thom Browne himself is a renowned fashion icon. (SA-122-23). Throughout, the company has maintained its "sporting varsity-inspired sensibility." (SA-125).

While Thom Browne's clothing has a sporty look, it is generally not intended for actual athletics. Thom Browne's CEO, Rodrigo Bazan, testified that Thom Browne has never "provided clothes to be worn on a playing field by athletes." (SA-170). Thom Browne similarly testified that he "would advise not running" in his "running shoes." (SA-157). And some of Thom Browne's "sports" wear is sold with tongue firmly in cheek: its website, for example, shows

5

its "football jersey" on a model in a white dress shirt, tie, and a pleated skirt.  (SA-49, 406).

Thom Browne's clothes have an extremely high price point:  a Thom Browne hoodie and paired sweat-pant *each* retailed for over $1,000.  (SA-127-28).  A cashmere sweat-top retailed for "around $2,500."  (SA-130).  And Thom Browne's "compression collection"—a five item collection at issue in this case—retailed for $3,740.  (SA-177).

Early on, Thom Browne adopted a signature motif of three wide horizontal bars applied only to the left sleeve of some items of clothing, initially blazers (the "Three-Bar Signature").  This was a reference to classic university varsity jackets and sweaters, which often feature horizontal bars on one or both sleeves.  (SA-111-12, 529).  This motif was intended to impart a sporting, collegiate sensibility to Thom Browne's formal apparel.  (SA-124-25).  Browne also adopted a white, red, white, blue, and white trademark, known as the Grosgrain.  (SA-132).

In 2007, Adidas became aware of Thom Browne's use of the Three-Bar Signature on a blazer, and its in-house attorney called Thom Browne's then-CEO and demanded that Thom Browne cease using the Three-Bar Signature.  (SA-79, 111, 507-08).  At the time, Thom Browne was a small company, and it complied with Adidas's demand by adding a fourth bar (the "Four-Bar Signature"), which debuted in the middle of 2008.  (SA-80, 138-39).  For the next decade, Thom

6

Browne used the Four-Bar Signature on many of its items—and the Grosgrain on every single item—without any protest by Adidas.  (SA-113-14, 132).

After ten years of silence, Adidas contacted Thom Browne again in the spring of 2018.  (SA-84).  It objected to Thom Browne's use of the Grosgrain (which it had been using since its founding) and Four-Bar Signature adopted in 2008.  (SA-81-82).  Now an established luxury brand, Thom Browne refused to stop using these signature design elements.  Adidas sued to challenge Thom Browne's use of the Four-Bar Signature and Grosgrain on specified "accused products."[1]

### B.    Trial And First Appeal

It was obvious that Adidas could not prove point-of-sale confusion:  its products were too different from Thom Browne's, the price points and channels of distribution too far apart.  Instead, Adidas's infringement claim proceeded to trial on two theories:  initial-interest confusion (*i.e.*, confusion prior to point of sale that ceases to exist at the point of sale) and post-sale confusion (*i.e.*, confusion by non-purchasers of the product who see purchasers wearing the product).  Adidas also alleged trademark dilution.

---

[1] Adidas's trademark registrations are found at SA-409-35 and SA-483-500.  The accused Thom Browne products are found at SA-324-80 and SA-381-89.

In addition to lack of consumer confusion, Thom Browne put on a laches defense based on Adidas's decade-plus delay in bringing its case. The laches defense was not submitted to the jury, but instead was reserved for decision by the court in the event the jury found liability.

Trial began in January 2023 and lasted eight days. The parties presented 15 live witnesses and over 400 exhibits, including excerpts from depositions. Adidas executives testified about the undisputed longevity, ubiquity and prominence of the company's Three-Stripe Mark in the general consumer sportswear market. (SA-226-31). Adidas witnesses also testified to the company's broad perception of the market it serves: one stated that Adidas's competitors include Louis Vuitton and Versace—even Apple. (SA-51).

Meanwhile, Thom Browne called its current CEO to testify about the company's high-end collections, use of the Four-Bar Signature and Grosgrain trademarks, the high quality of its materials and workmanship, and its "exceptionally high" price points. (SA-160-67, 177-78). Thom Browne's former CEO testified about his 2007 conversation with Adidas's trademark counsel that led to the company's shift from the Three-Bar Signature to the Four-Bar Signature. (SA-79). Thom Browne's vice president of retail testified about the company's limited number of stores, personalized customer retail experience, and upmarket third-party retailers. (SA-183-89).

8

Thom Browne himself attended every day of the trial and testified concerning his design and development of the company's luxury collections and tailored fits. He also testified about his personal inspirations behind the Four-Bar Signature and Grosgrain marks, including about the varsity jacket inspiration for the horizontal bars. (SA-122-30, 132-37).

However, as the district court later noted, the trial was largely a battle of the experts. (Add.19). Adidas's main evidence was a consumer survey conducted by Hal Poret. Poret's survey purported to show that 27% of consumers confused the accused Thom Browne marks with Adidas's Three-Stripe Mark. (SA-56). But the survey was limited and deeply flawed. It addressed only *post-sale* confusion, and provided no support for Adidas's initial interest claim. (SA-55). It also tested only eight of the 136 accused products with the Four-Bar Signature. (SA-74-76). And despite purporting to be a *post-sale* survey, it failed to recreate the post-sale environment. (SA-57-68, 71-74). Poret's survey was so weak that Thom Browne did not offer a rebuttal survey. As the district court observed, the jury's verdict plainly reflected its rejection of Poret's survey. (Add.20-21).

Adidas also offered a branding expert, Dr. Erich Joachimsthaler, to opine on the strength of the Three-Stripe Mark and the harm supposedly caused by consumer exposure to Thom Browne's Four-Bar Signature and Grosgrain mark. Joachimsthaler opined that "three stripes is essentially synonymous" with "the

9

[A]didas name." (SA-85). He opined that consumers "see something in a Gestalt, in a holistic way," so that even a common design element such as three stripes can become a strong brand. (SA-86-87). He testified about the harm he claimed Adidas suffers when consumers see Thom Browne's products because Thom Browne's reputation for fashion "spreads to infect [A]didas's relationship with sport credibility." (SA-93). He also testified that Adidas and Thom Browne are "competitors" for consumers' "wallet share." (SA-90-91).

Thom Browne called its own branding expert, Dr. Joel Steckel, specifically to rebut Joachimsthaler's opinion. Steckel opined that Joachimsthaler's "opinions lack scientific basis and are grounded in baseless and incorrect assumptions and a lot of speculation." (SA-211). Steckel also responded to Joachimsthaler's opinion that Adidas and Thom Browne are "competitors." Calling the two companies competitors because they "both produce[] athleisure items," Steckel opined, is like saying "Peter Luger and McDonalds's are competitors because they both sell hamburgers" or "Rolls-Royce and Hyundai are competitors because they both manufacture cars." (SA-216). In sum, Joachimsthaler's opinion was "a lot of complicated hand-waving as opposed to scientific investigation." (SA-211).

The defense also called Joanne Arbuckle, the former dean of the School of Art and Design at the Fashion Institute of Technology and co-author of the "Historical Dictionary of Fashion." (SA-581-92). Arbuckle testified about the

10

extensive and wide-ranging history of the use of stripes on clothes. (SA-191-210). She used resources in museum collections, the special collections of the FIT library, the Smithsonian, the Naval Museum, and elsewhere. (SA-191). She showed that stripes, including horizontal stripes on sleeves, have been commonly used for hundreds of years, including on dresses (SA-193, 572), military and civilian uniforms (SA-193-94, 544-46, 568), and by other fashion designers, such as Tommy Hilfiger (SA-198, 556). She also focused on the use of horizontal stripes going back more than a hundred years in fashionable sportswear. (SA-201-03, 577-80). She showed the jury the common use of horizontal stripes across the arm on varsity sweaters or jackets, the original inspiration for Thom Browne's use of the motif. (SA-203-210, 537-43, 547-53, 570-71).

Arbuckle's testimony went to the heart of the central defense theme, as illustrated by the opening of Thom Browne's summation: "Ladies and gentlemen of the jury, [A]didas does not own stripes. Remember that as you consider the evidence, as you consider your verdict. Adidas does not own stripes. And that's what this case is about." (SA-269). Variations on this theme became a refrain. Counsel told the jury that "[A]didas believes it owns stripes, but it doesn't." (SA-277). A few minutes later, counsel said "[A]didas thinks it owns stripes smushed together." (SA-278). Still later, he argued that "[p]eople always use stripes on clothing. They always have and they always will." (SA-286). Finally, "[a]gain,

11

this case isn't about confusion. It isn't about competition. It's about whether [A]didas can own all stripes." (SA-305). The district court later called this theme the "essence of [the] defense" and noted its impact on the jury. (Add.21).

Thom Browne's counsel also emphasized the absence of bad faith. Counsel reminded the jury that when Mr. Browne adopted his horizontal-bar designs, he and his colleagues never "talked about" or "considered" Adidas. (SA-271). That was because Mr. Browne "didn't have any interest in imitating [A]didas." (*Id.*). As counsel explained, "[w]hy on earth would a high-end luxury brand like Thom Browne want to be associated with a performance active-wear company like [A]didas?" (*Id.*).

The jury deliberated for approximately two hours before returning a verdict for Thom Browne on all counts.

Adidas appealed. It attacked a single line in the jury instructions and argued that the district court had erred in its handling of the expert evidence. This Court affirmed by summary order. *Adidas Am., Inc. v. Thom Browne, Inc.*, 23-166, 2024 WL 1953594 (2d Cir. May 3, 2024).

## C.    Rule 60 Motion

During the pendency of Adidas's appeal, Thom Browne's attorneys handling a parallel action between the parties in the High Court in London produced four emails that referred to Thom Browne's brand in relation to Adidas. These emails

12

had not been produced in this litigation.  It is undisputed that the emails were

provided sight-unseen by Thom Browne's U.S. counsel to London counsel along

with other data collected in connection with this litigation.  (SA-608-09).  The

emails were then produced by London counsel in the ordinary course of discovery.

(App.149-50 ¶ 2).

The emails fall into two categories.  **Email 1** is a December 2016 email from

Emily Maturo, a Thom Browne account manager, to a Swiss distributor that

purchased Thom Browne products for retail stores in Asia.  (Add.5-6).  Referring

to the display of Thom Browne items in stores, Maturo explained that Thom

Browne had "removed some styles from [the distributor's] original orders" because

"[w]e try to avoid rows of 4 bar armband on the racks so as to not look like

Adidas."  (App.155-56).

The remaining three emails date from 2018 and 2019 and concern the design

of formalwear and accessories Thom Browne was creating for Spanish soccer club

FC Barcelona, which is sponsored by Adidas's main competitor, Nike.  These

emails postdated Adidas's demand that Thom Browne cease using the Four-Bar

Signature in spring 2018 and came on the heels of FC Barcelona's resolution of its

own trademark dispute with Adidas concerning FC Barcelona's attempt to

trademark its famous *blaugrana* stripes.

**Email 2** is a November 2018 email from Thi Wan, Thom Browne's head of menswear, to Thom Browne himself. (Add.6). The email concerned the design of formalwear and accessories that Thom Browne was creating for FC Barcelona. Wan states: "I wanted to hear your thoughts on the usage of 4bar for FCB dressing for players. I wanted to raise a flag now from me before other teams start bombarding you with this concern. As Adidas has such a big presence in the sporting world, it is inevitable that our 4bar in white be read as [A]didas stripes, especially on accessories." (App.160).

**Email 3** is a December 2018 email from Tomaso Galli, Thom Browne's Vice President of Marketing and Communication, to Thom Browne, stating that FC Barcelona "are not comfortable with any four bars, which in their view is too much in the spirit of Adidas." (Add.7); (App.162).

**Email 4** is an August 2019 email from Thom Browne to Thi Wan reminding Wan that Galli had relayed FC Barcelona's instruction "that we shouldn't use the four bar [for FC Barcelona items] because of [A]didas." (App.165).

Following the discovery of these emails, Adidas moved for a new trial under Rules 60(b)(2) and 60(b)(3). (App.146-48). The district court held an evidentiary hearing. Prior to the hearing, Thom Browne's counsel, Wolf Greenfield, produced relevant documents, including the audit logs from the document review platform, Relativity, showing whenever any of the emails was reviewed or tagged. (SA-610-

14

11).  Adidas called as witnesses an e-discovery specialist from its own outside counsel, along with two paralegals who worked on the matter at Wolf Greenfield. (Add.8).  Following the hearing, Adidas took the depositions of two Wolf Greenfield associates and that of a representative of Thom Browne's e-discovery vendor, Consilio.  (Add.9).  The district court also ordered supplemental briefing on whether an innocent failure to produce documents may constitute "misconduct" under Rule 60(b)(3), whether and to what degree Thom Browne was culpable in not producing the emails, and, if so, whether that degree of culpability sufficed for relief.  (*Id.*).

### D.    District Court Decision

The district court denied Adidas's motion.

Regarding the non-production of the four emails, the district court found that Thom Browne's e-discovery vendor (Consilio) and counsel (Wolf Greenfield), collected over 1.4 million documents from nine agreed-upon custodians spanning 2005 to 2021.  (Add.10).  Consilio ran agreed-upon search terms to identify responsive documents.  (*Id.*).  Wolf Greenfield then conducted a privilege review, using search terms to identify potentially privileged documents.  (Add.10-11).  Because of the parties' long-running legal disputes, one of the search terms was "adidas."  (Add.10).  To carry out the privilege review, a Wolf Greenfield paralegal emailed Consilio and asked it to create "a saved search for ALL

15

potentially privileged documents that have not already been produced … so that we will have one search to work with when we go to do our privilege review." (Add.11). Consilio created a search titled "All Potentially Privileged" documents. (*Id.*). Consilio clarified that, in creating this search, it had run the privilege terms across all documents that were "not produced, not coded for responsiveness and not coded for privilege." (Add.11-12). Wolf Greenfield and Consilio then conducted a privilege review, "with reviewers going through each document and either tagging it for production or listing it on the privilege log to be withheld." (Add.12).

The district court found that "[t]he non-production of the four emails … resulted from a misunderstanding between Wolf Greenfield and Consilio" concerning the documents included in "th[e] 'All Potentially Privileged' saved search." (*Id.*). "Unbeknownst to Consilio," the Wolf Greenfield paralegal had previously "carried out a mass edit on [a] subset of documents that hit on the search term 'adidas,'" coding them "needs further review" in both the responsiveness and privilege fields. (*Id.*). This coding of these documents resulted in the four emails being inadvertently excluded from Consilio's "All Potentially Privileged" saved search because Consilio included only documents that had not been previously coded for privilege or responsiveness. (*Id.*). As a result, the four emails at issue here were not included in the privilege review. (Add.12-13). They

16

were also not reviewed when a Wolf Greenfield associate later performed a quality check.  (Add.38-39).

The district court denied relief under Rule 60(b)(2), finding Adidas's arguments regarding the importance of the four emails to be "highly exaggerated." (Add.17).  Adidas had only alleged that a subset of Thom Browne's products were confusing, and none of the emails related to those products.  (Add.17-19).  Email 1 was an "off-hand suggestion" about the display of products and "hardly conveys an opinion that the repeating bars are confusing."  (Add.17).  Email 3 merely reflected the view of an FC Barcelona employee, and Email 4 "simply summarizes Browne's view of the … views expressed in Email 3" and was "of doubtful relevance, let alone an … admission."  (Add.18).  The district court saw Email 2 as "perhaps the only [email] of more than marginal import."  (*Id.*).  But even that email did not refer to any of the accused products—it was concerned with accessories and formalwear.  And the Thom Browne executive's subjective belief was not probative of the "objective likelihood of confusion."  (Add.18-19).

The court explained that the "central focus at trial" was "on the competing testimony of the parties'… experts."  (Add.19).  That testimony concerned "the history of the brands, the historical use of stripes and bars … the vastly differing price points of Adidas's and Thom Browne's products and the very different channels through which they are sold."  (*Id.*).  "The four email exchanges … would

17

have had little relevance to these central foci." (*Id.*). "[W]hile not irrelevant, [the emails] hardly seem material to the central issues in this case as they actually played out at trial." (Add.20).

The court also found that the four emails would not have altered the jury's assessment of Thom Browne's alleged bad faith. "[I]t was essentially undisputed at trial that Thom Browne was aware from early on" that Adidas was fiercely protective of its Three-Stripe Mark, and that Adidas had already forced Thom Browne to shift from a three-bar to a four-bar signature motif. (Add.20). The district court further described Thom Browne's "Adidas does not own stripes" theme as the "essence of Thom Browne's defense" and observed that "the jury's 'body language' suggests that it was this argument that most likely influenced the jury in Thom Browne's favor." (Add.21). Finally, the "swift [two-hour] verdict shows that the jury was totally unpersuaded by virtually any of the proof or argument Adidas presented at trial, and it is frankly impossible to conclude … that these four emails … would have probably tipped the scales in [its] favor." (Add.22).

Turning to Rule 60(b)(3), the district court observed that Adidas's proposed "strict liability" standard—under which even an innocent or inadvertent mistake suffices for relief—was "inconsistent with the common meaning of 'misconduct.'" (Add.24, 29, 31). It reasoned that "misconduct" "plainly connotes some form of

18

malfeasance or inappropriate behavior" and that Adidas's strict liability standard was "inconsistent" with principles of "proportionality" and reasonableness found in the Federal Rules governing discovery and discovery sanctions. (Add.29-31). The court held that "[i]n the context of the non-production of electronically stored information, the moving party must show the non-production was at least the product of negligence on the part of the non-producing party." (Add.27).

The court then held that Adidas had failed to show by clear and convincing evidence that Thom Browne was negligent. (Add.34). It explained that "there is no evidence … that suggests the non-production of the four emails was intentional or knowing." (Add.35). It found that "[e]ach of Thom Browne's witnesses credibly denied any recollection of seeing the four emails or having ever been instructed to withhold responsive, non-privileged documents." (*Id.*). This was corroborated "by the Relativity document histories for the four emails." (*Id.*).

In sum, the record demonstrated "[a]n inadvertent but understandable mix-up" but not "negligence." (Add.38). While the "benefit of hindsight" makes the miscommunication "readily apparent," it would not have been so apparent "in the moment, while an extensive discovery review"—encompassing 1.4 million documents—"was ongoing." (*Id.*). The court also noted that an associate was assigned to perform a "quality check" on the review, and while the quality check did not turn up the four emails, "the very fact that such a check was conducted

negates the high burden placed on Adidas to prove negligence with clear and convincing evidence." (Add.38-39).

## SUMMARY OF ARGUMENT

1.      Rule 60(b)(2) provides that a court "may relieve a party … from a final judgment" because of "newly discovered evidence."  To obtain relief under this rule, the movant must show the evidence is "of such importance that it probably would have changed the outcome."  *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001).[2]  Adidas fails to satisfy this "onerous standard."  *Id.*  The four emails would have offered only negligible support for Adidas's trademark claims.  They were largely immaterial to the critical question at trial:  whether there was a likelihood of confusion.  The only "likelihood of confusion" factor for which the emails may have been even minimally relevant was bad faith.  But bad faith is not one of the most important factors.  *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987).  In any event, the emails did not demonstrate that Thom Browne acted in bad faith.  They were largely duplicative of other supposed evidence of bad faith that Adidas argued to the jury, none of which stopped the jury from returning a speedy verdict for Thom Browne.

--------

[2] Unless otherwise noted, citations omit internal quotation marks, footnotes, and previous alterations in the original source.

20

2.      Nor is Adidas entitled to a new trial under Rule 60(b)(3).  That rule only permits relief based on clear and convincing evidence of "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."  Because Adidas cannot show that the four emails probably would have led to a different verdict at trial, as required to obtain relief under 60(b)(2), it argues that "misconduct" includes even innocent or accidental mistakes.  In other words, it urges the Court to strip the "mis" out of the term "misconduct."  But Adidas's strict liability standard would obliterate the differences between 60(b)(2) and 60(b)(3) and channel most "newly discovered evidence" claims into 60(b)(3), which has a lower threshold for prejudice.  This strict liability rule defies the plain meaning of misconduct, Rule 60(b)(3)'s text, the Rule's Advisory Committee notes, the broader structure of Rule 60(b) and the Federal Rules generally, decades of caselaw, and weighty policy considerations.  Instead, 60(b)(3) requires movants to show intentional or reckless wrongdoing.

The Court, however, need not reach this question because, at a minimum, Rule 60(b)(3) requires a showing of negligence—as the district court correctly concluded.  And under a negligence standard, Adidas is not entitled to relief because the record is clear that Thom Browne did not produce the four emails because of an inadvertent miscommunication.  Moreover, Adidas would not be entitled to relief under Rule 60(b)(3) even if it had shown misconduct, because

21

Adidas cannot demonstrate that not having the four emails prevented it from fully and fairly presenting its case at trial.

## STANDARD OF REVIEW

"The decision whether to grant a party's Rule 60(b) motion is committed to the sound discretion of the district court, and appellate review is confined to determining whether the district court abused that discretion." *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012); *see also Fleming v. New York Univ.*, 865 F.2d 478, 484 (2d Cir. 1989) ("A Rule 60(b)(3) decision may not be disturbed on appeal absent an abuse of discretion."). Because "relief under Rule 60(b) is essentially discretionary," the Court of Appeals is "loath to substitute [its] judgment for that of the trial judge." *Nederlandsche Handel-Maatschappij, N.V. v. Jay Emm, Inc.*, 301 F.2d 114, 115 (2d Cir. 1962).

## ARGUMENT

Rule 60(b) motions to vacate a judgment are "not favored" and "granted only upon a showing of exceptional circumstances." *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001). To justify vacating a judgment, a party bears the burden to "present highly convincing … evidence," *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 53 (2d Cir. 2021), and the court must balance the desire to serve justice with the strong policy favoring the finality of judgments, *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986); *accord Paddington Partners v.*

22

*Bouchard*, 34 F.3d 1132, 1144 (2d Cir. 1994). The balance tips particularly in favor of finality here, where the jury has rendered a verdict that has been affirmed on appeal.

Rule 60(b)'s standards are designed to be difficult to meet. Adidas, however, requests this extraordinary relief based on Thom Browne's innocent and accidental non-production of four emails that, at best, would have provided negligible support for Adidas's trademark claims. Adidas failed to satisfy the requirements of either Rule 60(b)(2) or Rule 60(b)(3).

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING ADIDAS'S MOTION UNDER RULE 60(b)(2)

As the jury's speedy two-hour verdict reflected, Adidas's case was extraordinarily weak. The evidence showed that neither Thom Browne's Four-Bar Signature nor its Grosgrain mark look like Adidas's Three-Stripe Mark; that Adidas's products are everyday sports and leisure wear, while Thom Browne's products are high-fashion items that cost a small fortune; that Adidas's "initial interest" and "post-sale" confusion theories were baseless; that Adidas's expert testimony and survey were deeply flawed; and that Adidas wanted to "own all stripes." Against this backdrop, the four emails were not "smoking guns," as Adidas claims (Br.3, 6, 20, 44, 46, 51, 57)—far from it. They were relevant—*at most*—only to Thom Browne's purported bad faith. But they would have made little difference on that factor or to the jury's assessment generally.

23

Rule 60(b)(2) allows courts to set aside a judgment based on "newly discovered evidence." The movant must meet an "onerous standard" by showing, among other things, that the new evidence is not "merely cumulative or impeaching" and is "of such importance that it probably would have changed the outcome." *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001); *see also Mirlis v. Greer*, 952 F.3d 36, 50-51 (2d Cir. 2020) (holding that new evidence "would not have changed the outcome of the case"); *Boule v. Hutton*, 328 F.3d 84, 95 (2d Cir. 2003) (same).

Adidas cannot meet this "onerous standard" or show an abuse of discretion here. The "pivotal inquiry" in a trademark infringement case is whether the plaintiff can show a likelihood of confusion. *Adidas Am., Inc. v. Thom Browne, Inc.*, 23-166, 2024 WL 1953594, at *1 (2d Cir. May 3, 2024) (summary order); *accord, e.g.*, *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020); *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir 2005). As the district court explained, "[t]his is ultimately an objective standard" (Add.16), which is why the likelihood of confusion factors emphasize "objective facts of likely customer confusion, rather than … the subjective mental state of the [alleged] infringer," 3 McCarthy on Trademarks and Unfair Competition § 23:104 (5th ed. 2024). The four emails were largely immaterial to this objective inquiry.

24

At trial, the district court instructed the jury that it should consider seven factors adapted from the "*Polaroid* factors" set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) (Friendly, J.)):

- "*First,* the strength of [A]didas' Three Stripe Mark.
  …
- *Second*, the degree of similarity between [A]didas' Three Stripe Mark and Thom Browne's use of the Four Bar and/or Grosgrain designs on the accused products.
  …
- *Third*, whether the accused products and [A]didas products compete for the same consumers.

- *Fourth*, whether or not there is evidence that consumers are actually confused about which company offers the accused products.
  …
- *Fifth*, the quality of the accused products relative to [A]didas' products bearing the Three Stripe Mark.
  …
- *Sixth*, the degree of care and attention that an ordinary consumer would use when encountering [A]didas' and Thom Browne's respective products.
  …
- *Seventh*, whether Adidas has shown that Thom Browne acted in bad faith.

(App.138-40 (emphasis added)). The four emails would have made little or no difference to the jury's consideration of these factors with respect to the Four-Bar Signature and were irrelevant to the Grosgrain mark.

1. This Court has described the "first three *Polaroid* factors" as "the most significant in determining the likelihood of confusion." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987). These factors—

25

strength of the plaintiff's mark, similarity between the two marks, and competitive proximity—are purely objective. The four emails would have been irrelevant, or, at worst, cumulative of other evidence.

To begin, there was no serious dispute at trial that Adidas's Three-Stripe Mark was—as Adidas argued—"one of the strongest trademarks in America." (SA-9). Thom Browne's branding expert criticized Adidas's branding expert on many points, but did not disagree that Adidas's mark was strong. (SA-219). Adidas put on extensive evidence of its mark's ubiquity, its association with famous athletes, and of the public's recognition of the mark as indelibly associated with Adidas. The emails would have added little or nothing to this factor.

But this was the *only* factor that favored Adidas. The emails had little, if any probative value on the most important factor—similarity—and this factor cut strongly in favor of Thom Browne.

One major point of difference—and a simple one for the jury to grasp—was the number of stripes. Adidas is "known as the brand with the three stripes." (SA-4). As Adidas's first witness put it, "[f]irst and foremost, the [A]didas brand is the brand known as the brand with the three stripes." (SA-43; *see also* SA-45 (Adidas's second witness describing the "iconic and classic three stripes")). Adidas never uses any number of stripes other than three. (SA-510). Adidas even

26

uses "The Brand with the Three Stripes" as a slogan on its products. (*E.g.*, SA-46, 408). Thom Browne's mark, in contrast, has *four* bars.

Yet it is not just the number of stripes that renders the marks different. The classic iteration of the Adidas Three-Stripe Mark is three vertical stripes, equally spaced, on both sides of the garment, usually up the sleeve or pant leg. Thom Browne's Four-Bar Signature consists of four horizontal bars. These bars generally have wide bands and narrow spacing. And they are applied to only one side of the garment, *i.e.*, asymmetrically. Thom Browne never uses its Four-Bar Signature trademark vertically on a sleeve or pant leg. (SA-182). Thom Browne never uses the Four-Bar Signature on both sides of the garment.

2.      The third through sixth factors also strongly favored Thom Browne. Adidas is largely a consumer sportswear brand. Its products typically retail for a fraction of Thom Browne's. The two brands appeal to different types of consumers and generate different sets of associations. Adidas's own branding expert summed up the difference in the brands' ethos and appeal: "Thom Browne is a luxury, but also … a fashion statement … It's about … being exclusive … [T]hat is very different from what you see when you look at [A]didas. Thom Browne is exclusive. Adidas is inclusive … Adidas is for everybody." (SA-89). As the district court noted, there was "a considerable focus on the vastly differing price points of Adidas's and Thom Browne's products and the very different

channels through which they were sold." (Add.19). The four emails "had little relevance to these central foci." (*Id.*).

Nor was there evidence that customers are actually confused about which company offers Thom Browne's products. Adidas's survey evidence was deeply flawed and pertained only to post-sale confusion. As the district court observed, the jurors, "by their verdict, plainly indicated that they were not persuaded" by this survey, which "purported to show that hundreds of consumers were in fact confused." (Add.20-21). "If the jury was willing to believe that there was a risk of confusion between the two marks, the views of these actual consumers would presumably have been far more powerful than the views expressed in the four emails." (Add.21).

It was also undisputed at trial that Thom Browne's products are of far higher quality than Adidas's products. Thom Browne is known for offering upmarket luxury clothes made of the highest quality materials. (SA-165-66, 178). That is why Thom Browne's products retail at many multiples of the everyday sports and leisure wear that Adidas markets to a far broader customer base.

3.     At most, the four emails may have had some minimal relevance to the seventh factor: bad faith. But, despite Adidas's misleading argument to the contrary (Br.48), "[b]ad faith is not an essential element of a claim of infringement." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 44 (2d

Cir. 2016); *see also Mobil Oil Corp.*, 818 F.2d at 258 (first three *Polaroid* factors most important). Indeed, Adidas's lead counsel himself told the jury, "[b]ad faith, I like to tell my team as a plaintiff in a trademark case, it's a nice to have but not a need to have." (SA-225).

In any event, the emails did little or nothing to establish bad faith. "Bad faith generally refers to an attempt by a [defendant] to exploit the good will and reputation of a [plaintiff] by adopting the mark with the intent to sow confusion between the two companies' products." *Star Indus., Inc.*, 412 F.3d at 388; *accord Tiffany & Co.*, 971 F.3d at 88. The evidence presented at trial was resoundingly to the contrary. It is undisputed that Thom Browne adopted the Four-Bar Signature because Adidas demanded that it stop using its preferred three-bar design. Thom Browne therefore acted in *good faith*—precisely the opposite of what Adidas needed to prove.

The emails would not have changed any of this. They post-dated Thom Browne's good-faith adoption of the Four-Bar Signature by approximately a decade. There was also no evidence that Thom Browne's initial adoption of Three-Bar Signature had anything to do with Adidas—indeed, Thom Browne testified, without contradiction, that when he incorporated the mark into his clothing he was using collegiate varsity jackets and sweaters as an inspiration. (SA-111-12). Joanne Arbuckle, the former dean from FIT, corroborated this

testimony by showing the jury various examples of varsity jackets incorporating similar horizontal stripes.

Nor did the emails themselves speak to a wrongful intent. The three emails concerning Thom Browne's creation of off-field formalwear and accessories for FC Barcelona relayed a concern expressed by the soccer giant regarding the use of the Four-Bar Signature. Thom Browne agreed that the Four-Bar Signature should not be used for the FC Barcelona items. This is hardly evidence of bad faith. What's more, had the emails been offered, Thom Browne would have put on evidence explaining why FC Barcelona was not the average consumer but had particular reason to be sensitive to any mark that might be even remotely suggestive of Adidas's iconic stripes. FC Barcelona is sponsored by Nike, which would not look favorably on the team's use of any striped insignia even marginally suggestive of its great rival. Even more pertinently, FC Barcelona had just concluded a trademark dispute *with Adidas* concerning the use of FC Barcelona's famous *blaugrana* stripes.

On this point, the judgment of the High Court in London, which did consider the four emails at its hearing on the parties' parallel trademark dispute, is instructive. The court "agree[d] with [Thom Browne] that it is perhaps unsurprising that [FC Barcelona] would be concerned about any possibility of accessories from their collaboration with [Thom Browne] looking 'in the spirit of

30

Adidas' owing to the fact that they were sponsored by [A]didas' major rival in the market, Nike, for very substantial sums of money." *Thom Browne Inc. v. Adidas AG*, [2024] EWHC 2990 (Ch), ¶ 597. The court also noted that "in 2016 Adidas actively opposed [FC Barcelona's] trade mark application for a mark featuring seven stripes in the [FC Barcelona] colours." *Id.* Thus, "it is unsurprising that [FC Barcelona] would express anxiety as to the use of stripes generally." *Id.* The court "reject[ed] any suggestion … that these emails evidence a real likelihood of confusion on the part of the average consumer or knowledge on the part of [Thom Browne] and Mr Browne that there was a real risk of confusion." *Id.*

As for the 2016 email from the Thom Browne account manager, this does not speak to bad faith or any possibility of confusion with Adidas's mark at all. Rather, the account manager was explaining that Thom Browne avoids uniform rows of garments bearing the Four-Bar Signature because it doesn't want to "look like Adidas." The reference is not to the supposed similarity of the marks but to the desire to avoid uniform racks of clothing that might tend to look like those of an athletic brand rather than a fashion label. The London court noted that a Thom Browne executive testified "in the clearest terms that '[t]he reason we do not display product in this way is because it does not look good and that is the exact reason why. It has nothing to do with looking like [A]didas.'" *Id.* ¶ 591. The court accepted this evidence. *Id.* ¶ 592.

31

Moreover, the emails were cumulative of other, similarly weak evidence of bad faith. If the emails spoke to bad faith, they spoke to the fact that Thom Browne continued using the mark after being put on notice of possible confusion with Adidas. But Adidas had *other evidence* that spoke to the same point. After all, no one disputed that Thom Browne was aware of the Adidas mark when it adopted the Three-Bar Signature. No one disputed that it changed from the Three-Bar Signature to the Four-Bar Signature in 2007 specifically to avoid a dispute with Adidas. No one disputed that Adidas contacted Thom Browne in the spring of 2018 and objected to Thom Browne's Four-Bar Signature. (SA-81-82, 84). No one disputed that Thom Browne continued using the Four-Bar Signature after Adidas demanded it stop, including in its "compression collection," which launched in 2020. (SA-151). In summation, Adidas argued that "[t]his is where bad faith gets really obvious." (SA-253). Adidas's "bad faith" argument ran to seven transcript pages, and touched on numerous other, and equally flimsy points—*e.g.*, Thom Browne's failure to get a legal opinion "as to whether [the Four-Bar Signature] was OK," even Thom Browne's use of "the language of sport to promote [their] products." (SA-251-58). None of it made any difference to the jury.

    4.    Adidas also argues that Thom Browne's argument that Adidas wanted to "own all stripes" would have "crumbled" had the jury seen the emails. (Br.48-

49). This is nonsense. Thom Browne would have made the exact same argument, with the exact same result, had Adidas introduced the emails. In fact, had the trial detoured into the concerns raised by FC Barcelona, Thom Browne would have introduced evidence showing that Adidas had challenged FC Barcelona's registration of a seven-stripe mark founded on its famous *blaugrana* soccer kit. *Thom Browne Inc. v. Adidas AG*, [2024] EWHC 2990 (Ch), ¶ 597. This would have fit the "Adidas wants to own all stripes" theme perfectly.

Adidas also plucks a few words out of Thom Browne's summation to argue that the emails would have rebutted the supposed argument that "no one at the company '[e]ver talked about Adidas.'" (Br.49). But this wasn't Thom Browne's argument, and for obvious reasons: it was undisputed that executives at Thom Browne *did* talk about Adidas, not only because Adidas challenged Thom Browne in 2007, but also because Adidas raised concerns again in the spring of 2018, *before* the FC Barcelona related emails even existed. Rather, counsel's point was that in adopting the horizontal bar motif back before 2007, "[t]hey never talked about Adidas. They never considered Adidas. They didn't have any interest in imitating Adidas." (SA-271).

## II.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING ADIDAS'S MOTION UNDER RULE 60(b)(3)

### A.   Rule 60(b)(3) Requires Intentional Or Reckless Wrongdoing

Rule 60(b)(3) allows courts to set aside a judgment based on "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."  As the Advisory Committee note from the rule's 1946 adoption puts it, the rule is intended to cover "fraud and the like."  Despite this, Adidas argues that "misconduct" encompasses even an innocent or accidental mistake—a strict liability standard.  (Br.18, 21-29).  This tortured construction is contrary to the ordinary meaning of "misconduct," Rule 60(b)(3)'s text, the Advisory Committee notes, the broader structure of Rule 60(b) and the Federal Rules generally, decades of caselaw, and weighty policy considerations.  Far from a strict liability rule, 60(b)(3) requires movants to demonstrate intentional wrongdoing or recklessness—an onerous standard, but one sufficient to prevent litigants from turning a blind eye to their obligations.

#### 1.  The Plain Meaning Of "Misconduct"

A statute or rule is interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment."  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020).  This Court should thus consult dictionary definitions from the decades surrounding Rule 60(b)(3)'s adoption in 1946.  *See, e.g.*, *id.* at 655, 657-58 (defining terms "sex," "discriminate" and "individual" in Title VII of the Civil

34

Rights Act of 1964 by using contemporary dictionary definitions, including from 1954 and 1975); *Carroll v. Trump*, 49 F.4th 759, 769-70 (2d Cir. 2022) (defining ordinary meaning of "employee" in Federal Tort Claims Act, enacted in 1946, using dictionary definitions from 1943 and 1944).

Legal and nonlegal dictionary definitions confirm that misconduct ordinarily means intentional or reckless wrongdoing. The leading legal dictionary defines misconduct as: "A transgression of some established and definite rule of action, a forbidden act, a dereliction from duty, unlawful behavior, *willful in character*, improper or wrong behavior; its synonyms are misdemeanor, misdeed, misbehavior, delinquency, impropriety, mismanagement, offense, but *not negligence or carelessness*." *Misconduct*, Black's Law Dictionary (4th ed. 1951) [Black's 4th] (emphasis added); *accord Misconduct*, Black's Law Dictionary (4th rev. ed. 1968). Black's is clear that to constitute misconduct, the performance of a "forbidden act" or a "dereliction from duty" must be "willful in character"—and "negligence" or "carelessness" does not suffice. A different legal dictionary from the mid-20th Century similarly defines misconduct as: "Improper conduct. A transgression of some established and definite rule of action, where no discretion is left, except what necessity may demand; a violation of definite law; a forbidden act. *Intentional wrongdoing*." *Misconduct*, Ballentine's Law Dictionary (3d ed. 1969) (emphasis added). Again, the focus is on "intentional wrongdoing" and on

35

deliberate "transgression" of a "definite rule," not negligence, and certainly not inadvertent errors.

These definitions expressly contemplate "intentional" and "willful" wrongdoing and plainly exclude innocent or inadvertent errors. Unsurprisingly, related dictionary definitions emphasize that "misconduct" typically involves a heightened level of culpability. Black's lists various kinds of "willful," "reckless," and "wanton" misconduct. But Black's contains no entries for "inadvertent misconduct," "accidental misconduct," or "innocent misconduct." That's because "inadvertent" and "misconduct" are antonyms—they embody opposite concepts.

Non-legal dictionaries underscore that misconduct typically involves intentional or reckless wrongdoing. At the time of Rule 60(b)(3)'s adoption "misconduct" meant "[w]rong or improper conduct; unlawful behavior; [specifically], malfeasance or adultery." Webster's New Collegiate Dictionary (2d ed. 1953). Current definitions are similar. Merriam-Webster defines "misconduct" as "intentional wrongdoing," specifically a "deliberate violation of a law or standard." *Misconduct (2)*, Merriam-Webster.com Dictionary. Collins similarly defines misconduct as "bad or unacceptable behavior, especially by a professional person." *Misconduct*, Collins Online Dictionary.

To reach a definition that encompasses even an accidental failure to produce a document, Adidas hopscotches from Black's current definition of "misconduct"

to its current definition of "dereliction of duty" and mixes in cherry-picked fragments from other dictionaries. (Br.24-25, 29). These fragmentary definitions either do not support Adidas or are highly specialized and unusual meanings inapplicable here. For example, Adidas quotes Ballentine's definition of misconduct only in part, leaving out the part that says that the transgression is only misconduct if it occurs "where no discretion is left," and that says misconduct is "[i]ntentional wrongdoing." Adidas also quotes part of the Oxford English Dictionary's definition of "misconduct," which includes "mismanagement" of "official or professional duties" (as in, "the misconduct of the war"), but omits the far more common part of the definition, "unacceptable or improper conduct or behaviour." *Misconduct*, Oxford English Dictionary (2024). Courts look to a statute or rule's "ordinary meaning" or "plain meaning," not to an obscure meaning confined to unusual circumstances. *Niz-Chavez v. Garland*, 593 U.S. 155, 160, 168-69 (2021); *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454-55 (1993). The ordinary meaning of "misconduct" is intentional wrongdoing or at least recklessness.

The legal meaning of "misconduct" has long been consistent with this ordinary meaning. The law often speaks of misconduct as intentional or reckless wrongdoing. For example, the Supreme Court has explained that bribe and kickback schemes have long been considered the "core misconduct" of honest

37

services fraud. *Skilling v. United States*, 561 U.S. 358, 408 (2010). The "fraudulent manipulation of stock prices" is "misconduct" too. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 89 (2006). Procuring the unavailability of a witness is also "misconduct." *Grayton v. Ercole*, 691 F.3d 165 (2d Cir. 2012).

Legal uses dating to the period of Rule 60(b)(3)'s adoption similarly show that "misconduct" generally requires intentional or reckless wrongdoing. For example, in 1948, two years after Rule 60(b)(3)'s adoption, the Supreme Court held that a court may bar cross-examination of a character witness concerning the defendant's stale arrest "unless recent misconduct"—such as a more contemporary arrest or conviction—has revived rumors of it. *Michelson v. United States*, 335 U.S. 469, 484 (1948). The same year, the Court described the judge's power to punish contempt without "notice, hearing and counsel" as applicable only in the rare circumstances of "charges of misconduct, in open court, in the presence of the judge … where immediate punishment is essential." *In re Oliver*, 333 U.S. 257, 275-76 (1948). In 1943, the Court observed that a shipowner will be liable for an injury suffered by a seaman, even if the seaman is negligent, and will be relieved of liability only by something more: "misconduct" on the part of the seaman, defined as "wilful misbehavior [and] deliberate act[s] of indiscretion." *Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 730-31, 734-35 (1943).

38

Ignoring these ordinary legal uses of misconduct, Adidas relies on four specialized types of misconduct—by jurors, prosecutors, judges and lawyers. (Br.25). But these specialized instances of "misconduct" simply reinforce that "misconduct" ordinarily involves deliberate, culpable conduct. "Jury misconduct" is typically deliberate, such as lying and withholding important information during voir dire, *United States v. Parse*, 789 F.3d 83 (2d Cir. 2015), or insulting and humiliating other jurors during deliberations, *State v. Arnold*, 629 S.E.2d 807 (Ga. 2006). "Prosecutorial misconduct" is also usually intentional, including knowingly presenting false forensic evidence, *United States v. Butler*, 955 F.3d 1052 (D.C. Cir. 2020), or deliberately misstating the record in a closing argument, *United States v. Reyes*, 577 F.3d 1069 (9th Cir. 2009). As for "judicial" and "professional" misconduct, most such violations are intentional or deliberate—*e.g.*, an attorney knowingly acquiring a pecuniary interest adverse to a client, or knowingly offering false evidence, Model Rules of Pro. Conduct R. 1.8(a), 3.3(a)(3), or a judge holding office in a political organization, Model Code of Jud. Conduct Canon 4, R. 4.1(A)(1).

### 2. *The Interpretative Canons*

The applicable interpretive canons, *noscitur a sociis* and *ejusdem generis*, confirm that Rule 60(b)(3) "misconduct" requires intentional or reckless wrongdoing. These two canons are often applied in tandem, *e.g.*, *Fischer v. United*

*States*, 603 U.S. 480, 487 (2024); *Yates v. United States*, 574 U.S. 528, 543-46 (2015) (plurality opinion), because they are merely applications of the common-sense notion that words acquire meaning from "the setting in which they are used," *N.L.R.B. v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.).

*Noscitur a sociis* teaches that "a word is known by the company it keeps." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).  As the Supreme Court put it just last term, "a word is given more precise content by the neighboring words with which it is associated," or else the word may take on a "meaning so broad that it is inconsistent with the company it keeps." *Fischer*, 603 U.S. at 487.  Put differently, this means that when words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar" and that "words grouped in a list should be given related meanings."  Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012).

There could not be a clearer case to apply *noscitur a sociis*.  Rule 60(b)(3) contains a list of terms that may trigger relief: "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fraud is the poster child for heightened culpability.  As Adidas concedes, it "requires 'the intention to deceive.'"  (Br.28)  Fraud can also be proven through a showing of recklessness.  *See Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d

40

204, 213-16 (2d Cir. 2020) (defining recklessness in securities fraud context as "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence"). A misrepresentation, like fraud, is ordinarily understood to mean "a statement made to deceive or mislead." *Misrepresentation*, Black's 4th. It would make no sense to write a rule triggered equally by "fraud" on the one hand and by an innocent or accidental mistake on the other. One would no more write such a rule than one would write a statute that criminalized murder and traffic offenses and penalized them equally.

*Ejusdem generis* instructs that "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes … that precede it," *Fischer*, 603 U.S. at 487, or any "common attributes shared by the specific items," *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252 (2024). Just last term, the Supreme Court applied *ejusdem* to a catchall provision so that it would not be improperly broad in light of the specific phrases that preceded it. *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2081-84 (2024). Because Rule 60(b)(3) contains a general or collective term, "misconduct," preceded by two specific terms, "fraud" and "misrepresentation," misconduct should be defined in relation to fraud and misrepresentation. As explained above, these two terms both involve intentional or reckless wrongdoing, so the Court should construe misconduct similarly.

41

The Advisory Committee's notes from Rule 60's 1946 amendment confirm that it is appropriate to apply the *noscitur* and *ejusdem* canons here. Reflecting its intent that the three heads of Rule 60(b)(3) relief each require a similar level of culpability, the Committee described "fraud," "misrepresentation" and "misconduct" collectively as "fraud and the like." Courts within this Circuit have followed the Advisory Committee's lead, describing the requirements of Rule 60(b)(3) as "fraud or similar misconduct." *Buxbaum v. Deutsche Bank AG*, 216 F.R.D. 72, 81 (S.D.N.Y. 2003) (Koeltl, J.); *accord Geo-Grp. Commc'ns., Inc. v. Chopra*, 15 Civ. 1756 (KPF), 2023 WL 6235160, at *7, 11 (S.D.N.Y. Sept. 26, 2023).

The crux of Adidas's Rule 60(b)(3) argument is a misapplication of the canon against surplusage. Adidas argues that, unless misconduct is interpreted to cover innocent and inadvertent mistakes, it would otherwise be superfluous when read alongside "fraud" and "misrepresentation" in Rule 60(b)(3). (Br.28-29). But the canon against surplusage applies only when a term would otherwise not retain an independent meaning. *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 545-46 (1994). Misconduct *would* retain an independent meaning if construed to mean only intentional or reckless wrongdoing. It would cover the broad range of intentional or reckless conduct that, although not fraud or a misrepresentation, nonetheless renders the judgment "unfair." (Add.27). Examples include spoliation, *Jenkins v.*

42

*Anton*, 922 F.3d 1257, 1270-71 (11th Cir. 2019), concealing the existence of a lawsuit, *Summers v. Howard Univ.*, 374 F.3d 1188, 1192-93 (D.C. Cir. 2004), and threatening witnesses, *West v. Love*, 776 F.2d 170, 175-76 (7th Cir. 1985)—along with the many cases Adidas itself cites in which, unlike here, the nonmovant *intentionally or recklessly* withheld information in discovery (Br. 23-24 & n.3).

To the extent that the canon against superfluity has any application here, it favors Thom Browne's interpretation of "misconduct." If misconduct could be established based on a purely innocent error, why would anyone ever try to prove fraud, which requires scienter? Misconduct would swallow both "fraud" and "misrepresentation" whole. *Fischer*, 603 U.S. at 487 (applying the "common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it").

### 3. The Structure Of Rule 60(b) And The Federal Rules

The broader structure of Rule 60(b) and its place within the Federal Rules further demonstrate that "misconduct" means intentional or reckless wrongdoing.

First, the relief Adidas seeks here already has a home: Rule 60(b)(2), which allows courts to set aside judgments based on "newly discovered evidence," with no demonstration of culpability. Of course, Rule 60(b)(2) demands a stringent showing of prejudice: the new evidence must be of such importance that it would probably have made a difference to the result. That is because Rule 60(b)(2) is

43

concerned with correcting erroneous judgments. *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1290 (10th Cir. 2005). In contrast, Rule 60(b)(3) is concerned with "judgments which were unfairly obtained." *Id.* That concern with unfairness is why the rule is triggered only by culpable conduct—"fraud," "misrepresentation," "misconduct"— by the "opposing party." Upon clear and convincing evidence of such culpability, Rule 60(b)(3) allows relief on a minimal showing of prejudice.

The drafters plainly intended to channel non-culpable instances of "newly discovered evidence" into Rule 60(b)(2), with its heightened prejudice requirement, while reserving Rule 60(b)(3), with its much less stringent prejudice requirement, for culpable conduct. Adidas's interpretation of Rule 60(b)(3) would nullify the difference between 60(b)(2) and 60(b)(3) and allow any party aggrieved by an adversary's mistaken failure to disclose relevant information to obtain relief under Rule 60(b)(3)'s relaxed prejudice standard when it couldn't satisfy the test under Rule 60(b)(2).

Adidas agrees that Rule 60(b)(3) is concerned with "judgments which were unfairly procured." (Br.27). It argues, however, that movants denied access to relevant material by an adversary "should have an easier standard than movants denied access to evidence without party fault." (*Id.*). But there is no textual support for this proposition, even though Adidas's proposed rule is one the drafters

44

could easily have written.  The rule that was written is one that requires a showing of heightened culpability to unlock the gateway to Rule 60(b)(3)'s low prejudice standard.

Adidas's proposal that "misconduct" under Rule 60(b)(3) includes even purely non-culpable failures to produce discoverable materials is also inconsistent with the Federal Rules governing discovery.  Rule 26 contemplates only discovery that is "proportional to the needs of the case," considering, among other things, "whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  In responding to discovery requests, a party need only make "reasonable inquiry," *id.*, 26(g)(1), and in searching for documents, a party need only make a "reasonable search," *Raine Grp. LLC v. Reign Cap., LLC*, 21-cv-1898 (JPC) (KHP), 2022 WL 538336, at *1 (S.D.N.Y. Feb. 22, 2022); *Solomon v. Fordham Univ.*, 18-cv-4615 (ER), 2024 WL 3273112, at *10 (S.D.N.Y. Jul. 2, 2024).  In the case of electronically stored information, "[a] party need not provide discovery … from sources that the party identifies as not reasonably accessible because of undue burden or cost."  Fed. R. Civ. P. 26(b)(2)(B).

All of these rules proceed on the premise that discovery should be thorough but not unduly burdensome and that, accordingly, some relevant material may not be produced.  Adidas's proposed rule contravenes this principle and would lead to

45

bizarre results.  Consider a company with 50 employees (*i.e.*, 50 possible document custodians).  It may be reasonable—*i.e.*, "proportional"—only to search the 10 custodians most likely to have discoverable information (*e.g.*, those who worked directly on the transaction at issue).  However, accepting Adidas's culpability-free version of Rule 60(b)(3), a reasonable search is not enough:  if a useful document is found, post-judgment, in the records of one of the unsearched custodians, then the failure to produce this document would be "misconduct" and grounds for a new trial.  This "reasonable inquiry before trial but strict liability after judgment" approach cannot be what the rule drafters intended.

Adidas's strict liability rule would also conflict with the Federal Rules governing discovery sanctions.  For example, to obtain discovery sanctions before trial, a party must show that the opposing party was at least negligent.  (Add.30 (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 113 (2d Cir. 2002))).  But if, as Adidas argues, even innocent or accidental discovery lapses are grounds for a new trial under Rule 60(b)(3), the movant arguably would not have "demonstrated that the non-moving party even breached its discovery obligations at all, and hence, that any misconduct has occurred."  (Add.30-31).  Adidas is asking this Court to create, in essence, a new ground for sanctions based on a strict liability standard.

### 4. The Caselaw

This Court has not previously addressed the meaning of misconduct in Rule 60(b)(3). Adidas contends that an "overwhelming" "weight of authority" establishes that even an innocent or inadvertent mistake constitutes "misconduct" within the meaning of Rule 60(b)(3). (Br.18, 24). In fact, Adidas relies on just a handful of cases that, if they address the issue at all, do so only in poorly reasoned *dicta*. More persuasively reasoned decisions by the Sixth, Eighth, Tenth, and D.C. Circuits support reading Rule 60(b)(3) to require a showing of intentional or at least reckless conduct.

### a. The Weight Of Caselaw Supports A Requirement Of Intentional Or Reckless Conduct

In *Jordan v. Paccar, Inc.*, the Sixth Circuit addressed and rejected the argument that Rule 60(b)(3) misconduct may be found absent "some purposeful 'bad act' on the part of the adverse party." 97 F.3d 1452 (Table), 1996 WL 528950, at *6 (6th Cir. 1996). The court held that a "straightforward interpretation" requires proof that "the adverse party committed a deliberate act that adversely impacted the fairness of the … proceeding." *Id*. In so holding, the Sixth Circuit specifically rejected contrary language in decisions in the First, Fifth, and Eleventh Circuits. *Id*. Applying the *noscitur* canon, the court found that "each of the words in Rule 60(b)(3) suggests a requirement of some odious behavior" and that "[t]o interpret one of these words as permitting the moving party merely to

47

demonstrate that the non-moving party make a non-reckless mistake is to ignore the text and context of the rule." *Id.* at \*7. The court also rejected the First Circuit's application of the canon against superfluity, on which Adidas relies heavily. (Br.28-29). The Sixth Circuit explained that each word had independent meaning even when "misconduct" is interpreted to require culpable conduct. *Id.* at \*6.

*Jordan* is unpublished, but it is a thorough, fully reasoned decision and has repeatedly been cited by the Sixth Circuit, which subsequently reaffirmed that "Rule 60(b)(3) clearly requires the moving party to 'show that the adverse party committed a deliberate act that adversely impacted the fairness of the … proceeding.'" *Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F.3d 448, 455 (6th Cir. 2008) (repeatedly citing *Jordan*); *see also, e.g.*, *Satyam Comput. Servs., Ltd. v. Venture Global Eng'g, LLC*, 323 Fed. App'x 421, 429 (6th Cir. 2009). In determining that *Jordan* was the authoritative statement of the Sixth Circuit on the meaning of Rule 60(b)(3), the Federal Circuit noted *Jordan*'s "thorough analysis of the language of the rule and its treatment by other circuits." *Venture Indus. Corp. v. Autoliv ASP, Inc.*, 457 F.3d 1322, 1332-33 (Fed. Cir. 2006).

The Tenth Circuit too has held that Rule 60(b)(3) relief is generally only available where there is "evidence of intent or a deliberate plan or scheme to interfere" with the opposing party's case. *Zurich N. Am.*, 426 F.3d at 1291-92

48

(10th Cir. 2005). The court observed that "the *violation* of a specific discovery request or order" or even "violations" of Rule 26's automatic disclosure provisions "may constitute misconduct" under Rule 60(b)(3). *Id.* at 1292 (emphasis added). But to warrant relief, such "violations" must be "clear and *deliberate* and typically *lead to other misconduct* such as the introduction of false testimony." *Id.* (emphasis added).

The D.C. Circuit has similarly emphasized the importance of bad purpose in establishing "misconduct" based on the suppression of information in discovery. In *Summers*, the court found that "plaintiffs engaged in repeated, affirmative efforts to keep the filing of [a second lawsuit] a secret from [defendant]" and emphasized plaintiffs' concession that "these acts were intentional." 374 F.3d at 1193 (D.C. Cir. 2004); *see also Sack v. Cent. Intel. Agency*, 53 F. Supp. 3d 154, 179 (D.D.C. 2014) (distinguishing "affirmative" and "intentional" efforts to suppress information in *Summers* from a "minor oversight, without evidence of affirmative misconduct"). The Eighth Circuit has similarly held that a Rule 60(b)(3) motion generally demands "deliberate fraud" or "knowing and intentional misrepresentation." *See Smith v. Clarke*, 458 F.3d 720, 724-25 (8th Cir. 2006); *accord, e.g.*, *Dukes v. City of Minneapolis*, 339 F. App'x 665, 668 (8th Cir. 2009) (per curiam) (unpublished).

Although the Second Circuit has not specifically addressed the meaning of misconduct within Rule 60(b)(3), it has strongly suggested that it will require movants to demonstrate intentional or reckless wrongdoing. In *In re Lawrence*, this Court held that Rule 60(b)(3) movants must demonstrate fraudulent intent, recognizing that, in this context, a heightened level of culpability applies. *See* 293 F.3d 615, 625-26 (2d Cir. 2002). *In re Lawrence* is this Court's only authoritative treatment of this issue. Adidas misleadingly claims this Court has "favorably cited" cases holding that not disclosing evidence in discovery can constitute misconduct. (Br.24 (citing *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 176 (2d Cir. 2004))). But this Court only cited those cases for a different issue: Rule 60(b)(3)'s prejudice standard.

Before and after *In re Lawrence*, several district courts in this Circuit have required intentional or reckless wrongdoing to obtain relief under Rule 60(b)(3). For example, one court denied Rule 60(b)(3) relief when the movant failed to show the nonmovant "intentionally altered" important metadata. *Jeanty v. Cerminaro*, 16-cv-966 (BKS/TWD), 2023 WL 2559412, at *4 (N.D.N.Y. Feb. 13, 2023), *aff'd sub nom. Jeanty v. City of Utica*, 23-369, 2024 WL 4429417 (2d Cir. Oct. 7, 2024) (summary order); *see also, e.g.*, *Geo-Grp. Commc'ns*, 2023 WL 6235160, at *15. Another court denied Rule (60)(b)(3) relief where the movant failed to establish that its adversary "intentionally misrepresented facts." *Gomez v. Banco Bilbao*

*Vizcaya, S.A.*, 92 Civ. 7863 (RPP), 1994 WL 414483, at *1 n.1 (S.D.N.Y. Aug. 8, 1994). Even *Thomas v. City of New York*, which quoted the First Circuit's *dicta* regarding accidental or inadvertent misconduct, *see infra*, pp. 53-54, ultimately concluded that "the misconduct was knowing and intentional"—indeed, it "reek[ed] of underhand dealing." 293 F.R.D. 498, 503-05 (S.D.N.Y. 2013), *aff'd sub nom. Thomas v. McAullife*, 691 F. App'x 671 (2d Cir. 2017) (summary order).

  b. The Cases Adidas Cites Either Support
     Thom Browne Or Are Unpersuasive

Adidas's "overwhelming" "weight of authority" is an illusion. Several of the cases it cites do not even address the level of culpability required to show "misconduct." Several that do address that question support Thom Browne's position.

Adidas cites *Stridiron v. Stridiron*, 698 F.2d 204 (3d Cir. 1983), for the proposition that "inadvertent" or "accidental" discovery omissions may constitute Rule 60(b)(3) misconduct. (Br.24 n.3). But *Stridiron* holds nothing of the sort. Rather, *Stridiron* observes—uncontroversially—that the "[f]ailure to disclose or produce evidence requested in discovery can constitute Rule 60(b)(3) misconduct." 698 F.2d at 207. *Stridiron* then addresses the particular "failure to disclose" at issue: the plaintiff's failure to disclose, in response to a "yes" or "no" interrogatory, that he had previously been married. *Id.* at 206-07. This was "a

51

serious misrepresentation of a material matter," an "abuse," and a "possible …

fraud." *Id.* at 207.

Adidas similarly cites *Lonsdorf v. Seefeldt*, 47 F.3d 893 (7th Cir. 1995).

*Lonsdorf* suggests that "Rule 60(b)(3) applies to both intentional and unintentional

*misrepresentations*." *Id.* at 897 (emphasis added). This was apparently a reference

to defense counsel's summation, which the court was at pains to emphasize was

delivered in good faith, even if factually inaccurate. *See id.* at 896, 898. But there

is no question the *discovery violation* in *Lonsdorf* was intentional: defendant

produced a "fraudulently altered" document and this doctored document became

the centerpiece of the successful defense. *Id.* at 896-98.

Adidas also cites the D.C. Circuit's decision in *Summers*. But as explained

above, *Summers* said nothing about "inadvertent" or "accidental" discovery

failures. Rather, *Summers* involved "repeated, affirmative" and "intentional" acts

of concealment. As in *Stridiron* and *Lonsdorf*, this affirmative concealment of an

unhelpful fact is precisely the type of misconduct that may warrant Rule 60(b)(3)

relief, and a stark contrast with the inadvertent discovery failure in this case.

Even the cases that contain language appearing to support Adidas's position

involved intentional or reckless conduct. In *West v. Bell Helicopter Textron, Inc.*,

for example, the court held that "defendants failed to produce information not due

to oversight, inadvertence, or counsel's own ignorance of its existence" but rather

based on a "conscious, deliberate choice." 803 F.3d 56, 70-72 (1st Cir. 2015). Similarly, in *Morgan v. Tincher*, an interrogatory asked the defendant police officer to identify any other lawsuits to which he was a party. Despite being sued in another case in which he was represented by the same attorney, the police officer did not supplement his interrogatory response and gave misleading testimony when asked about other claims against him. This smacked of deliberate misconduct. 90 F.4th 172, 175-76 (4th Cir. 2024). In *Rozier v. Ford Motor Co.*, the nonmovant did not amend its response to an interrogatory to reflect its discovery of a critical document—or produce the document—and the court found that it failed to act "in good faith." 573 F.2d 1332, 1339-42, 1349 (5th Cir. 1978); *see also, e.g.*, *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1323, 1328 (Fed. Cir. 2016) (applying 11th Circuit law, and finding that expert witness affirmatively "withheld" critical information in discovery); *Schultz v. Butcher*, 24 F.3d 626, 629-30 (4th Cir. 1994) (key report was withheld at least knowingly).

Almost all the cases that contain language supporting Adidas's position rely on poorly reasoned *dicta* in *Anderson v. Cryovac, Inc.*, 862 F.2d 910 (1st Cir. 1988). In *Anderson*, there was "overwhelming" evidence that the nonmovant had "played possum" regarding the existence of an unfavorable report. *Id.* at 927-29. The court thus had no reason to address whether a purely innocent or accidental

discovery failure could give rise to 60(b)(3) relief. It did so anyway, explaining in extended *dicta* that "misconduct" would be "pleonastic"—that is, redundant—of "fraud" and "misrepresentation" unless it permitted relief even in the absence of "nefarious" intent. *Id.* at 923. This led it to an "expansive" definition of misconduct. *Id.*

The court adopted this superfluity analysis from a footnote in an Eleventh Circuit case that was also *dicta*. *Id.* (citing *United States v. One (1) Douglas A-26B Aircraft*, 662 F.2d 1372, 1374-78, n.6 (11th 1981)). But as explained *supra*, pp. 42-43, "misconduct" retains significant independent meaning when construed according to its plain meaning to require proof of culpability. The court's application of the canon against surplusage was obviously wrong.

The First Circuit, moreover, did not stop at adding "innocent mistake" to the list of terms in Rule 60(b)(3). It went on to add "further embellishments" in the form of a burden shifting framework in which the movant either would or would not have the burden of proving prejudice depending on the nonmovant's level of fault. *Anderson, Inc.*, 862 F.2d at 925-27. This is because, per the First Circuit, "[t]he concept of misconduct seems mutable" and "not every instance of nondisclosure merits the same judicial response." *Id.* at 923. Wisely, Adidas stops short of asking this Court to import this portion of the First Circuit's analysis.

54

Nonetheless, it is symptomatic of the First Circuit's deeply flawed interpretation of Rule 60(b)(3) and the problems that arise from that interpretation.

### 5. *Policy Considerations*

Requiring Rule 60(b)(3) movants to show intentional or reckless wrongdoing for relief based on "misconduct" is also supported by weighty policy considerations.

*First*, requiring a robust showing of culpability advances the fundamental interest in the finality of judgments, which is central to Rule 60(b). *See Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986); *see also Brown v. Felsen*, 442 U.S. 127, 131 (1979) (explaining finality interest in *res judicata* context). Requiring a showing of intentional or reckless wrongdoing ensures that judgments remain final unless the movant can demonstrate that the nonmovant acted with a heightened level of culpability. By contrast, Adidas's proposed strict liability rule would undermine the interest in finality by making 60(b)(3) relief too easy to obtain.

*Second*, it makes no sense to require perfection in discovery—particularly when the parties exchange a voluminous amount of electronically stored information. Adidas's strict liability rule would do exactly that—it would impose an impossible standard. Relief would be available under Rule 60(b)(3) even if, as here, a party innocently and accidentally does not produce just a few out of millions of documents. Courts are clear, however, that "[p]erfection is not the rule,

especially with multiple sources of ESI." (Add.28 (citing cases)). Parties need only conduct a "reasonable search" for responsive documents, not "boil the ocean to ensure every potentially responsive item is produced." (Add.29). The Federal Rules likewise do not ask parties to flawlessly execute sprawling ESI discovery processes. Instead, the Rules specifically seek to help parties account for the many challenges of digital discovery. *See* Advisory Committee Notes for 2006 Amendments to Rules 26, 34.

*Third*, an intent/recklessness requirement for Rule 60(b)(3) would not be insuperable and would provide relief against litigants who blind themselves to the existence of discoverable material. A litigant acts recklessly if its conduct entails "an unjustifiably high risk of harm that is either known *or so obvious that it should be known*." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68-69 (2007) (emphasis added). Relief would also be available for certain avoidable accidents, such as "a reckless approach to searching one's files for discoverable material" that resulted in the non-production of an important document—along with other "questionable behavior affecting the fairness of litigation." *Jordan*, 1996 WL 528950, at *6.

### B.    At Minimum, Rule 60(b)(3) Requires Negligence, And Thom Browne Was Not Negligent

Even if Rule 60(b)(3) movants do not need to show intentional or reckless wrongdoing for relief based on "misconduct," a minimum of negligence is required, as the district court held. (Add.27-32). Adidas's proposed test—

56

whereby even innocent and inadvertent mistakes would give rise to relief—is untenable and inconsistent with the Federal Rules governing discovery. *See supra*, pp. 45-46. As the district court explained, "courts do not demand perfection in responding to discovery requests" because doing so would place a disproportionate onus on parties to fulfill discovery requests without even minor, accidental errors. (Add.28).

Adidas argues that whether Thom Browne's nondisclosure of the four emails was negligent is a "predominantly legal" mixed question of fact and law warranting *de novo* review. (Br.23). But negligence is a predominantly factual question that is "generally reviewed deferentially." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990). In the Second Circuit, courts review negligence determinations *de novo* as a formal matter, but this Court has recognized that this rule is against the overwhelming weight of Circuit authority, and that its *de novo* standard is "not so different from the other circuits' more deferential standard of review." *In re M/V MSC Flaminia*, 72 F.4th 430, 446 (2d Cir. 2023).

There is no evidence, let alone clear and convincing evidence, that Thom Browne engaged in intentional or reckless wrongdoing when it did not produce the four emails. *See Fleming*, 865 F.2d at 484. The district court found that Thom Browne did not act intentionally or knowingly (Add.35), and Adidas concedes as much by arguing that Thom Browne's conduct was only negligent (Br.34-41).

Even if the Court concludes that a negligence standard is appropriate for Rule 60(b)(3), however, there is not clear and convincing evidence that Thom Browne did not exercise reasonable care. Adidas had ample opportunity, both before and after the evidentiary hearing, to uncover evidence of Thom Browne's negligence. Yet substantially for the reasons the district court described in detail, the record is clear that Thom Browne fulfilled its discovery obligations in a reasonable manner, and that it did not produce the four emails because of an "inadvertent but understandable mix-up." (Add.34-39).

Adidas's arguments to the contrary rely heavily on the undisputed principle that lawyers have a duty to supervise the nonlawyers who assist them, such as paralegals and third-party discovery vendors. (Br.35-38 (repeatedly citing N.Y. Rules of Pro. Conduct R. 5.3)). But Adidas takes this principle way too far. Thom Browne's lawyers did supervise the non-lawyers who assisted them, yet Adidas criticizes Thom Browne's counsel for not "double-check[ing] Consilio's document compilation." (Br.37). Adidas also seems to suggest that even senior lawyers need to micromanage ESI discovery. That makes no common or financial sense. All that the ethical rules require is supervision "reasonable under the circumstances," N.Y. Rules of Pro. Conduct R. 5.3(a), and the record shows Thom Browne's counsel met this standard.

58

### C.     Even Assuming "Misconduct," Adidas Was Not Prevented From Fully And Fairly Presenting Its Case

To obtain relief under Rule 60(b)(3), the movant must also show that the alleged misconduct "prevented [it] from fully and fairly presenting [its] case." *State St. Bank*, 374 F.3d at 176; *accord* 11 Wright & Miller, Federal Practice and Procedure § 2860 (3d ed. 2024). Because this prejudice standard is the only one endorsed by this Court, Adidas's out-of-Circuit glosses can be ignored. (Br.41-42). Although this prejudice standard is more lenient than 60(b)(2)'s prejudice standard, it is not toothless. Courts in and outside this Circuit routinely deny 60(b)(3) relief on the ground that the movant failed to show that the alleged fraud, misrepresentation or misconduct prevented it from fully and fairly presenting its case. *See, e.g.*, *Genger v. Genger*, 663 F. App'x 44, 51 (2d Cir. 2016) (summary order); *Geo-Grp. Commc'ns.*, 2023 WL 6235160, at *15-16; *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998).

Largely for the reasons explained in Point I, Thom Browne's non-production of the four emails did not prevent Adidas from fully and fairly presenting its case.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should affirm the district court's order denying Adidas's Rule 60(b) motion for a new trial.

59

Dated:      New York, New York
               December 13, 2024

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Julian S. Brod
Christopher Johnson
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880
ashapiro@shapiroarato.com
jbrod@shapiroarato.com
cjohnson@shapiroarato.com

Robert T. Maldonado
WOLF, GREENFIELD & SACKS, PC
605 Third Avenue
New York, New York 10158
(212) 697-7890
robert.maldonado@wolfgreenfield.com

John L. Strand
John L. Welch
WOLF, GREENFIELD & SACKS, PC
600 Atlantic Avenue
Boston, Massachusetts 02210
(617) 646-8000
john.strand@wolfgreenfield.com
john.welch@wolfgreenfield.com

Harley I. Lewin
LEWINCONSULT LLC
72 Commercial Street #5
Portland, Maine 04102
(914) 310-0744
harley@lewinconsult.com

*Counsel for Defendant-Appellee*
*Thom Browne, Inc.*

60

## **CERTIFICATE OF COMPLIANCE**

1.  The undersigned counsel of record for Defendant-Appellee Thom Browne, Inc. certifies pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1 that the foregoing brief contains 13,321 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature of Microsoft Word.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font of Times New Roman.

Dated:    December 13, 2024

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
